# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| **IN RE WIRELESS TELEPHONE RADIO FREQUENCY EMISSIONS PRODUCTS LIABILITY LITIGATION** | MDL No. 1421 <br><br> Civil Action No. 01-MD-1421 |

**THIS DOCUMENT RELATES TO:**

*Dahlgren v. Audiovox, et al.* (D. D.C.)
*Horn v. Motorola, Inc., et al.* (W.D. Tex.)
*Murray, et al. v. Motorola, Inc., et al.* (D. D.C.)
*Schofield v. Matsushita Electric Corp. et al.* (D. D.C.)
*Cochran, et al. v. Audiovox, et al.* (D. D.C.)
*Keller, et al. v. Nokia, Inc., et al.*, (D. D.C.)
*Schwamb, et al. v. Qualcomm, Inc., et al.* (D. D.C.)
*Agro, et al. v. Motorola, Inc., et al.* (D. D.C.)
*Barrett, et al. v. Nokia Corp., et al.* (N.D. Ga.)

# DEFENDANTS' RESPONSE AND OPPOSITION TO
# PLAINTIFFS' MOTIONS TO REMAND

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................................iii

INTRODUCTION AND BACKGROUND..............................................................................1

I.    Remand Briefing in the Morganroth, *Horn* and *Barrett* cases.............................................2

     A.    The Morganroth Cases ..............................................................................3

     *B.*    *Barrett* ...............................................................................................3

     *C.*    *Horn* ..................................................................................................4

II.    Defendants' Response to the Remand Motion In *Dahlgren* ...............................................4

     A.    Procedural History.....................................................................................5

     B.    The Failure To Warn Allegations In *Dahlgren* Are Substantially Similar, If Not Identical, To Those Made In The *Pinney* Cases.............................................6

     C.    Dahlgren's Challenges To The Comprehensive Regulatory Scheme Governing Wireless Phone Safety Create Federal Question Jurisdiction...............9

          1.    Dahlgren's Fraud Claims Will By Necessity Require This Court To Pass On The Validity Of The Federal RF Standards To Protect Public Health. ........................................................................................9

          2.    Dahlgren's Request For A Warning Directly Challenges The Federal Regulatory Scheme That Has Determined No Such Warnings Are Necessary..................................................................11

          3.    Requiring Additional Warnings Based On Maryland And District Of Columbia Law Would Undermine Congress's Goal Of Uniform Federal Regulation. ..................................................................12

          4.    Claiming That The SAR Testing Process Is Not "Meaningful Or Objective" Puts The FCC-Approved SAR Measurement Process, And Therefore the FCC Regulations Themselves, In Dispute...................14

     D.    Dahlgren Cannot Plead Around The Comprehensive Federal Scheme By Including Disclaimers And Asserting Only State-Law Claims ............................16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. NVR Homes, Inc.*,
    135 F. Supp. 2d 675 (D. Md. 2001) ................................................................ 10

*Alicke v. MCI Comm. Corp.*,
    111 F.3d 909 (D.C. Cir. 1997) ....................................................................... 10

*Drawhorn v. Qwest Communications, Inc.*,
    121 F. Supp. 2d 554 (E.D. Tex. 2000)............................................................ 13

*Frayler v. New York Stock Eschange, Inc.*,
    118 F. Supp. 2d 448 ........................................................................................ 13

*In re Wireless Tele. Radio Frequency Emissions Prods. Liab. Litig.*,
    No. MDL 1421, 2003 WL 758710 (D. Md. Mar. 5, 2003) ............................ 11, 12, 13, 14

*In re Wireless Telephone Radio Frequency Emissions Products Liability Litigation*,
    216 F. Supp. 2d 474 (D. Md. 2002) ......................................................passim

*Missouri ex rel. Nixon v. Axces, Inc.*,
    No. 98-0416-CV-W-2, 1998 WL 1034595, at *2 (W.D. Mo. Dec. 16, 1998)................. 13

*Ormet Corp. v. Ohio Power Co.*,
    98 F.3d 799, 806 (4th Cir. 1996)................................................................... 13

**Statutes**

21.U.S.C. § 360................................................................................................. 12

**Other Authorities**

Cell Phone Facts:  Consumer Information on Wireless Phones, FDA/FCC Website, available at
    www.fda.gov/cellphones/qa.html................................................................. 12

FCC Office of Engineering and Technology, *Evaluating Compliance with FCC Guidelines for
    Human Exposure to Radiofrequency Electromagnetic Fields*, August 1997................... 15

Office of Engineering and Technology,
    *Evaluating Compliance with FCC Guidelines for Human Exposure to Radiofrequency
    Electromagnetic Fields*, Update June 2001................................................... 15

Pursuant to this Court's scheduling order of February 12, 2003, the defendants in the above-captioned cases hereby submit their opposition to the various plaintiffs' motions for remand.

## INTRODUCTION

This Court's June 21, 2002 Opinion[1] confirms that it has federal question jurisdiction over three sets of cases recently transferred by the Judicial Panel on Multidistrict Litigation ("JPML") and now pending under docket MDL No. 1421: (1) six cases filed in the District of Columbia Superior Court (*Murray, Schofield, Cochran, Keller, Schwamb,* and *Agro*) (the "Morganroth cases"); (2) two cases alleging a brain tumor filed in Texas and Georgia state courts (*Horn* and *Barrett*); and (3) a case challenging the adequacy of defendants' warnings filed in the District of Columbia Superior Court (*Dahlgren*). Like the *Pinney* cases at issue in *In re Wireless*, plaintiffs' claims in these three sets of cases all challenge the comprehensive federal regulations governing radiofrequency ("RF") emissions and wireless telephones.

For example, the Morganroth and *Barrett* plaintiffs seek a ruling that the FCC's RF emissions regulations do not adequately protect public health and that FCC-compliant phones are "unreasonably dangerous." (*See, e.g., Schofield* Cmpl. ¶¶ 38-39, 88, *Barrett* Cmpl. ¶¶ 26, 107, 113) Indeed, the Morganroth and *Barrett* cases specifically allege that the sale of FCC compliant phones constitutes "battery," that such phones are not fit for their intended purpose under state warranty law, and that phones sold without protective devices such as a headset or speaker phone adapter are unsafe. (*See* e.g. *Schofield* Cmpl. ¶¶ 94, 111-116, 139-141; *Barrett* Cmpl. ¶¶ 115, 128-123,156-158) And the plaintiff in *Dahlgren* seeks warnings that FCC-compliant phones could cause adverse biological health effects. (*Dahlgren* Cmpl. ¶¶ 43, 69, 83-

---

[1]   *In re Wireless Tele. Radio Frequency Emissions Prods. Liab. Litig.*, 216 F. Supp. 2d 474 (D. Md. 2002) (hereinafter "*In re Wireless*").

85, Prayer for Relief at (i))  Each of these cases is predicated on an alleged link between RF emissions from wireless telephones and human health effects.

This Court has ruled that the only way a court can resolve claims that are premised on alleged health risks of FCC-compliant wireless telephones is to "pass judgment on the validity of the federal RF standards." *In re Wireless*, 216 F. Supp. 2d at 491.  Because each of the cases pending before this Court constitutes a challenge to the FCC's RF emissions standards, and because "[d]efendants have the right" to have that issue resolved in federal court, each case presents a substantial federal question.  *Id*. at 491-92.  Plaintiffs cannot avoid this conclusion by arguing that they are "masters of their complaint."  As this Court held, "[p]laintiffs may not deny defendants their right to have decisions concerning RF safety made in a federal forum by labeling their claims exclusively under state law."  *Id*. at 493.

In Part One of this response, defendants describe the status of remand briefing in the Morganroth, *Horn* and *Barrett* cases, which are either fully briefed or briefing has been stayed.  In Part Two, defendants provide their response to the remand motion pending in *Dahlgren*.  The briefing in all the cases demonstrates that the remand motions should be denied.

## I.    REMAND BRIEFING IN THE MORGANROTH, *HORN* AND *BARRETT* CASES

As described in more detail below, remand motions have been filed and fully briefed in the Morganroth cases.  Remand motions in *Horn* and *Barrett* were filed, but briefing was not completed because the parties agreed to a stay of all proceedings.  As this Court noted in its February 12, 2003 scheduling order, "the issues presented [in the recently-transferred cases] are similar to those in *Brower v. Motorola, Inc.*, *et al.*, CCB-02-2089, which has been both briefed and argued."  Indeed, in response to the Court's February 12, 2003 scheduling order, the *Barrett* plaintiffs expressly joined in the *Brower* remand briefs.  Thus, with respect to the Morganroth cases and *Barrett*, defendants rest on their prior briefing, which is identified below.

*Horn*, as described below, is the subject of an agreed stay and, therefore, no briefing is necessary at this juncture.

### A.    The Morganroth Cases

The Morganroth cases raise allegations very similar to those in *Brower*. Both sets of cases challenge the adequacy of the FCC's SAR standard. Plaintiffs request damages and other relief caused by defendants' alleged failure to adopt equipment modifications that the FCC has rejected ("protective devices such as, but not limited to, a headset" and "shielding"), alleged improper "influencing" of the FCC to adopt a defective SAR standard, and alleged failure to warn about wireless phone hazards. (*See, e.g., Murray* Cmpl. ¶¶ 40-41, 45, 47-49, 73(b), 74(i), 124, 134(m).)

Prior to transfer by the JPML, the six Morganroth cases had been consolidated, and the Court permitted consolidated briefing on plaintiffs' various motions to remand. After that briefing was completed, this Court handed down its June 21, 2002 decision denying remand in the *Pinney* cases. *See In re Wireless*, 216 F. Supp. 2d at 474. That decision resulted in supplemental briefing in the District of Columbia cases. (*See* Ex. A, Defendants' Notice of Tag-Along Actions and Motion for a Stay, at 7-8.) Defendants' opposition to the *Brower* remand motion also makes arguments equally applicable to the District of Columbia cases. With respect to the Morganroth cases, defendants stand on their prior papers filed in the Morganroth cases, as well as the arguments in the briefs filed in the *Pinney* and *Brower* cases, and will not burden the Court with additional filings regarding remand.

### B.    *Barrett*

The allegations in *Barrett* are also similar to those in *Brower*. No motion to remand was filed in *Barrett* prior to the JPML's transfer. In response to this Court's February 12, 2003 scheduling order, the plaintiffs in *Barrett* filed a motion for remand but did not

separately brief the remand question, instead joining in the *Brower* remand briefs. Accordingly, with respect to *Barrett*, defendants rest on their briefs in opposition to the *Brower* remand motion and the oral argument presented at the November 1, 2002 hearing on the *Brower* motion.

### C.     Horn

In the *Horn* case, plaintiff and defendants have agreed to a stay of all proceedings pending a decision by the United States Court of Appeals for the Fourth Circuit in *Newman v. Motorola*. Accordingly, this opposition does not address the remand motion filed in *Horn* prior to transfer by the JPML.[2]

## II.     DEFENDANTS' RESPONSE TO THE REMAND MOTION IN *DAHLGREN*

For the reasons set forth in this Court's earlier opinion and described in detail below, *Dahlgren* is removable under the "substantial federal question" and "artful pleading" doctrines.[3] Plaintiff in *Dahlgren* seeks to hold the defendants liable for failing to do more than the FCC has mandated. While the FCC has set specific guidelines for the manufacture and sale of wireless phones, plaintiff contends that defendants' failed to take additional steps -- warning the public of alleged "risks" that the FCC and FDA have affirmatively determined are scientifically unsupported, and informing the public that the FCC's SAR levels are not "meaningful" because they are purportedly "not based on standardized tests, purportedly provide

---

[2]     In addition to asserting that the *Horn* case raises substantial federal questions, the defendants assert that there is complete diversity between plaintiff and all properly named defendants. Accordingly, this Court has jurisdiction of *Horn* pursuant to 28 U.S.C. § 1332 as well as 28 U.S.C. § 1331.

[3]     Defendants also believe that the "complete preemption" doctrine and "federal officer" removal statute support removal of *Dahlgren* as they did in the *Pinney* cases. In light of the Court's earlier ruling, however, defendants will not set forth that analysis here. To preserve the argument, however, defendants incorporate by reference the argument made in their Memorandum of Law in Opposition to the Consolidated and Renewed Motion for Remand in the *Pinney* cases.

no assurances of accuracy, and allegedly cannot be a source of objective comparison for the consuming public." (Cmpl. ¶¶ 20, 74)  Because these claims would require this Court to evaluate whether the federal regulatory scheme adequately protects the public health, plaintiff's claims raise a substantial federal question.

### A.      Procedural History

Plaintiff originally filed this case on May 10, 2002 in the United States District Court for the District of Maryland, and it was assigned in the ordinary course to this Court. Shortly thereafter, this Court found that the "allegations made in this action involve questions of fact common to those in the action entitled *In re: Wireless Telephone Radio Frequency Emissions Products Liability Litigation*, MDL 1421," and transferred this case into MDL No. 1421.  The transfer was accomplished, in this Court's words, "pursuant to my authority as the Judge assigned to said Multidistrict Litigation."  (*See* 5/14/02 Order, attached as Ex. B)

However, after its transfer into MDL No. 1421, plaintiff voluntarily dismissed the case, only to re-file a substantively identical complaint, asserting the same claims and seeking the same relief, in the Superior Court for the District of Columbia.  As in the initial complaint, plaintiff seeks damages and declaratory and injunctive relief on behalf of a putative class of persons who purchased wireless handheld telephones in Maryland and the District of Columbia. (Cmpl. ¶¶ 1, 18)  Plaintiff raises claims for violations of the Maryland Consumer Protection Act (Cmpl. ¶¶ 87-95) and the D.C. Consumer Protection Procedures Act (Cmpl. ¶¶ 96-102), and for unjust enrichment (Cmpl. ¶¶ 103-106).  The basic theme of the *Dahlgren* complaint is that while the wireless phones sold to plaintiff were fully compliant with FCC regulations, the warnings that came with those phones failed to alert plaintiff to the alleged "conflicting scientific studies and industry debate concerning the safety risks associated with the use of WHHPs, the SAR levels associated with each WHHP, and the consumer's ability to compare the RFR exposure

associated with each WHHP before making any purchase."  (Cmpl. ¶ 85)  Plaintiff seeks damages, injunctive relief (in the form of additional warnings not required by the FCC), and funds for studies to: (1) ascertain the extent of any health risk; and (2) set a "standardized" SAR testing method other than the one approved by the FCC.  (Cmpl., Prayer for Relief)

Defendants timely removed this case to the United States District Court for the District of Columbia on October 11, 2002, and that same day informed the Judicial Panel on Multidistrict Litigation (the "JPML," or "Panel") that *Dahlgren* was a tag-along action to MDL No. 1421.  Plaintiff moved to remand shortly thereafter, but that motion and all other activity in the case was stayed pending transfer into MDL No. 1421.  (*See* 11/6/02 Stay Order, Ex. C)  On November 21, 2002, the Panel issued a Conditional Transfer Order, which became a Final Transfer Order on December 9, 2002.  (*See* 11/21/02 Transfer Order, Ex. D)

> **B.    The Failure To Warn Allegations In *Dahlgren* Are Virtually The Same As Those Made In The *Pinney* Cases.**

In the *Pinney* cases, plaintiffs acknowledged "that Defendants are licensed by the FCC to provide wireless phones[] and that phones are manufactured" and sold "in accordance with these licenses and other information provided by the FCC."  *In re Wireless*, 216 F. Supp. 2d at 487.  Yet, the *Pinney* plaintiffs alleged that defendants: (1) "failed to warn consumers about adverse health risks associated with RF emissions from wireless phones"; (2) "engaged in deceptive acts and practices by 'making false and misleading oral and written statements' about the safety of wireless phones in violation of Maryland's Consumer Protection Act"; and (3) "fraudulently 'misinformed, misled, and deceived' consumers into believing in the safety of the wireless phone."  *In re Wireless*, 216 F. Supp. 2d at 487.  In reviewing the *Pinney* complaints, the Court noted that: "In plaintiffs' view, any statements by defendants portraying the phones as 'safe' because they comply with FCC standards are fraudulent and deceitful because the 'FCC

has declared that it does *not* consider itself the 'expert agency' for evaluating the health effects' of radiofrequency radiation." *Id*. at 488. The *Pinney* plaintiffs tried to bolster this position by suggesting that such "safety 'advertisements' have been challenged by the FDA," citing to a July 19, 1993 letter from Elizabeth Jacobson, Deputy Director of the FDA's Center for Devices and Radiological Health. *Id*. The Court held that these allegations, among others, "put the validity of the federal regulations, and the process by which they were developed, directly into dispute." *Id*.

In *Dahlgren*, plaintiff has asserted virtually *identical* claims, including, with respect to *Pinney* specifically, claims under the same statute (the Maryland Consumer Protection Act). For example, plaintiff specifically acknowledges that the defendants cannot manufacture phones or sell service without an FCC license, and that the phones are manufactured and sold pursuant to the licenses granted by the FCC. (Cmpl. ¶¶ 27-32) Plaintiff further alleges that defendants (1) "failed to warn" her and the class about "the safety risks associated with the use of their WHHPs" (Cmpl. ¶¶ 20(a), 43); (2) "made representations and/or omissions regarding the potential risks associated with their WHHPs which had the capacity[,] tendency, or effect of deceiving Plaintiff and the Class" (*id*. ¶ 91); and (3) made statements that were "false and misleading" about the safety of cellular phones (*id*. ¶ 63). As in the *Pinney* cases, plaintiff asserts that any claim that the FCC SAR standard is a "safety limit" is false because "the FCC has stressed that they are not a public health agency and do not have any expertise in the area of WHHP safety" (*id*. ¶ 78). And, just as in the *Pinney* case, plaintiff cites to the same July 19, 1993 letter from Elizabeth Jacobson to Tom Wheeler to bolster her claims of "industry deception" (*id*. ¶ 45). In fact, many of the substantive allegations in the *Dahlgren* complaint

repeat, virtually verbatim, the allegations in the *Pinney* complaints.[4]  Though plaintiff repeatedly attempts to disclaim the federal interests evoked in her complaint in an attempt to separate herself from the *Pinney* plaintiffs (*see, e.g.,* Cmpl. ¶¶ 4-5, 18), the general theme is identical: that defendants should have added additional warnings and other information contrary to the requirements and statements of the FCC before selling their phones to the public.  (Cmpl. ¶¶ 2, 5-6, 85)

Moreover, like the *Pinney* plaintiffs, Dahlgren seeks more than merely damages, but rather an affirmative change in conduct in Maryland and the District of Columbia, which would be different -- in a myriad of ways -- than that which the FCC requires nationally. Specifically, plaintiff seeks:

- an injunction preventing defendants "from continuing in any manner the violations alleged in this Complaint," *see* Cmpl., Prayer For Relief, at (c);

- equitable relief in the form of a declaration that defendants' conduct "constitutes violations of applicable statutory and common law in Maryland and the District of Columbia," *see id.* at (g);

---

4    *Compare Dahlgren* Cmpl. ¶ 26 *with Farina* Am. Cmpl. ¶ 42, *Gilliam* Am. Cmpl. ¶ 45, and *Pinney* Am. Cmpl. ¶3; *Dahlgren* Cmpl. ¶ 27 *with Farina* Am. Cmpl. ¶ 43, *Gilliam* Am. Cmpl. ¶ 46, and *Pinney* Am. Cmpl. ¶¶ 51, 53; *Dahlgren* Cmpl. ¶ 28 *with Farina* Am. Cmpl. ¶ 44, *Gilliam* Am. Cmpl. ¶ 47, and *Pinney* Am. Cmpl. ¶ 54; *Dahlgren* Cmpl. ¶ 30 *with Farina* Am. Cmpl. ¶ 45, *Gilliam* Am. Cmpl. ¶ 48, and *Pinney* Am. Cmpl. ¶ 55; *Dahlgren* Cmpl. ¶ 34 *with Farina* Am. Compl ¶¶ 58-59 and *Gilliam* Am. Cmpl. ¶¶ 61-62; *Dahlgren* Cmpl. ¶ 35 *with Farina* Am. Cmpl. ¶¶ 60-62 , *Gilliam* Am. Cmpl. ¶¶ 63-65, and *Pinney* Am. Cmpl. ¶ 63, 71-73; *Dahlgren* Cmpl. ¶ 36 *with Farina* Am. Cmpl. ¶ 63, *Gilliam* Am. Cmpl. ¶ 66, and *Pinney* Am. Cmpl. ¶ 74; *Dahlgren* Cmpl. ¶ 37 *with Farina* Am. Cmpl. ¶ 64, *Gilliam* Am. Cmpl. ¶ 67, and *Pinney* Am. Cmpl. ¶ 75; *Dahlgren* Cmpl. ¶ 38 *with Farina* Am. Cmpl. ¶ 65, *Gilliam* Am. Cmpl. ¶ 68, and *Pinney* Am. Cmpl. ¶ 78; *Dahlgren* Cmpl. ¶ 44 *with Farina* Am. Cmpl. ¶ 71, *Gilliam* Am. Cmpl. ¶ 74, and *Pinney* Am. Cmpl. ¶ 84; *Dahlgren* Cmpl. ¶ 45 *with Farina* Am. Cmpl. ¶ 72, *Gilliam* Am. Cmpl. ¶ 75, and *Pinney* Am. Cmpl. ¶ 85; *Dahlgren* Cmpl. ¶ 46 *with Farina* Am. Cmpl. ¶ 73, *Gilliam* Am. Cmpl. ¶ 76, and *Pinney* Am. Cmpl. ¶ 86; *Dahlgren* Cmpl. ¶ 67 *with Farina* Am. Cmpl. ¶ 75, *Gilliam* Am. Cmpl. ¶ 78, and *Pinney* Am. Cmpl. ¶ 88; *Dahlgren* Cmpl. ¶ 83 *with Farina* Am. Cmpl. ¶ 80, *Gilliam* Am. Cmpl. ¶ 83 and *Pinney* Am. Compl. ¶ 92; *Dahlgren* Cmpl. ¶ 84 *with Farina* Am. Cmpl. ¶ 81 and *Gilliam* Am. Cmpl. ¶ 84; *Dahlgren* Cmpl. ¶ 85 *with Farina* Am. Cmpl. ¶ 82, *Gilliam* Am. Cmpl. ¶ 85, and *Pinney* Am. Cmpl. ¶ 94.

- equitable relief in the form "of a fund created by Defendants for the purpose of testing safety associated with WHHPs and for the purpose of establishing standardized protocols for testings [sic] SAR levels," *see id.* at (h); and

- an injunction forcing defendants to give a "revised public warning and statements regarding the scientific debate regarding the potential risks of using WHHPs," *see id.* at (i).

Thus, just as in the *Pinney* cases, the class purportedly represented and the remedy requested will require this Court to "evaluate whether the FCC has been authorized by Congress to act as the final authority on the regulation of RF emissions from wireless phones, and whether the current RF requirements promulgated by the FCC adequately protect the public's health." *In re Wireless*, 216 F. Supp. 2d at 489.

### C. Plaintiff's Challenges To The Comprehensive Regulatory Scheme Governing Wireless Phone Safety Create Federal Question Jurisdiction.

The only difference between this case and the *Pinney* cases is that plaintiff here is not seeking a headset requirement. Seeking a mandatory state law-based warning, however, is just as much of a challenge to the federal regulatory scheme as a state law-based headset requirement. Just as federal agencies could require a headset, but have not, the agencies could require warnings but have not. And plaintiff's allegations that the SAR testing system mandated by the FCC is "meaningless" is yet an additional challenge to the federal scheme that relies on the SAR exposure limit to regulate RF emissions from wireless phones. Indeed, plaintiff's complaint presents a direct challenge to the federal regulatory scheme in several ways, each discussed below.

### 1. Plaintiff's Fraud Claims Will By Necessity Require This Court To Pass On The Validity Of The Federal RF Standards To Protect Public Health.

Plaintiff's fraud claims rely primarily on the allegation that defendants failed to warn of the alleged risks and adverse biological effects from wireless phone use. (*See, e.g.,*

Cmpl. ¶¶ 20(a), 35-36, 43, 65, 91, 99.)  For example, plaintiff alleges that defendants failed to warn her and the class of a number of studies that purportedly found "adverse" and "harmful biological effects" from RF emissions that raise "serious and credible questions regarding whether the RFR, to which WHHP users were and are exposed, posed a risk to their health." (*Id.* ¶¶ 35-37)  In addition, plaintiff alleges that Motorola's public statement that RF emissions "from wireless phones pose no known health risk" was "false." (*Id.* ¶ 69)  Under the law applicable to plaintiff's claims, to prove that statements of safety (or failure to make statements concerning alleged adverse health effects) constituted fraud, plaintiff will have to prove that wireless phone use does lead to adverse or harmful biological affects and that RF emissions do pose a known health risk.  *See, e.g., Alicke v. MCI Communications Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997) ("[T]o state a claim based upon an unfair trade practice, the plaintiff must allege that the defendant made a material misrepresentation or omission that has a tendency to mislead."); *Adams v. NVR Homes, Inc.*, 135 F. Supp. 2d 675, 697 (D. Md. 2001) (Maryland Consumer Protection Act claim failed when "the record does not indicate that any of the [] defendants' general statements . . . were actually false at the time that such statements were made").

Claims that there are risks of adverse health effects from wireless phone use and that statements of safety are "false" directly contradict the FCC's and the FDA's statements that phones that comply with the 1.6 SAR standard do not present any known health risks.  *In re Wireless,* 216 F. Supp. 2d at 489 & n.17 (quoting from FCC and FDA joint website that "there are no known risks from exposure to RF emissions from wireless phones.").  Thus, because the central premise of plaintiff's complaint is that wireless phone use has adverse health risks, the only way a court can resolve this dispute is for it to pass judgment on the validity of the federal RF standards by, among other things, evaluating "whether the current RF requirements

promulgated by the FCC adequately protect the public's health." *Id*. at 489.  A substantial federal question exists here because -- if this issue is to be litigated at all -- "Defendants have the right to have such an evaluation take place in federal court." *Id.* at 491-92.

> **2.    Plaintiff's Request For A Warning Directly Challenges The Federal Regulatory Scheme That Has Determined No Such Warnings Are Necessary.**

Plaintiff's efforts to require state law-based "warnings" further challenges the federal regulatory scheme.  As this court has recognized, federal RF emission standards are a product of the comprehensive federal regulation of wireless telephones, dependent upon collaboration between and among different federal agencies to achieve a uniform result. *Id.* at 486-87, 490; *In re Wireless Tele. Radio Frequency Emissions Prods. Liab. Litig.*, No. MDL 1421, 2003 WL 758710, at *2 (D. Md. Mar. 5, 2003) (hereafter "*In re Wireless II*") ("[I]t is apparent that the FCC and the FDA share significant responsibility for the regulation of environmental, health, and safety matters related to WHHPs.")  The FDA's involvement is particularly important in this interagency collaborative effort "because of its authority over radiation emitting products pursuant to the Electronic Product Radiation and Control Act," 21 U.S.C. § 360ii; *In re Wireless*, 216 F. Supp. 2d at 485-86.

There is no question that the need, if any, for warnings is part of the comprehensive federal regulatory scheme governing wireless phones.  Indeed, as part of this comprehensive scheme, the FDA has the *obligation* to require warnings or additional labels if it determines that they are "necessary for the protection of the public health and safety." 21 U.S.C. §§ 360kk, 360kk(a)(1).  The FDA has, in specific reliance on the multi-agency approach which has established the SAR limit, declined to require additional warnings because the FCC regulations governing wireless phones *are* sufficient to protect public health. *In re Wireless II*, 2003 WL 758710, at * 6 (FDA's support for policy decisions behind RF regulations are clear

"not only implicitly by its decision not to require any stronger action under 21.U.S.C. § 360kk, but also explicitly by its recent adoption of the joint FDA-FCC website addressing cell phone health and safety."); *see also* (Ex. E, Cell Phone Facts: Consumer Information on Wireless Phones, FDA/FCC Website, available at www.fda.gov/cellphones/qa.html ("the [FDA] has authority to take action if wireless [phones] are shown to emit radio frequency energy (RF) at a level that is hazardous to the user. In such a case, FDA could require the manufacturers of wireless phones to notify users of the health hazard . . . . [T]he existing scientific data do not justify FDA regulatory actions . . . .")); *In re Wireless*, 216 F. Supp. 2d at 485 (SAR limits are set at "one fiftieth of the point at which RF energy begins to cause any unhealthful thermal effect."); *In re Wireless II*, 2003 WL 758710 at *6 n. 20 ("The majority of currently available studies suggests . . . that there are no significant non-thermal human health hazards. . . . [t]he FCC exposure guidelines adequately protect the public from all scientifically established harms that may result from RF energy fields generated by FCC licensees.") (internal quotation marks omitted). Requesting a warning that there are studies that report adverse health effects from RF emitted from a wireless phone creates a substantial federal question because it would require this Court to "pass judgment on the validity" of the FDA's decision not to require such a warning. *In re Wireless*, 216 F. Supp. 2d at 491.[5]

3.    **Requiring Additional Warnings Based On Maryland And District Of Columbia Law Would Undermine Congress's Goal Of Uniform Federal Regulation.**

"Congress has expressed its intent on numerous occasions to achieve substantial national uniformity over the operation and regulation of wireless telecommunications services."

---

[5]    *See also In re Wireless II*, 2003 WL 758710, at *6 n.22, noting that the FCC and FDA both share the same position of "refraining from regulating unless and until scientific data supports doing so").

*In re Wireless II*, 2003 WL 758710, at *5; *see also In re Wireless*, 216 F. Supp. 2d at 483-84, 490-91.  Indeed, "Congress's primary goal in regulating wireless service is to develop a seamless and ubiquitous national system of wireless communications."  *In re Wireless*, 216 F. Supp. 2d at 490.  Such uniformity is in the national interest.  *Id*. at 484 (quoting from "the relevant Congressional report" finding that "it is in the national interest that uniform, consistent requirements, with adequate safeguards of the public health and safety, be established as soon as possible").  This Court and many others have held that allegations that threaten the uniformity of a federal regime create substantial federal questions requiring adjudication, if at all, in federal court.  *See, e.g., Id.* at 490; *Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 807 (4th Cir. 1996) ("Where the resolution of a federal issue in a state-law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for uniformity becomes a substantial federal interest, justifying the exercise of jurisdiction by federal courts.").[6]

Plaintiff's effort to require warnings different than those the FCC and FDA have mandated is an effort to impose state-law standards that threaten the uniformity sought in the federal RF regulatory scheme.  As this Court held:

> While state courts ultimately might conclude that they are preempted from regulating the wireless industry on the basis of RF concerns, the risk of fifty different states articulating fifty different rules about whether and to what extent they may set RF safety standards could create market instability and prevent the

---

[6]    *See also Drawhorn v. Qwest Communications Int'l, Inc.*, 121 F. Supp. 2d 554, 561-64 (E.D. Tex. 2000) (fraud claim based on alleged misstatements of what federal law required properly presented a federal question); *Frayler v. New York Stock Exchange, Inc.*, 118 F. Supp. 2d 448, 450 (federal question created when plaintiff's claims, though couched in state-law terms, revolved around a fundamentally federal regime); *Missouri ex rel. Nixon v. Axces, Inc.*, No. 98-0416-CV-W-2, 1998 WL 1034595, at *2 (W.D. Mo. Dec. 16, 1998) ("A federal forum, either in court or before the FCC, affords greater opportunity for uniformity and consistency in the interpretation and application of this unique body of federal law.").

> maintenance of an unimpeded national network of rapid and efficient telecommunications service, a goal of significant importance to national commerce and security.

*In re Wireless*, 216 F. Supp. 2d at 490-91.  Plaintiff acknowledges that, at a minimum mandating, warnings would decrease wireless phone sales.  (Cmpl. ¶ 43)  Thus, warnings would undermine the balance struck by Congress and the federal agencies in setting the current federal regulations. *In re Wireless*, 216 F. Supp. at 484, 487  (the comprehensive regulatory scheme represents a deliberate policy choice to balance the need to protect the public and the need "to allow communication services to readily address growing marketplace needs."); *see also In re Wireless II*, 2003 WL 758710, at *7 ("Congress passed legislation, and federal agencies collaborated in regulating RF emissions, guided by the objectives of achieving a nationally uniform wireless telecommunications system and balancing the development of that system with the need to protect the public from any harmful effects of RF exposure.").

### 4.    Claiming That The SAR Testing Process Is Not "Meaningful Or Objective" Puts The FCC-Approved SAR Measurement Process, And Therefore the FCC Regulations Themselves, In Dispute.

A substantial federal question also exists because plaintiff claims that the defendants have failed to disclose to consumers a "meaningful" SAR requirement.[7]  Plaintiff appears to believe that the SAR measurements performed by defendants to comply with FCC regulations are not "standardized testing protocols approved by an [sic] federal or scientific authority." (Cmpl. ¶ 3(c); *see also* Cmpl. ¶¶ 74-75, 78-79)  Plaintiff claims that "the SAR levels

---

[7]    Plaintiff's complaint is vague and inconsistent on this point.  At times, the complaint appears to be that until recently, defendants did not disclose the specific SAR levels on wireless phone packages.  (Cmpl. ¶¶ 20(c), 33, 83, 85, Motion for Remand at 3)  At other times, the complaint appears to claim that the manner in which defendants measure SAR is unreliable and "meaningless."  (Cmpl. ¶¶ 3(c), 5, 74, 78)  The question raised by this dual attack is obvious -- if the SAR measurement is meaningless, why does Plaintiff believe it should have been placed on wireless phone packages in the first place?

voluntarily disclosed to the public are not meaningful or objective since these [sic] are not based on standardized tests, [and] provide no assurances of accuracy . . . ." (Cmpl. ¶ 74)  Indeed, plaintiff goes so far as to allege that "there are NO objective safety standards," (Cmpl. ¶ 79) and that "[t]he SAR limit . . . is not a safety limit as claimed by the CTIA." (Comp. ¶ 78)  Plaintiff seeks, as relief in this action, funding to "establish[] standardized protocols for testings [sic] SAR levels." (Cmpl., Prayer for Relief, at (h))

These claims are direct challenges to the federal RF testing regime administered by the FCC.  Plaintiff asserts that the SAR measurements that the FCC *directs* the defendants to perform in order to comply with FCC regulations are invalid.  Indeed, the FCC provides wireless phone manufacturers with a detailed set of SAR measurement system descriptions and requirements, which are used to perform the tests about which plaintiff here complains.  (*See* Ex. F, FCC Office of Engineering and Technology, *Evaluating Compliance with FCC Guidelines for Human Exposure to Radiofrequency Electromagnetic Fields*, August 1997, Ex. G, Supplement C Update June 2001)  The FCC works constantly to evaluate these tests and refine them based on currently available technology.  (*Id.*)  Specifically, the FCC directs manufacturers on:

- *Testing equipment*, including probes, dipoles, sensors, signal sources, head and body models (*see* Ex. G at 11-12);

- *Testing conditions*, including power levels, testing models, channel selection, band selection, duty factors, and operating modes (*see id.* at 12-13);

- *Testing measurement procedures*, including phantom preparation and placement, probe placement, and phone placement and position (*see id.* at 37-42);

- *Testing calculations*, including algorithms, formulae, parameters, and models (*see id.* at 13-15).

Thus, the FCC *directs* the methods and mechanisms by which SAR calculations are performed.

Plaintiff's attack on the methodology by which wireless phones undergo SAR testing -- methodology prescribed by the FCC -- is a further challenge to the FCC's RF

requirements that should be adjudicated, if at all, in a federal court.  The challenge, at its essence, is the same as the *Pinney* plaintiffs' request for a headset requirement.  Any court faced with "such a class and requested remedy necessarily must evaluate whether the FCC has been authorized by Congress to act as the final authority on the regulation of RF emissions from wireless phones, and whether the current RF requirements promulgated by the FCC adequately protect the public's health."  *In re Wireless*, 216 F. Supp. 2d at 488-89.

Altogether, plaintiff's assertion that a failure to provide "meaningful" SAR disclosures because current testing is not "standardized" or is otherwise "meaningless" provokes substantial federal questions which plaintiff cannot plead around in an attempt to escape this Court's jurisdiction.  Plaintiff's allegations -- like the *Pinney* plaintiffs' -- "put the validity of the federal regulations, and the process by which they were developed, directly into dispute."  *Id.* at 488.

### D.    Plaintiff Cannot Plead Around The Comprehensive Federal Scheme By Including Disclaimers And Asserting Only State-Law Claims.

Plaintiff is presumably aware that she cannot directly challenge the comprehensive regulatory scheme governing wireless phones, so she goes out of her way trying to plead around federal jurisdiction.  Indeed, the *Dahlgren* complaint is notable in that plaintiff spends almost as much time describing what she purportedly does *not* assert as what she purportedly does assert.  (*See, e.g.,* Cmpl. ¶¶ 4, 18.)  These disclaimers are telling of plaintiff's true intent, and even a brief reading of plaintiff's claims makes obvious her attempt to artfully plead around federal jurisdiction.

The bottom line, though, is that this is just another "disguised attack on federal law in an area of national importance."  *In re Wireless*, 216 F. Supp. 2d at 479.  Plaintiff seeks different safety measures than those set by the comprehensive regulatory scheme of the

government, *i.e.,* warnings about the safety of wireless phones and the alleged adverse biological consequences of using them. Plaintiff claims that the defendants should have warned her and the public about studies purportedly showing that RF from FCC-compliant wireless phones is unsafe or presents adverse health risks. (Cmpl. ¶¶ 20(a), 20(c), 34-37, 43, 49, 64, 78, 91, 99) But as this Court has already held, plaintiff cannot deny defendants their right to have decisions about RF safety risks made in federal court by disclaiming the federal nature of the claims and labeling them exclusively under state law. *In re Wireless*, 216 F. Supp. 2d at 493.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that plaintiffs' motions for remand be DENIED.

Respectfully submitted,

/s/ Michael Esher Yaggy
Michael Esher Yaggy, Esq.[8]
Jeffrey M. Yeatman, Esq.
Piper Rudnick LLP
6225 Smith Avenue
Baltimore, Maryland 21209-3201
Phone: 410-580-3000
Fax: 410-580-3001

Garrett B. Johnson, Esq.
Terrence J. Dee, Esq.
Michael Slade, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601
Phone: 312-861-2000
Fax: 312-861-2200

Attorneys for Defendant Motorola, Inc.

---

[8] Counsel for all other defendants have given counsel for Motorola, Inc. permission to sign on their behalf.