PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

J. Douglas Pinney, M.D.; Patricia
S. Colonell, individually and on
behalf of all others similarly
situated; Francis J. Farina,
individually and on behalf of all
those similarly situated; Garrett J.
Naquin; Ronald LeBlanc; Judith A.
Kaufman; Asher Rubenstein;
Crystall Gilliam; Dimitri Mack;
Riedy Gimpelson, individually and
on behalf of all others similarly
situated; Sarah Dahlgren, on
behalf of herself and all others
similarly situated; Linda Barrell;
Blayne Minogue; Brian Lane
Barrett; Diana Barrett; David C.
Keller; Marsha L. Keller,
           *Plaintiffs-Appellants*

        v.

Nokia, Incorporated, a/k/a Nokia
Mobile Phones, Incorporated, a/k/a
Nokia Corporation; NEC America,
Incorporated; Ericsson Wireless
Communications, Incorporated,
a/k/a Ericsson, Incorporated; Sprint
PCS Limited Partnership, a/k/a
Sprint PCS, a/k/a Sprint Spectrum,
LLP, a/k/a Sprint Spectrum;
Audiovox Communications
Corporation; Nextel
Communications, Incorporated,

No. 03-1433

FILED
LODGED    ENTERED
RECEIVED
MAR 17 2005
AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY
DEPUTY

a/k/a Nextel Communications of the
Mid-Atlantic, Incorporated, a/k/a
Nextel Partners, Incorporated, a/k/a
Nextel; MATSUSHITA CORPORATION OF
AMERICA, a/k/a Panasonic
Corporation; PHILIPS ELECTRONICS
NORTH AMERICA CORPORATION;
QUALCOMM INCORPORATED; SAMSUNG
ELECTRONICS AMERICA,
INCORPORATED, a/k/a Samsung
Electronics; SANYO NORTH AMERICA,
INCORPORATED, a/k/a Sanyo Business
Systems Corporation, a/k/a Sanyo
North America Group; SONY
ELECTRONICS, INCORPORATED; AT&T
CORPORATION, a/k/a AT&T; VERIZON
MARYLAND, INCORPORATED, a/k/a
Verizon, a/k/a Verizon Wireless,
formerly known as Bell Atlantic
Maryland, Incorporated; VERIZON
COMMUNICATIONS, INCORPORATED,
formerly known as Bell Atlantic
Corporation; VERIZON WIRELESS,
a/k/a Nynex, a/k/a Bell Atlantic
Nynex, a/k/a Bell Atlantic Mobile,
Incorporated, a/k/a Bell Atlantic
NYNEX Mobile; CELLCO
PARTNERSHIP, d/b/a Verizon
Wireless, formerly known as Bell
Atlantic NYNEX Mobile, formerly
known as Bell Atlantic Mobile;
CINGULAR WIRELESS, LLC, formerly
known as BellSouth Mobility,
Incorporated, a/k/a Southwestern

Bell Wireless, formerly known as
Southwestern Bell Mobile Systems,
Incorporated; CINGULAR WIRELESS,
a/k/a Washington/Baltimore Cellular
Limited Partnership; SBC
COMMUNICATIONS, INCORPORATED;
CELLULAR ONE GROUP, a/k/a Cellular
One; VOICESTREAM WIRELESS
CORPORATION; C.E.I., INCORPORATED,
a/k/a Communications Electronics,
a/k/a Communications Electronics,
Incorporated; BALTIMORE BUSINESS
COMMUNICATIONS, INCORPORATED;
COMCAST/METROPHONE; RADIOFONE;
POWERTEL, INCORPORATED; POWERTEL
PCS, INCORPORATED;
POWERTEL/ATLANTA, INCORPORATED;
MITSUBISHI WIRELESS
COMMUNICATIONS, INCORPORATED;
MOTOROLA, INCORPORATED, a
Delaware corporation; CELLULAR
TELECOMMUNICATIONS AND INTERNET
ASSOCIATION, a District of Columbia
corporation; CELLULAR
TELECOMMUNICATIONS INDUSTRY
ASSOCIATION; TELECOMMUNICATIONS
INDUSTRY ASSOCIATION, a/k/a TIA;
NEXTEL PARTNERS OPERATING
CORPORATION,
                    *Defendants-Appellees,*

                         and

WESTINGHOUSE COMMUNICATIONS;
SOUTHERN TELECOM, INCORPORATED,
a/k/a Southern LINC; JOHN DOES
1-100; LGIC CORPORATION;

4                           Pinney v. Nokia, Inc.

Panasonic Corporation; Samsung
SDI Company; Sanyo Corporation;
Sony Corporation; Planet
Cellular Communications,
Incorporated; Visitor Cellular
L.L.C.; Bell South Mobility;
Kyocera Wireless Corporation;
MCI Worldcom Communications,
Incorporated; U.S. West Wireless,
L.L.C., A Colorado corporation; U.
S. West Communications,
Incorporated, a Colorado
corporation; GTE Mobilnet of San
Diego, Incorporated, a Delaware
corporation; GTE Wireless San
Diego, LLC, a California Limited
Liability; Cellular Carriers
Association of California, a
California corporation; AB
Cellular Holdings, LLC, d/b/a LA
Cellular, d/b/a Los Angeles Cellular
Telephone Company,
                              *Defendants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CA-01-1421-CCB; CA-01-1456-CCB; CA-01-3259-CCB;
CA-01-3260-CCB; CA-01-3261-CCB; CA-01-3899-CCB)

Argued: October 1, 2004

Decided: March 16, 2005

Before LUTTIG and MICHAEL, Circuit Judges, and
Jackson L. KISER, Senior United States District Judge
for the Western District of Virginia, sitting by designation

Reversed and remanded by published opinion. Judge Michael wrote the opinion, in which Judge Luttig joined. Senior Judge Kiser wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Michael R. Allweiss, LOWE, STEIN, HOFFMAN, ALLWEISS & HAUVER, L.L.P., New Orleans, Louisiana, for Appellants. Kenneth Winston Starr, KIRKLAND & ELLIS, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** H. Russell Smouse, John C. M. Angelos, Glenn E. Mintzer, LAW OFFICES OF PETER G. ANGELOS, P.C., Baltimore, Maryland; H. Thomas Howell, HOWELL & GATELY, Baltimore, Maryland, for Appellants. Garrett B. Johnson, Terrence J. Dee, Michael B. Slade, KIRKLAND & ELLIS, L.L.P., Chicago, Illinois, for Motorola, Inc. Seamus C. Duffy, Mary Catherine Roper, DRINKER, BIDDLE & REATH, L.L.P., Philadelphia, Pennsylvania, for Cingular Wireless, Inc., SBC Communications, Inc. Mark F. Horning, Thomas M. Barba, STEPTOE & JOHNSON, Washington, D.C., for AT&T Corp., AT&T Wireless PCS, LLC and AT&T Wireless Services, Inc. John H. Beisner, Brian P. Brooks, O'MELVENY & MEYERS, L.L.P., Washington, D.C., for Verizon Wireless, Cellco Partnership. Paul F. Strain, VENABLE, BAETJER AND HOWARD, L.L.P., Baltimore, Maryland; M. King Hill, III, VENABLE, BAETJER AND HOWARD, L.L.P., Towson, Maryland; Jane Fugate Thorpe, Scott A. Elder, ALSTON & BIRD, L.L.P., Atlanta, Georgia, for Cellco Partnership formerly d/b/a Bell Atlantic Mobile and Bell Atlantic Nynex Mobile d/b/a Verizon Wireless, Verizon Maryland, Inc. a/k/a Verizon Wireless, a/k/a Verizon, f/k/a Bell Atlantic-Maryland, Inc., Verizon Communications, Inc., f/k/a Bell Atlantic Corporation, Verizon Wireless, a/k/a Bell Atlantic Nynex, a/k/a Nynex, a/k/a Bell Atlantic Mobile, Inc. f/k/a Bell Atlantic Nynex Mobile, Inc. Thomas Watson, Curtis Renner, WATSON & RENNER, Washington, D.C., for Cingular Wireless, L.L.C. Michael Esher Yaggy, Jeffrey M. Yeatman, PIPER RUDNICK, L.L.P., Baltimore, Maryland, for Motorola, Inc. Steven M. Laduzinsky, Scott A. Hanfling, KANE, LADUZINSKY & MENDOZA, LTD., Chicago, Illinois; Robert B. Green, IRWIN, GREEN & DEXTER, L.L.P., Towson, Maryland, for Cellular Telecommunications and Internet

Association. Michael H. O'Brien, Jason P. Sultzer, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, White Plains, New York; Laura N. Steel, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, Washington, D.C.; John B. Isbister, Harold M. Walter, TYDINGS & ROSENBERG, L.L.P., Baltimore, Maryland, for Samsung Electronics America, Inc., a/k/a Samsung Electronics. Paul S. Schleifman, SHOOK, HARDY & BACON, L.L.P., Washington, D.C.; J. Stan Sexton, Michael D. Moeller, SHOOK, HARDY & BACON, L.L.P., Kansas City, Missouri, for Sprint PCS Limited Partnership, a/k/a Sprint Spectrum; Sprint Spectrum, L.L.C., d/b/a Sprint PCS. Charles P. Goodell, James A. Frederick, GOODELL, DEVRIES, LEECH & DANN, Baltimore, Maryland, for North America, Inc. a/k/a Sanyo North America Group, Sanyo Corporation, Sanyo Business Systems Corporation. Steven M. Zager, Lance Lackey, Robert Pemberton, AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P., Houston, Texas; Paul F. Walter, TYDINGS AND ROSENBERG, L.L.P., Baltimore, Maryland, for Nokia, Inc., a/k/a Nokia Mobile Phones, Inc., and Nokia Corporation. Ray M. Aragon, Raymond B. Biagini, MCKENNA, LONG & ALDRIDGE, L.L.P., Washington, D.C., for Electronics North America Corporation. Eugene A. Schoon, Tamar B. Kelber, SIDLEY, AUSTIN, BROWN & WOOD, L.L.P., Chicago, Illinois, for Voicestream Wireless Corporation a/k/a Voicestream Wireless, Powertel, Inc., Powertel PCS, Inc., Powertel/Atlanta, Inc. Patrick R. Buckler, Walter T. Dudley, MCGUIREWOODS, L.L.P., Baltimore, Maryland; Edward M. Crane, David L. Hanselman, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Chicago, Illinois, for Nextel Communications of the Mid-Atlantic, Inc., Nextel of New York, Inc., and Nextel South Corp. James P. Ulwick, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for NEC America, Inc. Francis A. Citera, GREENBERG & TRAURIG, P.C., Chicago, Illinois, for Electronics Inc., Qualcomm Incorporated. Russell J. Rogers, Lawrence A. Slovensky, MCKENNA, LONG & ALDRIDGE, L.L.P., Atlanta, Georgia, for Partners Operating Corp. and Nextel Partners, Inc. Paul D. Krause, Laura N. Steel, WILSON, ELSER, MOSKOWITZ, EDLEMAN & DICKER, L.L.P., Washington, D.C., for Matsushita Corporation of America, a/k/a Panasonic Corporation, and Sanyo North America, Inc. a/k/a Sanyo North America Group; Sanyo Corporation; Sanyo Business Systems, Corporation. Paul Vishny, Paul Freehling, D'ANCONA & PFLAUM, L.L.C., Chicago, Illinois,

for Telecommunications Industry Association. Mark H. Kolman, Leslie R. Cohen, DICKSTEIN, SHAPIRO, MORIN & OSHINSKY, L.L.P., Washington, D.C., for Audiovox Communications Corp. Charles L. Perry, ANDREWS & KURTH, L.L.P., Dallas, Texas, for Cellular One Group. Matthew T. Covell, Kevin B. Getzendanner, ARNALL, GOLDEN & GREGORY, L.L.P., Atlanta, Georgia, for Mitsubishi Wireless Communications, Inc. Daniel S. Reinhardt, Steven J. Hewitson, TROUTMAN SANDERS, L.L.P., Atlanta, Georgia, for Southern Telecom, Inc. Gregg L. Bernstein, Denis J. Charlesworth, MARTIN, SNYDER & BERNSTEIN, P.A., Baltimore, Maryland; Charles L. Babcock, David T. Moran, James M. McCown, Ryan C. Wirtz, JACKSON WALKER, L.L.P., Dallas, Texas, for Ericsson Inc. Maureen Ellen Murphy, MURPHY & MURPHY, L.L.C., Catonsville, Maryland, for Baltimore Business Communications, Inc.

## OPINION

MICHAEL, Circuit Judge

This multidistrict litigation includes five class actions brought initially in the state courts of Georgia, Louisiana, Maryland, New York, and Pennsylvania. The plaintiffs sue Nokia Inc. and other entities (collectively, "Nokia") involved in the manufacture and sale of wireless telephones. The plaintiffs claim that wireless telephones emit an unsafe level of radio frequency radiation and that Nokia has hidden this fact from consumers. Nokia removed the five cases to various federal courts, and the Judicial Panel on Multidistrict Litigation (JPML) transferred the cases to the United States District Court for the District of Maryland (the district court) for consolidated pretrial proceedings. The district court denied the plaintiffs' motion to remand four of the cases to state court and then dismissed all five cases on the ground that the plaintiffs' state law claims are preempted by the Federal Communications Act of 1934 (FCA), 47 U.S.C. § 151 et seq. The plaintiffs appeal both rulings. Because federal subject matter jurisdiction is lacking in four of the cases, we reverse the district court's order denying the motion to remand those cases. There is diversity jurisdiction over the fifth case, and because the state law claims are not preempted, we reverse the order dismissing that case.

A wireless telephone (commonly called a cell phone) is actually a radio containing a low power transmitter. When a wireless telephone is turned on, it searches for a base station (usually a lower) within range. A base station is a fixed transmitter containing antennae and electronic equipment that communicates with the transmitter in a wireless telephone. If a wireless telephone finds a base station within range, the telephone identifies itself by transmitting its Mobile Identification Number (MIN), its System Identification Code (SID), and its Electronic Serial Number (ESN). The ESN is a number permanently programmed into the telephone when it is manufactured. The SID and the MIN are programmed into the wireless telephone when a customer purchases a service plan and the telephone is activated. The base station receives the identifying information (MIN, SID, and ESN) to the local mobile telephone switching office (MTSO), which confirms that the telephone is assigned to a valid customer. An MTSO is a sophisticated computer that controls all of the base stations in a particular area for the purpose of coordinating radio transmissions to and from wireless telephones. Once an MTSO confirms that a wireless telephone is assigned to a valid customer, the MTSO assigns a frequency on which the user may communicate.

Base stations receiving and routing transmissions from wireless telephones have a relatively small transmission range because they have low power transmitters. Accordingly, to provide continuous wireless telephone service coverage over an extended area, numerous base stations must be built. Cities and regions are divided into cells, typically ten square miles, each containing a base station. As a user moves out of one cell (and thus out of range of the base station in that cell) and into an adjoining cell, the MTSO hands the signal off to the base station in the adjoining cell. Marshall Brain & Jeff Tyson, *How Cell Phones Work, at* http://www.howstuffworks.com/cell-phone.htm (last visited January 24, 2005).

Wireless telephones emit a low level of radio frequency (RF) radiation, a form of electromagnetic energy, from their antennae when they communicate with base stations. *See Cell Phone Facts: Consumer Information on Wireless Phones, at* http://www.fda.gov/cellphones/qa.html (last updated July 29, 2003). While it is well established that

exposure to high levels of RF radiation can cause adverse health effects, there is no scientific consensus on the effects of low level exposure. The Federal Communications Commission (FCC) requires all transmitters that emit RF radiation to be authorized by the agency before they are marketed or sold. *See* 47 C.F.R. §§ 2.801, 2.803 (2004). Pursuant to the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*, which requires agencies to consider the impact of their actions on the quality of the human environment, the FCC has promulgated rules that limit the amount of RF radiation that FCC-regulated transmitters (including wireless telephones) may emit. *In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation*, 11 FCC Rcd. 15123, 15125 (1996) (*In re Guidelines*); *see* 47 C.F.R. §§ 1.1307, 1.1310, 2.1091, 2.1093.

The plaintiffs brought five class actions in state courts against Nokia, claiming, among other things, that (1) wireless telephones emit an unsafe level of RF radiation and (2) Nokia, in knowing this, negligently and fraudulently endangered the consuming public by marketing wireless telephones without headsets. According to the plaintiffs, they were exposed to the risk of adverse biological effects from the RF radiation emitted by their wireless telephones when they used the telephones without headsets. The plaintiffs purport to represent wireless telephone users who have not been diagnosed with brain- or eye-related diseases and who were not provided headsets when they leased or bought their wireless telephones. Compensatory damages are sought in an amount sufficient to buy a headset for each class member who lacks one and to reimburse each class member who has already bought one. For class members with wireless telephones that are not headset-compatible, an injunction is sought to require Nokia to provide them with telephones that can be used with a headset. The plaintiffs also seek punitive damages, costs, and attorneys' fees.

After these cases were filed in the five state courts, Nokia removed them, pursuant to 28 U.S.C. § 1447, to the five appropriate federal district courts. On October 31, 2001, the JPML transferred the five cases to the District of Maryland for consolidated or coordinated pre-trial proceedings. On January 7, 2002, the plaintiffs in four of the cases — those with lead plaintiffs named Pinney, Farina, Gilliam, and Gimpelson (collectively, the "Pinney plaintiffs") — filed a consolidated motion to remand their cases to the state courts in which they

originated. The plaintiffs in the fifth case (the "Naquin plaintiffs") did not join this motion because there was federal subject matter jurisdiction over their case based on diversity of citizenship. On June 21, 2002, the district court denied the Pinney plaintiffs' motion to remand on the ground that their claims necessarily depend on the resolution of a substantial federal question. According to the district court, the claims are a disguised attack on the FCC's RF radiation standards, and resolution of the claims would require the court to rule on the validity of those standards.

After remand was denied, Nokia filed a consolidated motion to dismiss for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), on the ground of federal preemption. On March 5, 2003, the district court granted Nokia's motion on the basis that the plaintiffs' claims are preempted by the FCA. More specifically, the district court concluded that the relief sought by the plaintiffs in all five cases conflicts with Congress's goal of achieving national uniformity in RF radiation emission levels for all wireless telecommunications equipment. The plaintiffs appeal the district court's orders.

## II

We turn first to the district court's order denying the Pinney plaintiffs' consolidated motion to remand their four cases to state court. Federal removal jurisdiction may be exercised over state court actions "of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). The original jurisdiction of the district courts includes jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The propriety of Nokia's removal of the Pinney plaintiffs' state court cases depends on whether the claims "aris[e] under" federal law. *See Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). We must strictly construe our removal jurisdiction because removal "raises significant federalism concerns." *Id.* "If it appears before final judgment that a case was not properly removed, because it was not within the original jurisdiction of the United States district courts, the district court must remand it to the state court from which it was removed." *Franchise Tax Bd. of Cal. v. Constr. Laborer's Vacation Trust*, 463 U.S. 1, 8 (1983) (citing 28 U.S.C. § 1447(c)).

PINNEY V. NOKIA, INC

We begin with the issue of whether the Pinney plaintiffs' claims arise under federal law pursuant to the substantial federal question doctrine. We then address whether their claims arise under federal law pursuant to the doctrine of complete preemption. We ultimately conclude that the claims of the Pinney plaintiffs do not arise under federal law by reason of either doctrine. Accordingly, the district court lacked jurisdiction over these claims, and the court erred in denying the Pinney plaintiffs' consolidated motion to remand their cases to state court.

## A.

In determining whether a plaintiff's claim arises under federal law, we apply the well-pleaded complaint rule, which holds that courts "ordinarily . . . look no further than the plaintiff's [properly pleaded] complaint in determining whether a lawsuit raises issues of federal law capable of creating federal-question jurisdiction under 28 U.S.C. § 1331." *Custer v. Sweeney*, 89 F.3d 1156, 1165 (4th Cir. 1996). Thus, in examining the complaint, our first step is to "discern whether federal or state law creates the cause of action." *Mulcahey*, 29 F.3d at 151; *see also Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) ("The vast majority of lawsuits 'arise under the law that creates the cause of action.'") (quoting *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916)). If federal law creates a plaintiff's claim, then removal is proper. *Mulcahey*, 29 F.3d at 151. The general rule, of course, is that a plaintiff is the "master of the claim," and he may "avoid federal jurisdiction by exclusive reliance on state law" in drafting his complaint. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Here, it is undisputed that state law creates the claims asserted by the Pinney plaintiffs, but this does not end our inquiry. We must also determine whether these cases fall within the small class of "cases in which a well-pleaded complaint establishes . . . that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law, in that federal law is a necessary element of one of the well-pleaded . . . claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808 (1988) (quoting *Franchise Tax Bd.*, 463 U.S. at 13, 27-28) (internal quotation marks and citations omitted). Under the substantial federal question doctrine, "a defendant seeking to remove a case in which state law creates the plaintiff's cause of action must establish two elements: (1) that the

plaintiff's right to relief necessarily depends on a question of federal law, and (2) that the question of federal law is substantial." *Dixon*, 369 F.3d at 816. If the defendant fails to establish either of these elements, the claim does not arise under federal law pursuant to the substantial federal question doctrine, and removal cannot be justified under this doctrine. *Id.*

A plaintiff's right to relief necessarily depends on a question of federal law when "it appears that some . . . disputed question of federal law is a necessary element of one of the well-pleaded state claims." *Franchise Tax Bd.*, 463 U.S. at 13. If a plaintiff can establish, without the resolution of an issue of federal law, all of the essential elements of his state law claim, then the claim does not necessarily depend on a question of federal law. *See id.* at 13-14; *see also Dixon*, 369 F.3d at 817 ("[I]f the plaintiff can support his claim with even one theory that does not call for an interpretation of federal law, his claim does not 'arise under' federal law for purposes of § 1331."). This principle is illustrated in *Franchise Tax Board*. There, the Supreme Court found no substantial federal question when a California tax agency attempted to enforce a levy on funds held in trust for several taxpayers under an ERISA-covered benefit plan. 463 U.S. at 13-14. The claim did not necessarily depend on a resolution of federal law because "California law establishe[d] a set of conditions, without reference to federal law, under which a tax levy may be enforced; federal law bec[ame] relevant only by way of a defense to an obligation created entirely by state law, and then only if [the state agency] ha[d] made out a valid claim for relief under state law." *Id.* at 13. "[I]t has been well-settled law," the Court noted, "that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Id.* at 14.

We now examine the claims in the complaints filed by the Pinney plaintiffs. We note parenthetically that the district court allowed these plaintiffs to amend their complaints after it denied their motion to remand. Because amendment occurred after removal, we look at the original complaints rather than the amended complaints in determining whether removal was proper. *See Pullman Co. v. Jenkins*, 305 U.S. 534, 537 (1939). The Pinney plaintiffs assert seven claims in

their original complaints. They first allege that Nokia is strictly liable for placing a defectively designed product into the stream of commerce. These claims are brought under the laws of Georgia, Maryland, New York, and Pennsylvania. Under the laws of all four states, a manufacturer (and sometimes a seller) is strictly liable for selling a defectively designed product that causes personal injury. Georgia, Maryland, and New York assess whether a product suffers from a design defect by using the risk-utility balancing test. Under this test a fact-finder must determine whether the manufacturer acted reasonably in choosing a particular product design, given the probability and magnitude of the risk, the usefulness of the product in its particular condition, and the burden on the manufacturer to eliminate the risk. *See Banks v. ICI Ams., Inc.*, 450 S.E.2d 671, 673-74 (Ga. 1994); *Nissan Motor Co. v. Nave*, 740 A.2d 102, 118 (Md. Ct. Spec. App. 1999); *Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 208-09 (N.Y. 1983). Under Pennsylvania law a product suffers from a design defect if it lacks a component necessary to make it safe for its intended use. *See Harsh v. Petroll*, 840 A.2d 404, 416-17 (Pa. 2003).

Second, the Pinney plaintiffs allege that Nokia is strictly liable for its failure to warn about the adverse health risks associated with wireless telephones. These claims are brought under the laws of Georgia, Maryland, New York, and Pennsylvania. According to these laws, when a manufacturer or a seller knows or should have known of the latent danger of a product and fails to warn the consuming public, the manufacturer or seller is strictly liable for injuries caused by the danger while the product is used in a foreseeable manner. *See Hunt v. Harley-Davidson Motor Co.*, 248 S.E.2d 15, 16 (Ga. Ct. App. 1978); *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 639 (Md. 1992); *Rastelli v. Goodyear Tire & Rubber Co.*, 591 N.E.2d 222, 225 (N.Y. 1992); *Davis v. Berwind Corp.*, 690 A.2d 186, 190 (Pa. 1997).

Third, the Pinney plaintiffs allege that Nokia is liable for violating various state consumer protection statutes. These claims are brought under the laws of Maryland, New York, and Pennsylvania, where the relevant statutes allow a plaintiff to recover for losses or injuries sustained when a merchant engages in deceptive trade practices. *See* Md. Code Ann., Com. Law II, § 13-408; N.Y. Gen. Bus. Law § 349(h) (McKinney); 73 Pa. Cons. Stat. § 201-9.2. These statutes generally require a plaintiff to prove either (1) that the defendant made materi-

ally false or misleading statements about its product that deceived, or had the tendency to deceive, consumers, or (2) that the defendant failed to state a material fact with respect to its product, and this failure deceived, or had the tendency to deceive, consumers. *See* Md. Code Ann., Com. Law II, § 13-301(1), (2)(i), (3), (9)(i); N.Y. Gen. Bus. Law § 350-a(1); 73 Pa. Cons. Stat. § 201-2(4)(v), (vii), (ix), (xxi).

Fourth, the Pinney plaintiffs allege that Nokia breached an implied warranty of merchantability by selling and distributing unreasonably dangerous wireless telephones. These claims are brought under the laws of Georgia, Maryland, New York, and Pennsylvania. To make out a claim for breach of this implied warranty, a plaintiff must establish that a product is not of merchantable quality and that he suffered an injury as a result. A product is not of merchantable quality when it is not fit for the ordinary purposes for which it is used. *See Wilson v. J & L Melton, Inc.*, 606 S.E.2d 47, 49 n.1 (Ga. Ct. App. 2004); *Ford Motor Co. v. Gen. Acc. Ins. Co.*, 779 A.2d 362, 370 n.13 (Md. 2001); *Denny v. Ford Motor Co.*, 662 N.E.2d 730, 736 (N.Y. 1995); *Phillips v. Cricket Lighters*, 852 A.2d 365, 370-71 (Pa. Super. Ct. 2004). In determining whether a product is of merchantable quality, the fact-finder focuses on the "expectations for the performance of the product when used in the customary, usual, and reasonably foreseeable manners." *Denny*, 662 N.E.2d at 736.

Fifth, the Pinney plaintiffs allege that Nokia was negligent (1) in failing to conduct adequate and appropriate scientific research on the adverse health effects of exposure to RF radiation from wireless telephones, (2) in misrepresenting to the public that wireless telephones are safe, (3) in suppressing any scientific evidence suggesting that wireless telephones are not safe, (4) in failing to provide warnings about the potential health risks from failing to use a headset, and (5) in failing to provide headsets and instructions encouraging their use. These claims are brought under the laws of Georgia and Maryland. To make out a claim for negligence, a plaintiff must establish the following elements: (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) the plaintiff suffered an injury, and (4) there was a causal connection between the breach and the injury. *See Johnson v. Am. Nat'l Red Cross*, 578 S.E.2d 106, 108 (Ga. 2003); *Hemmings v. Pelham Wood LLP*, 826 A.2d 443, 451 (Md. 2003). A

manufacturer generally has a duty to exercise reasonable care in manufacturing, designing, and selling its products "so as to make the products reasonably safe for intended or foreseeable uses." *Chrysler Corp v. Batten*, 450 S.E.2d 208, 211 (Ga. 1994) (citation omitted); *see also Eagle Pitcher Indus., Inc. v. Balbo*, 604 A.2d 445, 454 n.9 (Md. 1992).

Sixth, the Pinney plaintiffs allege that Nokia engaged in fraud by misinforming and misleading the public as to the safety of wireless telephones. These claims are brought under the laws of Georgia, Maryland, New York, and Pennsylvania. To make out a claim for fraud, a plaintiff must establish the following elements: (1) the defendant made a false representation, (2) the defendant knew the representation was false or was recklessly indifferent to its truth or falsity, (3) the defendant made the representation with the intent to defraud the plaintiff, (4) the plaintiff justifiably relied on the false representation, and (5) the plaintiff suffered damages as a result. *See Rhone v. Bolden*, ___ S.E.2d ___, 2004 WL 2567343 (Ga. Ct. App. 2004); *Martens Chevrolet, Inc. v. Seney*, 439 A.2d 534, 537 (Md. 1982); *P. Chimento Co. v. Banco Popular de Puerto Rico*, 617 N.Y.S.2d 157, 158 (N.Y. App. Div. 1994); *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994). Concealment of a material fact, with intent to deceive, satisfies the false representation element of fraud. *See Paul v. Desito*, 550 S.E.2d 739, 744 (Ga. Ct. App. 2001); *Hoffman v. Stamper*, 843 A.2d 153, 186 (Md. Ct. Spec. App. 2004); *Nasaba Corp. v. Harfred Realty Corp.*, 39 N.E.2d 243, 245 (N.Y. 1942); *De Joseph v. Zambelli*, 139 A.2d 644, 647 (Pa. 1958).

Seventh, the Pinney plaintiffs allege that Nokia engaged in a civil conspiracy to market unsafe wireless telephones by improper and wrongful means, and, in doing so, both defrauded the plaintiffs and failed to warn them of the health risks of using wireless telephones. These claims are brought under the laws of Georgia and Maryland. In a claim for civil conspiracy a plaintiff must establish that two or more defendants, acting in concert, engaged in conduct constituting a tort. Damages are assessed on the basis of the defendants' tortious conduct, not on the basis of their agreement to engage in such conduct. *See Miller v. Lomax*, 596 S.E.2d 232, 242 (Ga. Ct. App. 2004); *Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc.*, 639 A.2d 173, 176-77 (Md. Ct. Spec. App. 1994).

We have thoroughly examined the claims asserted by the Pinney plaintiffs in their complaints, and one thing is clear: the elements of each of the claims depend only on the resolution of questions of state law. There is no "substantial, disputed question of federal law [that] is a necessary element of [any] of the well-pleaded state claims." *Franchise Tax Bd.*, 463 U.S. at 13. The district court, however, determined that these cases depend on the resolution of a substantial federal question because the claims "put . . . directly into dispute" the validity and sufficiency of the federal RF radiation standards for wireless telephones. *See In Re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.*, 216 F. Supp. 2d 474, 488 (D. Md. 2002) (*In re Wireless I*). The ultimate objective of these complaints, according to the district court, "is to attack the lack of a headset requirement under the federal RF safety rules." *Id.* Although the court acknowledged that the complaints contain no allegations attacking the federal RF radiation standards, it believed that it could ultimately resolve the case only by passing judgment on the validity of the federal standards. The court therefore determined that removal was justified under the substantial federal question doctrine. *Id.* at 488, 491-92.[1]

The district court erred by not recognizing that its inquiry was limited by the well-pleaded complaint rule. It should have considered only whether a disputed question of federal law is an essential element of one of the well-pleaded state claims. *See Franchise Tax Bd.*, 463 U.S. at 13. The district court went beyond this restricted inquiry and in effect anticipated (1) that Nokia would raise the affirmative defense that the state law claims are preempted by the FCA and federal RF radiation standards and (2) that the Pinney plaintiffs would be called upon to rebut that defense. The cases could be decided, the court concluded, only by resolving whether the claims are preempted by the FCA and the federal RF radiation standards. Even if that is so, a preemption defense "that raises a federal question is inadequate to confer federal jurisdiction." *Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 808 (1986). Again, "a case may not be removed to fed-

---

[1] The dissent makes the same argument as the district court — that a substantial federal question exists because "the effect of [the Pinney plaintiffs'] allegations" is to "challenge the sufficiency of the FCC standard." *Post* at 37. As we explain in the text that follows, this argument cannot be sustained.

eral court on the basis of a federal defense, including the defense of preemption," even if the complaint begs the assertion of the defense, and even if "the defense is the only question truly at issue in the case." *Franchise Tax Bd.*, 463 U.S. at 14.

The thrust of the claims is that Nokia violated state law by manufacturing and selling a product that it knew, or should have known, was dangerous and by not adequately warning of the dangers. As was the case in *Franchise Tax Board*, state law establishes a set of elements, without reference to federal law, that the plaintiffs must establish in order to a make out "valid claim[s] for relief." 463 U.S. at 13. Federal law becomes relevant only as a defense, and only after the Pinney plaintiffs have made out the elements of their state law claims. In this situation, as the Supreme Court has observed, "[t]he most one can say is that a question of federal law is lurking in the background." *Gully v. First Nat'l Bank*, 299 U.S. 109, 117 (1936). The lurking question of federal law is, of course, the affirmative defense of preemption, but that does not make the claims into ones arising under federal law.

**B**

It becomes even clearer that the Pinney plaintiffs' claims do not contain a disputed question of federal law when we consider Nokia's arguments. Nokia argues that an issue of federal law must be resolved for the Pinney plaintiffs to establish the necessary elements for two of their claims. Nokia first points to the claim of strict liability due to a design defect. As discussed above, *see supra* at 12-13, one element a plaintiff must establish is that the product suffered from a design defect. A design defect is established by proving that the product is unreasonably dangerous, as determined by the risk-utility standard. Nokia argues that the FCC's RF radiation standards establish the relevant "duty" with regard to RF radiation emissions from wireless telephones, and therefore the unreasonably dangerous inquiry depends on the resolution of a federal question. Br. for Appellees at 26. Nokia's use of the term "duty" is misplaced because the term is more commonly employed in a negligence context, not a strict liability context. In any event, the nub of Nokia's argument is that a wireless telephone's compliance (or noncompliance) with the federal RF radiation standards determines whether the telephone is unreasonably

dangerous. Nokia is wrong. Under the laws of Georgia, Maryland, and New York, compliance with the federal RF radiation standards is only one factor in assessing whether a wireless telephone is unreasonably dangerous under the risk-utility standard. *See Doyle v. Volkswagenwerk Aktiengesellschaft*, 481 S.E.2d 518, 521 (Ga. 1997); *Beatty v. Trailmaster Prods.*, 625 A.2d 1005, 1014 (Md. 1993); *Denny*, 662 N.E.2d at 735-36; *Sherman v. M. Lowenstein & Sons, Inc.*, 282 N.Y.S.2d 142, 143-44 (N.Y. App. Div. 1967). And because Pennsylvania law rejects the importation of negligence concepts into its strict liability doctrine, compliance with the federal RF radiation standards is not relevant in determining whether Nokia is strictly liable under Pennsylvania law for selling a product that suffers from a design defect. *See Lewis v. Coffing Hoist Div., Duff-Norton Co.*, 528 A.2d 590, 593-94 (Pa. 1987) (holding that product compliance with industry standards is irrelevant in strict liability case based on defective design). Thus, even if Nokia's wireless telephones comply with the federal RF radiation standards, the Pinney plaintiffs could still establish the defective design element of the their strict liability claim. Conversely, if Nokia's wireless telephones do not comply with the federal RF radiation standards, the Pinney plaintiffs would not automatically establish the defective design element.

Nokia also argues that the Pinney plaintiffs "need to establish disputed federal-law propositions" to make out their fraud claims. Br. for Appellees at 27. To make out a claim of fraud, a plaintiff must establish, among other elements, that the defendants made a false statement. Nokia asserts that the Pinney plaintiffs, in order to prove that statements made by Nokia were false, must demonstrate that the "substantive content of federal wireless emissions regulations is inconsistent with [Nokia's] alleged characterizations of those regulations." *Id.* This is a mischaracterization of the fraud claims. The Pinney plaintiffs do not allege that Nokia fraudulently misrepresented the RF radiation standards. Rather, they allege that Nokia made false statements by misrepresenting the general safety of wireless telephones and by misrepresenting or failing to disclose the biological risks posed by wireless telephones. To prove the falsity of these statements, the Pinney plaintiffs must establish that the RF radiation emissions from wireless telephones create a health risk. This has nothing to do with the substantive content of the federal regulations. In sum, there is no

substantial question of federal law that is a necessary element of the Pinney plaintiffs' strict liability (design defect) or fraud claims.[2]

To get around this problem, Nokia advances a new theory — the "sufficient connection" to a federal regulatory scheme theory — for why the Pinney plaintiffs' claims are removable pursuant to the substantial federal question doctrine. Nokia relies on our decision in *Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799 (4th Cir. 1996), to argue that "where a plaintiff's state law complaint is sufficiently connected to a federal regulatory regime as to which Congress has expressed a

---

[2]In arguing for removal jurisdiction, the dissent points to one of the many factual allegations made by the Pinney plaintiffs in support of their fraud claims. The Pinney plaintiffs allege that Nokia engaged in fraud on an occasion when it claimed that wireless telephones are safe and "fall within [FCC] safety standards," but "deceitfully omitted the fact that the FCC had declared that it does *not* consider itself the 'expert agency' for evaluating health effects." J.A. 142 (emphasis in original). According to the dissent, this allegation "call[s] into question the expertise of the FCC." *Post* at 37. That is not the case. To establish that the safety statement made by Nokia was false, a necessary element for fraud, the Pinney plaintiffs need only prove that the failure to disclose the FCC's statement was the concealment of a material fact or that Nokia's safety statement was false in light of the FCC's statement. The plaintiffs will not have to prove any lack of FCC expertise in the RF radiation area in order to establish that Nokia made false statements about the safety of wireless telephones. A "substantial, disputed question of federal law" is simply not a necessary element of the fraud claims. *Franchise Tax Bd.*, 463 U.S. at 13.

The dissent also relies on a general allegation in the Pinney plaintiffs' complaint to support its argument that removal jurisdiction exists. This allegation is that Nokia "obtain[ed] and exercised control over the American National Standards Institute ('ANSI') Committee responsible for developing safety standards for RFR emitting devices." J.A. 140. ANSI's proposals regarding RF radiation standards were generally adopted in FCC rulemaking. *See In re Guidelines*, 11 FCC Rcd. at 15123-25. According to the dissent, the allegation about Nokia's influence over ANSI means that the plaintiffs "are . . . attacking the rule-making process that the FCC used in developing [its RF radiation] standards." *Post* at 38. The dissent, however, does not explain how the allegation about ANSI raises a substantial question of federal law that is a necessary element of any one of the plaintiffs' state law claims.

need for uniform implementation and interpretation, that connection
can provide a basis for federal question jurisdiction even if no explic-
itly federal claim is pled." Br. for Appellees at 25. Nokia does not
suggest a standard for determining when a connection is sufficient to
render removal proper under its theory, but it nonetheless asserts that
a sufficient connection exists in the present cases. According to
Nokia, there is a comprehensive federal scheme to regulate wireless
telecommunications, and Congress has delegated to federal regulators
the exclusive authority over all technical aspects of wireless telecom-
munications. A sufficient connection exists between the telecommuni-
cations regulatory regime and the Pinney plaintiffs' claims, Nokia
says, because the claims are premised on the amount of RF radiation
that emits from wireless telephones, a technical aspect of wireless
telephones that is regulated by the FCC. To begin with, Nokia's suffi-
cient connection theory, as applied to these claims, is similar to, if not
indistinguishable from, the argument that the Pinney plaintiffs' claims
are removable under the substantial federal question doctrine because
they are preempted by the FCA and the federal RF radiation stan-
dards. Nokia, of course, avoids couching its argument in preemption
terms because it knows that the affirmative defense of preemption
cannot serve as a basis for removal under the substantial federal ques-
tion doctrine. Regardless of whether Nokia's sufficient connection
theory is at bottom a preemption argument, we reject it because it is
not supported by our *Ormet* decision, and it is inconsistent with
Supreme Court precedent.

   *Ormet* does not establish, or even support, Nokia's sufficient con-
nection theory. In *Ormet* one of the elements of the plaintiff's state
commercial law claim contained a disputed question of federal law:
for the plaintiff to establish the element, it had to show that it was an
owner (as defined by the federal Clean Air Act) of tradeable emission
allowance permits. 98 F.3d at 807. Nokia relies on our statement,
"[w]here the resolution of a federal issue in a state-law cause of action
could, because of different approaches and inconsistency, undermine
the stability and efficiency of a federal statutory regime, the need for
uniformity becomes a substantial federal interest, justifying the exer-
cise of jurisdiction by federal courts." *Id.* at 807 (citation omitted).
Nokia claims this language stands for the proposition that a nexus (or,
in Nokia's words, a "sufficient connection") between a plaintiff's
claim for relief and a federal regulatory scheme is sufficient to estab-

lish removal jurisdiction. Nokia's reliance on the quoted statement from *Ormet* is completely off the mark because the statement specifically addresses the issue of whether a federal question is substantial enough to justify removal jurisdiction, not the threshold issue of whether a federal question must be resolved in order for the plaintiff to establish a necessary element of his claim. Nowhere in *Ormet* did we ever suggest that some "sufficient connection" between a federal regulatory regime and a state claim is enough to establish removal jurisdiction. In short, *Ormet* did not slacken in any way the principle that the substantial federal question doctrine applies only when a disputed issue of federal law is an essential element of at least one of the plaintiffs' state claims.

*Ormet* aside, Nokia's sufficient connection theory is inconsistent with Supreme Court precedent. By Nokia's reasoning, even if the Pinney plaintiffs can establish the necessary elements of their claims without resolving a question of federal law, the cases are still removable under the substantial federal question doctrine because of a connection between the federal scheme regulating wireless telecommunications and the Pinney plaintiffs' state claims. That is not enough. The Supreme Court has been quite clear that for removal to be proper under the substantial federal question doctrine, a plaintiff's ability to establish the necessary elements of his state law claims must rise or fall on the resolution of a question of federal law. *See Merrell Dow*, 478 U.S. at 813 ("[T]he mere presence of a federal issue in a state cause of action does not confer federal question jurisdiction."). In sum, removal of these cases cannot be sustained on the basis of the substantial federal question doctrine.

## C.

Having determined that these cases do not arise under federal law pursuant to the substantial federal question doctrine, we consider whether they arise under federal law through the doctrine of complete preemption. Under complete preemption a state claim arises under federal law when Congress "so completely pre-empt[s] a particular area that any civil complaint raising th[e] select group of claims is necessarily federal in character." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987). There is, of course, a difference between the doctrine of complete preemption and the affirmative defense of fed-

eral preemption. "As a defense, [federal preemption] does not appear
on the face of a well-pleaded complaint, and, therefore, does not
authorize removal to federal court." *Id.* at 63 (citation omitted). In
contrast, the doctrine of complete preemption "converts an ordinary
state common law complaint into one stating a federal claim," *id.* at
65, and the federal claim is deemed to appear on the face of the com-
plaint. *Darcangelo v. Verizon Communications, Inc.*, 292 F.3d 181,
187 (4th Cir. 2002). To remove an action on the basis of complete
preemption, a defendant must establish that the plaintiff has a "dis-
cernible federal [claim]" and that "Congress intended [the federal
claim] to be the exclusive remedy for the alleged wrong." *King v.
Marriott Int'l, Inc.*, 337 F.3d 421, 425 (4th Cir. 2003).

In assessing the removal of these cases on the basis of complete
preemption, our basic inquiry is whether the FCA establishes the
exclusive claim for consumers alleging injury by wireless telephones.
Nokia argues that §§ 201 and 207 of the FCA provide the exclusive
claim for the Pinney plaintiffs. Section 207 allows private parties to
sue common carriers and recover damages resulting from a common
carrier's breach of its obligations under the FCA. 47 U.S.C. § 207.
Nokia argues that the Pinney plaintiffs' exclusive claim is to allege
that Nokia violated § 201(b), which imposes on common carriers the
obligation that "[a]ll charges, practices, classifications, and regula-
tions for and in connection with [wire or radio] communication ser-
vice, shall be just and reasonable." 47 U.S.C. § 201(b). Specifically,
Nokia argues that the sale of dangerous wireless telephones consti-
tutes a "practice in connection with" wireless service. Nokia is wrong
in saying that the FCA provides the exclusive claim.

First off, § 207 does not provide any claim against a number of the
defendants in these cases. Sections 201 and 207 allow recovery only
against common carriers. Under the FCA "'common carriers' are enti-
ties that must provide [transmission] service[s] to the public without
discrimination and are heavily regulated by the FCC." *In re Applica-
tion of the United States for an Order Authorizing the Roving Inter-
ceptions of Oral Communications*, 349 F.3d 1132, 1137 n.9 (9th Cir.
2003) (citations omitted); *see also* 47 U.S.C. § 153(10). In the wire-
less telecommunications arena, "[a] person engaged in the provision
of" wireless service is treated as a common carrier. *See* 47 U.S.C.
§ 332(c)(1)(A). In their complaints the Pinney plaintiffs name two

groups of defendants: providers of wireless service (that also market and distribute wireless telephones) and manufacturers of wireless telephones. As to the second group, the plaintiffs allege that these defendants "engaged in the design, manufacture, marketing, and sale of" wireless telephones. *See, e.g.,* J.A. 122-127. There are no allegations that these manufacturer-defendants are engaged in providing any wireless service, and we therefore conclude that these defendants cannot be treated as common carriers. As a result, they cannot be sued under §§ 201 and 207.

As to the first group of defendants (certain wireless service providers), Nokia does not cite to any authority that supports the proposition that §§ 201 and 207 provide wireless telephone users with a claim against wireless service providers for their role in marketing and distributing wireless telephones. An interpretation of § 201 that would construe the selling of dangerous wireless telephones as a "practice in connection with" wireless service would be dubious at best. A "practice in connection with" wireless service does not even include tortious conduct such as deceptive advertising and billing by wireless service providers in the provision of wireless telephone service. *See Marcus v. AT & T Corp.,* 138 F.3d 46, 54 (2d Cir. 1998). Further, even if we were to broadly construe § 201 as Nokia urges, there is simply no evidence that Congress intended §§ 201 and 207 to be the exclusive claim for plaintiffs alleging injury from wireless telephones. Nokia fails to identify any evidence in the statute or legislative history that Congress intended §§ 201 and 207 to preempt completely state law claims that are based on a wireless service provider's sale and promotion of wireless telephones. The single authority to which Nokia cites is an FCC statement claiming that individual states should not be permitted to add additional requirements to the standards the FCC imposes for cellular systems. *See* Br. for Appellees at 36 (citing *In re An Inquiry into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Sys.; and Amendment of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communication Sys.,* 89 F.C.C.2d 58 (1982)). This statement is not evidence of congressional intent, and we accord it no weight.

The FCA also contains a savings clause: "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in

addition to such remedies." 47 U.S.C. § 414. The presence of a savings clause counsels against a finding that Congress intended to sweep aside all state claims in a particular area. Indeed, at least two circuits have recognized in other contexts that § 414 precludes such a finding. *See Smith v. GTE Corp.*, 236 F.3d 1292, 1313 (11th Cir. 2001) (concluding that § 414 counsels against a determination that the FCA completely preempts telecommunications customers' claims against a telecommunications service provider's fraudulent conduct in leasing telephones and related equipment); *Marcus*, 138 F.3d at 54 (concluding that § 414's savings clause counsels against a determination that the FCA completely preempts wireless service customers' claims against a wireless service provider based on the provider's deceptive billing and false advertising). Because there is no evidence that Congress intended the FCA to provide the exclusive remedy for claims like those of the Pinney plaintiffs, and because there is evidence that Congress intended to preserve state law claims such as the ones asserted in these cases, we conclude that these claims do not arise under federal law through the doctrine of complete preemption. Because the Pinney plaintiffs' claims do not arise under federal law, the district court lacked jurisdiction over them, making removal improper.

### III

After the district court denied the Pinney plaintiffs' motion to remand their four cases to state court, it dismissed all five cases, including the one brought by the Naquin plaintiffs, on the ground that the claims are preempted by the FCA. Because the district court lacked subject matter jurisdiction over the four cases brought by the Pinney plaintiffs, the district court had no power to dismiss them. However, as we noted earlier, the district court has diversity jurisdiction over the case brought by the Naquin plaintiffs. *See* 28 U.S.C. § 1332(a). We must therefore review the district court's order granting Nokia's motion to dismiss the claims of the Naquin plaintiffs.

### A

Before we address the substance of the dismissal, we consider the Naquin plaintiffs' argument that the district court erred in taking up Nokia's motion to dismiss their case. They first contend the dismissal

should be vacated because there is no subject matter jurisdiction over the other four cases (the Pinney plaintiffs' cases) that were consolidated with their case. The Naquin plaintiffs argue that if the district court had not erred in failing to recognize that it lacked jurisdiction over the cases of the Pinney plaintiffs, only the Naquin case would have remained, and Nokia's motion to dismiss would not have been considered due to lack of venue over the lone remaining case. According to the Naquin plaintiffs, the district court's error also denied them the procedural right to petition the JPML or the district court for a re-transfer of their case to the transferor court, the United States District Court for the Eastern District of Louisiana. Finally, the Naquin plaintiffs argue that the district court should not have considered the motion to dismiss because it had been denied by the transferor court prior to transfer.

There is no merit to the argument that venue over the Naquin plaintiffs' case in the District of Maryland was improper due to the lack of federal jurisdiction over the other four consolidated cases. The statute authorizing transfer (and consolidation) of multidistrict actions, 47 U.S.C. § 1407, is a venue statute that allows the JPML to override a plaintiff's choice of forum when three factors are present: (1) "one or more common questions of fact are pending in different districts," (2) a transfer would serve "the convenience of parties and witnesses," and (3) a transfer would "promote the just and efficient conduct of [the] actions." 28 U.S.C. § 1407(a); *see also In re Vernitron Secs. Litig.*, 462 F. Supp. 391, 394 (J.P.M.L. 1979) ("Nor can the policies behind venue provisions designed to operate in the context of single independent actions prevail, in a multidistrict context, over the Panel's statutory mandate to weigh the interests of all the plaintiffs and all the defendants and to consider multidistrict litigation as a whole in light of the purposes of the law."). Transfer, of course, may be ordered only for the purpose of "coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a).

In the present cases, the JPML, after noting the presence of common questions of fact, found that "[c]entralization . . . in the District of Maryland [would] serve the convenience of the parties and witnesses and [would] promote the just and efficient conduct of the litigation, while accordingly being necessary in order to avoid duplication of discovery, prevent inconsistent pretrial rulings, and

conserve the resources of the parties, their counsel, and the judiciary."
*In Re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.*,
No. 1421 (J.P.M.L. Oct. 31, 2001) (order consolidating and transfer-
ring the cases to the District of Maryland). Because these findings sat-
isfied the prerequisites for transfer, and because the proceedings were
still in the pretrial stage, venue in the District of Maryland was
proper. The Naquin plaintiffs essentially seek to add an additional
requirement that subject matter jurisdiction must exist over all trans-
ferred and consolidated cases for venue to be proper in the transferee
court. There is no basis for this requirement in either the multidistrict
litigation statute or the case law.

   The Naquin plaintiffs next argue that they were denied their proce-
dural right to request a remand to the Eastern District of Louisiana as
a result of the district court's error in finding subject matter jurisdic-
tion over the cases brought by the Pinney plaintiffs. We disagree. At
any point in the district court proceedings, the Naquin plaintiffs could
have petitioned the JPML directly for a remand, or they could have
requested that the district court suggest a remand to the JPML.
J.P.M.L. Rule 7.6(c)(i), (ii); *see also In re Roberts*, 178 F.3d 181, 184
(3d Cir. 1999) (noting that once a case is transferred, only the JPML,
and not the transferee court, has the authority to remand the case to
the transferor court). The Naquin plaintiffs never moved the JPML for
a remand nor asked the district court to suggest remand to the JPML.
Because these plaintiffs failed to raise the remand issue with either
the JPML or the district court, we consider the issue waived for pur-
poses of this appeal. *See Holland v. Big River Minerals Corp.*, 181
F.3d 597, 605 (4th Cir. 1999) ("Generally, issues that were not raised
in the district court will not be addressed on appeal.").

   Finally, the Naquin plaintiffs argue that the district court's dis-
missal order should be vacated because Judge Lemelle of the Eastern
District of Louisiana had denied, prior to transfer, motions to dismiss
filed by some of the defendants. The Naquin plaintiffs claim that a
transferee court may reconsider a prior order of a transferor court only
when: (1) there is an intervening change in the law, (2) there is newly
discovered (material) evidence, or (3) reconsideration is necessary to
correct a clear error of law or prevent manifest injustice. The two
cases relied on by the Naquin plaintiffs do not support such a con-
stricted view of a transferee court's authority. In each of the cases,

*Microbix Biosys., Inc. v. Biowhittaker, Inc.*, 184 F. Supp. 2d 434, 436 (D. Md. 2000), and *Potter v. Potter*, 199 F.R.D. 550, 552 (D. Md. 2001), the district court was ruling on a motion for reconsideration of its own order. The rules of constraint urged by the Naquin plaintiffs make sense when a district court is asked to reconsider its own order. "Were it otherwise, then there would be no conclusion to motions practice, each motion becoming nothing more than the latest installment in a potentially endless serial that would exhaust the resources of the parties and the court — not to mention its patience." *Potter*, 199 F.R.D. at 553. This same constraint is not always justified in the multidistrict litigation context, where there is a need for consistent treatment of consolidated cases. *See Astarte Shipping Co. v. Allied Steel & Expert Svc.*, 767 F.2d 86, 87 (5th Cir. 1985) ("The transferee court has the power and the obligation to modify or rescind any orders in effect in the transferred case which it concludes are incorrect."); *Degulis v. LXR Biotech., Inc.*, 928 F. Supp. 1301, 1309 (S.D.N.Y. 1996) ("A transferee court in a multi-district litigation thus has the power to modify interlocutory orders entered by the transferor court prior to transfer under 28 U.S.C. § 1407.") (citation omitted). Here, Judge Lemelle, in denying the motions to dismiss, denied them without prejudice and explicitly acknowledged that the issue of federal preemption could be revisited later in the litigation. In sum, the district court did not err in considering Nokia's motion to dismiss the Naquin case.

## B

In their amended complaint the Naquin plaintiffs allege both state and federal claims and seek the same remedy as the Pinney plaintiffs, headsets for wireless telephones.[3] We now consider whether the

---

[3]For their federal claims the Naquin plaintiffs allege that Nokia has violated the Magnuson-Moss Warranty Improvement Act, 15 U.S.C. § 2310. More specifically, they allege that Nokia breached the implied warranty of fitness for a particular purpose by failing to provide headsets and by engaging in deceptive trade practices in failing to disclose the harmful effects of RF radiation from wireless telephones. This failure to disclose renders the manufacturers' express warranties for wireless telephones misleading, the amended complaint alleges. The district court appeared to dismiss the Naquin plaintiffs' amended complaint entirely on preemption grounds, even though federal claims are also alleged.

Naquin plaintiffs' state law claims are preempted by the FCA. Under the Supremacy Clause a state law that "interferes with, or is contrary to" federal law is invalid. *Free v. Bland*, 369 U.S. 663, 666 (1962). There are three theories under which Congress preempts state law. First, under express preemption Congress expressly declares its intent to preempt state law. *S. Blasting Svcs., Inc. v. Wilkes County*, 288 F.3d 584, 590 (4th Cir. 2002) (citing *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). Second, under field preemption Congress impliedly preempts state law when "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the states to supplement it." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (internal quotation marks and citations omitted). Third, under conflict preemption Congress impliedly preempts state law when it "actually conflicts with federal law." *Hillsborough*, 471 U.S. at 713. We must remember that "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks and citations omitted). Further, "[c]onsideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (citation omitted). This presumption against preemption is particularly strong when Congress legislates "'in a field which the States have traditionally occupied,'" such as health and safety.[4] *Medtronic*, 518 U.S. at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

---

[4]The district court decided that the presumption against preemption does not apply here because the Naquin plaintiffs' claims relate to wireless telecommunications, an area where, according to the court, "'there has been a history of significant federal presence.'" *In re Wireless Tel. Radio Frequency Prods. Liab. Litig.*, 248 F. Supp. 2d 452, 463 (D. Md. 2003) (quoting *United States v. Locke*, 529 U.S. 89, 108 (2000)). In *Locke* the Supreme Court concluded that the State of Washington's oil tanker regulations were not entitled to the presumption against preemption because the regulations governed national and international maritime commerce, an area long regulated by Congress. 529 U.S. at 108. The district court's reliance on *Locke* is misplaced because there is not the same federal presence in the wireless telecommunications area as there is in the area of maritime commerce. States continue to have considerable authority in the wireless telecommunications area. *See, e.g.*, 47 U.S.C. § 332(c)(3)(A) (providing that states may not regulate "the entry of or rates charged by" wireless service providers, but that they may regulate

**1.**

Nokia argues that the Naquin plaintiffs' claims are expressly pre-empted by two provisions of the FCA. The first provision appears in § 332(c)(7), which is aimed at the "[p]reservation of local zoning authority" over "decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). Nokia asserts that the claims are expressly preempted by § 332(c)(7)(B)(iv), which limits the general authority of local bodies as follows: "No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions" if the facilities comply with the FCC's RF radiation standards. 47 U.S.C. § 332(c)(7)(B)(iv). This sec-tion applies only to "personal wireless service facilities," a term defined in circular fashion as "facilities for the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(C)(ii). The statute does not define the term "facilities" or "facility." We must therefore determine, as a matter of first impression, whether a wireless telephone consti-tutes a "facility" for purposes of § 332(c)(7)(B)(iv). We conclude that it does not.

"If the 'statutory language is unambiguous and the statutory scheme is coherent and consistent,' our inquiry ends." *Alexander S. v. Boyd*, 113 F.3d 1373, 1383 (4th Cir. 1997) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 342 (1997)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the

"other terms and conditions" of wireless service); 47 U.S.C. § 332(c)(7) (providing that state authority to regulate the "placement, construction, and modification of personal wireless service facilities" is preserved except in specific circumstances). While wireless telephones must meet the FCC's specifications and be authorized by the FCC before they can be sold, *see* 47 C.F.R. § 2.803, these provisions do not provide a remedy to someone injured by a defective wireless telephone. "The presumption against preemption is even stronger against preemption of state remedies, like tort recoveries, when no federal remedy exists." *Abbot v. Am. Cya-namid Co.*, 844 F.2d 1108, 1112 (4th Cir. 1988) (citation omitted).

broader context of the statute as a whole." *Robinson*, 519 U.S. at 341. Although "facility" as used in § 332(c)(7)(B)(iv) is not defined, when the specific and broader contexts of its use are considered, it becomes plain that a wireless telephone is not a facility. The dictionary defines "facility" as "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or serve or facilitate some particular end." Webster's Third New International Dictionary 812 (1993). If the dictionary definition was used here, a facility would be something "built, constructed, installed, or established" to provide personal wireless service. This might arguably include a wireless telephone. We continue our inquiry, however, and examine the specific statutory context in which the term "facility" is used. Section 332(c)(7) is entitled, "Preservation of local zoning authority" and provides, as the general rule, that "nothing [in the statute] shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). The section goes on to provide limitations to the general rule, and in doing so attempts to strike a balance between the states' interests in regulating land use and the federal government's interest in facilitating the development of wireless telephone service. *See Omnipoint Communications Enters., L.P. v. Newtown Township*, 219 F.3d 240, 242-43 (3rd Cir. 2000); *Town of Amherst v. Omnipoint Communications Enters., Inc.*, 173 F.3d 9, 13 (1st Cir. 1999). Because § 332(c)(7) deals with the authority of the states *over zoning and land use*, we conclude that Congress intended the term "facility" to mean a structure or object, such as a base station or a mobile telephone switching office (MTSO), that falls within the states' zoning or land use authority. This interpretation excludes devices, such as wireless telephones, that are completely portable and have no attachment to land. The broader context in which the term "facility" is used also supports the interpretation that the term does not include wireless telephones. As we discuss below, *see infra* at 33, Congress enacted the entire § 332 to ensure the availability of a nationwide network of wireless service coverage. Consistent with this objective, a facility should, at the very least, be part of the infrastructure (a base station or an MTSO, for example) that provides wireless service coverage. A wireless telephone, however, only accesses a wireless service provider's network of coverage;

a wireless telephone itself is not part of the underlying infrastructure. Because both the specific context of the use of the term "facilities" in § 332(c)(7) and the broader context (and purpose) of § 332 reveal that a wireless telephone is not a facility under § 332(c)(7)(B)(iv), state tort claims relating to the manufacture and sale of wireless telephones are not expressly preempted by § 332(c)(7)(B)(iv).

Nokia next argues that § 332(c)(3)(A) expressly preempts the Naquin plaintiffs' claims. This section prohibits a state or local government from regulating "the entry of or the rates charged by any commercial mobile service," but allows it to regulate "other terms and conditions of commercial mobile services." 47 U.S.C. § 332(c)(3)(A). Nokia argues that the Naquin plaintiffs seek to use state law to regulate technical specifications for wireless telephones; this, Nokia says, would hinder entry into the commercial mobile service market because the FCC requires that wireless service providers certify that they are using only FCC-authorized equipment. Because Nokia cites to the licensing provisions dealing with personal communications services (PCS), a specific type of commercial mobile service, we understand Nokia's argument to assert that state regulation of wireless telephone specifications constitutes a barrier to entry for PCS providers.[5]

While § 332(c)(3)(A) is unclear as to what precisely constitutes a barrier to entry into the PCS market, we conclude that the relief sought by the Naquin plaintiffs (a headset requirement) is not such a barrier. To begin with, the PCS market is a market for wireless *service*. Wireless service providers use base stations and MTSOs to create a network of coverage, a network that wireless telephone users

---

[5]There are basically two competing modes of wireless communications, cellular services and PCS. Malcom J. Tuesly, Note, *Not in My Backyard: The Siting of Wireless Communications Facilities*, 51 Fed. Comm. L.J. 887, 888 (1999). Cellular systems operate in the 834-MHz to 894-MHz range, and PCS systems operate in the 1850-MHz to 1990-MHz range. Marshall Brain & Jeff Tyson, *How Cell Phones Work, at* http://electronics.howstuffworks.com/cell-phone.htm/printable (last visited Jan. 24, 2005). "As demand for cellular service has outgrown the available radio spectrum used for cellular signals, the wireless industry has turned to PCS, which utilizes digital technology that triples the capacity of traditional cellular systems." Tuesly, *supra* at 88.

generally pay a fee to access. The FCC licenses portions of the radio spectrum to wireless service providers so they can provide PCS coverage, *see* 47 C.F.R. § 24.1(a), (b), and one of the main requirements for the grant of a license is that the licensee must construct enough base stations to provide coverage to the area for which it receives a license. 47 C.F.R. §§ 24.103, 24.203. Accordingly, in order for state law to constitute a barrier to entry, it must, at a minimum, obstruct or burden a wireless service provider's ability to provide a network of wireless service coverage. *See, e.g., Bastien v. AT&T Wireless Svcs., Inc.*, 205 F.3d 983 (7th Cir. 2000) (concluding that an action brought under state law to challenge the number of base stations in a coverage area constitutes a barrier to entry and is prohibited by § 332(c)(3)(A)).

A headset requirement for wireless telephones would not constitute a barrier to entry into the PCS market because wireless telephones are only used to access a wireless service provider's network of coverage; the telephones themselves do not provide the actual coverage. It is true that wireless service providers commonly market wireless telephones in conjunction with wireless service packages, and the wireless telephones that they sell must comply with federal RF radiation standards. *See* 47 C.F.R. § 24.52. Nevertheless, a wireless service provider's choice to bundle service packages and telephones does not mean that a headset requirement would affect its ability to enter into the wireless service market or to provide a network of wireless service coverage. Furthermore, notwithstanding Nokia's assertion, we find nothing in the regulations that requires a wireless service provider to certify, as a condition for obtaining a license to provide PCS, that the wireless telephones *used* within its coverage area comply with the FCC's RF radiation standards. This certification is generally undertaken by the manufacturer of the telephones when it requests equipment authorization. *See* 47 C.F.R. §§ 24.51(b); 24.52. Because the relief sought by the Naquin plaintiffs would not be a barrier for wireless service providers seeking to enter the PCS market, § 332(c)(3)(A) does not expressly preempt the claims of the Naquin plaintiffs.

## 2.

We also hold that the Naquin plaintiffs' claims are not preempted under the doctrines of conflict preemption and field preemption. As

noted above, a state statute can be set aside by conflict preemption "when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough*, 471 U.S. at 713 (internal quotation marks and citations omitted). Again, there is a strong presumption against preemption when the federal government regulates in areas traditionally left to the states, such as health and safety. *Medtronic*, 518 U.S. at 485.

The district court concluded that the Naquin plaintiffs' claims are preempted because their cases stand as an obstacle to "Congress' objectives of achieving national uniformity in wireless telecommunications services and striking a balance between the proliferation of wireless services and the need to protect the public from any harmful effects of RF exposure." *In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.*, 248 F. Supp. 2d 452, 463 (D. Md. 2003). Reasoning that the plaintiffs were essentially seeking to impose a headset requirement or a stricter RF radiation standard, the district court concluded that allowing the cases to go forward would usurp the regulatory authority Congress entrusted to expert federal agencies that had already confronted these issues. *Id.* The district court relied on § 332 of the FCA to find a sweeping congressional objective of ensuring that all equipment used in connection with wireless telecommunications be subject to exclusive national RF radiation standards that have the effect of precluding state regulation on the subject. *Id.* at 464 (citing *In re Wireless I*, 216 F. Supp.2d at 483-87).

We conclude that the district court erred because the FCA provides no evidence of such an objective. Congress enacted § 332 to ensure the availability of a nationwide network of wireless service coverage, more specifically, to develop the infrastructure necessary to provide wireless services. Thus, § 332 (1) provides factors that the FCC must consider in managing the spectrum used for wireless services, 47 U.S.C. § 332(a); (2) classifies wireless service providers that provide wireless service to the public for profit as "common carriers" (subjecting them to numerous duties under the FCA), 47 U.S.C. § 332(c)(1)(A); (3) prevents states from regulating "the entry of or the rates charged by" wireless service providers, 47 U.S.C. § 332(c)(3)(A); and (4) limits in certain respects the ability of states

and local zoning authorities to regulate the "placement, construction, and modification" of facilities that provide wireless service, 47 U.S.C. § 332(c)(7).

We do not infer from § 332 the congressional objective of achieving preemptive national RF radiation standards for wireless telephones. First, § 332 does not address the subject of wireless telephones, let alone the more specific issue of the permissible amount of RF radiation from wireless telephones. The FCC's RF radiation standards for wireless telephones were not promulgated pursuant to a mandate contained in § 332 of the FCA, but rather pursuant to the National Environmental Policy Act's mandate that all agencies assess the environmental impact of their actions. For the FCC, the action was authorizing transmitters that emit RF radiation. *In re Guidelines for Evaluating the Envt'l Effects of Radiofrequency Radiation*, 11 FCC Rcd. 15123, 15125 (1996). The complete absence of any provision addressing wireless telephones counsels against a finding that § 332 evidences a congressional goal of achieving preemptive national RF radiation standards for wireless telephones.

Second, in pursuing its objective of ensuring the availability of a nationwide network of wireless service coverage, Congress has been very careful to preempt expressly only certain areas of state law, preserving the remainder for state regulation. For example, § 332(c)(3)(A) prohibits states from regulating "the entry of or the rates charged by" wireless service providers, but explicitly provides that states may still regulate "the other terms and conditions of commercial mobile service." 47 U.S.C. § 332(c)(3)(A). And § 332(c)(7) preserves a good measure of the states' authority over decisions regarding "placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). Consistent with this conscious and careful effort to carve out the areas of state laws that it wants to preempt, Congress has specifically allowed for preemptive national RF radiation standards only for personal wireless service facilities. Section 332(c)(7)(B)(iv) provides that state and local zoning authorities may not "regulate the placement, construction, and modification of personal wireless service facilities" on the basis of RF emissions as long as the facilities comply with the FCC's RF radiation standards. This specificity as to the preemptive nature of federal RF radiation standards for personal wireless service facilities

weighs against a finding that Congress has an implicit goal of making preemptive the RF radiation standards for all other types of wireless telecommunications equipment, including wireless telephones.

Third, there are two applicable savings clauses. There is the general savings clause of the FCA, which provides that "[n]othing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414. And there is the savings clause in section 601(c)(1) of the Telecommunications Act of 1996. This Act added 47 U.S.C. § 332(c)(7), which preempts some of the states' authority to regulate the location of base stations (not wireless telephones); the savings clause, however, provides that the Act "shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided . . . ." Telecommunications Act of 1996, Pub. L. No. 104-104, § 601(c)(1), 110 Stat. 56, 143. These savings clauses counsel against any broad construction of the goals of § 332 and § 332(c)(7) that would create an implicit conflict with state tort law.

Having determined that the FCA provides no evidence of a congressional objective to ensure preemptive national RF radiation standards for wireless telephones, we next examine whether the relief sought by the Naquin plaintiffs would stand as an obstacle to Congress' actual goal of establishing a nationwide network of wireless telephone service coverage. We conclude that it would not. It is difficult to understand how a headset requirement (the specific relief sought) would affect the establishment of a nationwide wireless service network or the availability of wireless service coverage. Wireless service providers generally provide wireless service coverage through a network of base stations that are coordinated by MTSOs. A wireless telephone user purchases a service plan from a wireless service provider, and the provider assigns the user a MIN and a SID, which allow the user to access this network of base stations and MTSOs. While wireless telephones access the network, they are not part of the infrastructure; accordingly, a headset requirement would not stand as an obstacle to Congress's goal of achieving nationwide coverage.

Finally, we reject Nokia's argument that the Naquin plaintiffs' claims are preempted on the basis of field preemption. As our previ-

ous discussion indicates, the FCA does not "so thoroughly occup[y] [the] legislative field [of wireless telecommunications] as to make reasonable the inference that Congress left no room for the states to supplement it." *Cipollone*, 505 U.S. at 516. There is no evidence that Congress intended that state law claims, such as those asserted by the Naquin plaintiffs, be swept aside.

### IV

For the foregoing reasons, we reverse the district court's order denying the consolidated motion to remand made by the plaintiffs in the Pinney, Farina, Gilliam, and Gimpelson cases. Because federal subject matter jurisdiction does not exist over these four cases, we return them to the district court for remand to the state courts in which they originated. We also reverse the district court's order dismissing the Naquin plaintiffs' case as preempted by the FCA. That case is remanded to the district court for further proceedings.

*REVERSED AND REMANDED*

KISER, Senior District Judge, dissenting

I dissent because, like the district court in its well-researched and well-reasoned opinion, I believe the case cannot be resolved without proving that the FCC's RF radiation emission standards are too high to protect the consuming public. This conclusion stems from a reading of the plaintiffs' complaint — not from any defense that the defendants may assert.

The majority opinion reviews in some detail what elements of the seven claims must be proved and concludes that none of the claims are dependent on whether or not the wireless telephones comply with the FCC standards. Apparently, the majority believes that the plaintiffs can prove their prima facie case of all seven claims without reference to the FCC standards regulating RF radiation emissions in wireless telephones and without proving that those standards are insufficient and invalid. I disagree. The plaintiffs are not trying this case in a vacuum. The FCC has enacted a uniform, nationwide regulatory scheme pertaining to wireless telephones which is the result of

a thorough and complex rule-making process. The final rules reflect what the FCC believes will maintain the proper balance between the interest in promoting wireless communication throughout the country and the interest in protecting the health and safety of all consumers. The plaintiffs will not be able to ignore these standards. In proving their prima facie case for each claim, the plaintiffs will have to prove the unreasonableness of the RF radiation emitted by FCC-compliant wireless telephones. The plaintiffs will thus have to establish that the FCC standards are insufficient. It is well-settled that a suit to invalidate a federal regulation arises under federal law. *See Cahnmann v. Sprint Corp.*, 133 F.3d 484, 488 (7th Cir. 1998). In this case, the FCC standards' validity vel non is a matter of plaintiffs' proof by the very words of the complaint which purport to attack the FCC regulations. This thinly-disguised attack on the validity of the FCC standards raises a substantial federal question.

The plaintiffs attack the FCC standards in three ways. First, the plaintiffs challenge the sufficiency of the FCC standard. The plaintiffs allege that the defendants' wireless telephones, which comply with the FCC standard, do not give adequate protection from RF radiation. Although the plaintiffs have not indicted the FCC standard by name, that is the effect of their allegations.

Second, the plaintiffs challenge the expertise of the FCC. The plaintiffs allege that defendants were dishonest when they stated to the public that "cell phones fall within the safety standards of the [FCC]." ¶ 79. Plaintiffs arrive at the conclusion that the above statement is false because the defendants "omitted the fact that the FCC had declared it does not consider itself the 'expert agency' for evaluating health effects," even though the FCC relied on experts in evaluating health effects, one of which was the FDA. *See Cellular Phone Task Force v. FCC*, 205 F.3d 82, 88 (2nd Cir. 2000). This allegation is incorporated by reference in all of the plaintiffs' claims but is particularly pertinent to Count VI (Fraud) and Count VII (Fraud by Concealment). These allegations form a part of plaintiffs' factual basis on which these two counts are based. These are facts plaintiffs must prove along with any other alleged misrepresentations to sustain the allegations in the complaint. Therefore, the plaintiffs call into question the expertise of the FCC and the sufficiency of its standards.

Third, the plaintiffs question the procedure by which the FCC developed the regulations. Specifically, the plaintiffs challenge the data on which the FCC relied. In the rule-making process, the FCC relied in part on standards of the American National Standards Institute ("ANSI"). *Id.* Plaintiffs allege that the defendants "obtain[ed] and exercise[d] control over the [ANSI] Committee responsible for developing safety standards for RFR emitting devices." ¶ 71. The plaintiffs are therefore attacking the rule-making process that the FCC used in developing these standards. Because the plaintiffs are making a direct attack upon the validity and sufficiency of the FCC regulations, their claims arise under federal law.

The majority finds that this case fails to raise a substantial federal question because it does not rise or fall on the resolution of a question of federal law. In support of this conclusion, the majority points out the holding of the Supreme Court that the "mere presence of a federal issue in a state cause of action does not confer federal question jurisdiction." *Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. 804, 813 (1986). The situation in *Merrell Dow,* however, is inapposite to the one in this case. In *Merrell Dow,* the plaintiffs were supporting the Federal Food, Drug, and Cosmetic Act and claiming a violation of that act was negligence. Here, the plaintiffs are seeking to completely undo the FCC standard. Claims with the potential for severely limiting or eliminating a federal regulatory scheme raise a much more substantial federal question than those that merely seek to inure to the benefit of such a scheme. On the other hand, I find this case very similar to our holding in *Ormet Corp. v. Ohio Power Co.* In *Ormet,* the plaintiff's claim was couched in traditional commercial litigation language, but we held that because the plaintiffs had to make reference to the Clean Air Act to define one of the terms of the contract there was a sufficient nexus to the Clean Air Act to support federal question jurisdiction. *Ormet Corp. v. Ohio Power Co.,* 98 F.3d 799, 807 (4th Cir. 1996). The same logic applies here. Although the FCC regulation must be dealt with by the plaintiffs in a negative manner, its inadequacy is a fact that plaintiffs must prove. This provides a sufficient nexus to support federal question jurisdiction.

Moreover, the need for uniformity in a federal regulatory scheme heightens the importance of the federal question. In *Ormet,* we held that "[w]here the resolution of a federal issue in a state-law cause of

action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for uniformity becomes a substantial federal interest justifying the exercise of jurisdiction by federal courts." *Id.* (citing *Martin v. Hunter's Lessee*, 14 U.S. 304, 347-48 (1816)). Here, plaintiffs are not merely raising a claim which *may* undermine a federal regulatory scheme through inconsistent interpretations; rather they are raising claims which, if successful, *will* result in the complete invalidation of federal regulatory standards. This presents a substantial federal question.

This Court has repeated the call by Justice Cardozo for "principled, pragmatic distinctions" in determining federal question jurisdiction. *Columbia Gas Transmission Corp. v. Drain*, 191 F.3d 552, 558 (4th Cir. 1999). In the words of Justice Cardozo, "[w]hat is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of causation . . . a selective process which picks the substantial causes out of the web and lays the other ones aside." *Id.* (quoting *Gully v. First National Bank*, 299 U.S. 109, 117-18 (1936)). Although we have affirmed our commitment to Justice Cardozo's words, the majority today does not adhere to the principles espoused in these words. We should not dismiss this case as lacking federal question jurisdiction simply because the plaintiffs have filed claims cloaked in state law language. Instead, we should use common sense and recognize that plaintiffs' claims directly implicate a federal regulatory scheme and threaten to undermine that same scheme. I would affirm the district court's finding of federal question jurisdiction.