# EXHIBIT A

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| Michael Patrick Murray, et al., | ) |
| Plaintiffs, | ) |
| v. | ) C.A. No. 01-8479 |
| | ) Calendar No. 3 |
| Motorola, Inc., et al., | ) Judge Brook Hedge |
| Defendants. | ) |

| | |
|---|---|
| Dino Schofield, | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 02-1371 |
| | ) Calendar No. 3 |
| Matsushita Electric Corporation Of America, et al., | ) Judge Brook Hedge |
| Defendants. | ) |

| | |
|---|---|
| Pamela Cochran, et al., | ) |
| Plaintiffs, | ) |
| v. | ) C.A. No. 02-1369 |
| | ) Calendar No. 3 |
| Audiovox Corporation, et al., | ) Judge Brook Hedge |
| Defendants. | ) |

(caption continued on next page)

## BRIEF OF THE FEDERAL COMMUNICATIONS COMMISSION
## AS AMICUS CURIAE

(caption continued from previous page)

| | |
|---|---|
| David Keller, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 02-1372 |
| | ) Calendar No. 3 |
| Nokia, Inc., et al., | ) Judge Brook Hedge |
| | ) |
| Defendants. | ) |
| | ) |

| | |
|---|---|
| Richard Schwamb, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 02-1370 |
| | ) Calendar No. 3 |
| Qualcomm Incorporated, et al., | ) Judge Brook Hedge |
| | ) |
| Defendants. | ) |
| | ) |

| | |
|---|---|
| Baldassare Agro, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 02-1368 |
| | ) Calendar No. 3 |
| Motorola, Inc., et al., | ) Judge Brook Hedge |
| | ) |
| Defendants. | ) |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT AND STATEMENT OF INTEREST ........................................ 1

STATEMENT ....................................................................................................................... 4

ARGUMENT ...................................................................................................................... 12

CONCLUSION ................................................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767 (1947)..................................................................19

*Broyde v. Gotham Towers, Inc.*, 13 F.3d 994 (6th Cir.), *cert. denied*, 511 U.S. 1128 (1994) ......................................................7

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) ...............................................................................20

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984)...............................13

*Cellular Phone Taskforce v. FCC*, 205 F.3d 82 (2d Cir. 2000), *cert. denied*, 531 U.S. 1070 (2001)............................................3

*City of New York v. FCC*, 486 U.S. 57 (1988) .............................................13

*EMR Network v. FCC*, 391 F.3d 269, 364 U.S. App. D.C. 20 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 2925 (2005) ................................................................................ 3, 12, 16

*FCC v. Pottsville Broad. Co.*, 309 U.S. 134 (1940) ........................................7

*Fidelity Fed. Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141 (1982) ..................................................................13

*Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000) ................................................................................ 2, 13

*Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424 (1963) ..................................................................7

*Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985) ..................................................................2

*Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363 (1973) ..................................................................12

*Maryland v. Baltimore Radio Show, Inc.*, 338 U.S. 912 (1950) ..................................................................12

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)........................................... 2, 19

*National Broad. Co. v. United States*, 319 U.S. 190 (1943) ................................................................................ 6, 19

*Pinney v. Nokia, Inc.*, 402 F.3d 430 (4th Cir. 2005), *cert. denied*, 74 U.S.L.W. 3269 (U.S. Oct. 31, 2005)1, 5, 13, 14, 15, 16, 17, 18, 19, 21

*Wireless Tel. Radio Frequency Emissions Products Liability Litigation, In re*, 248 F. Supp. 2d 452 (D. Md. 2003) ............................................................................................15

**<u>Administrative Decisions</u>**

*Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 11 FCC Rcd 15123 (1996) ................................................ 10, 11, 14, 15, 16, 18

*Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 12 FCC Rcd 13494 (1997) ..............................................................10, 11, 16

*Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 8 FCC Rcd 2849 (1993) ....................................................................................9

*Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993*, 2005 WL 2429714 (2005) ............................................................................8

*Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems*, 86 FCC 2d 469 (1981)................................................ 7, 18

*Responsibility of the Federal Communications Commission to Consider Biological Effects of Radio Frequency Radiation when Authorizing the Use of Radio Frequency Devices*, 100 FCC 2d 543 (1985), *on recon.*, 58 Radio Reg. (P&F) 2d 1128 (1985) ....................................................................................9

**<u>Statutes and Regulations</u>**

42 U.S.C. § 4332(2)(C) ............................................................9

47 C.F.R. § 1.1306(b)(3)............................................................9

47 C.F.R. § 1.1307(b) ............................................................3, 9

47 C.F.R. § 1.1307(b)(2)............................................................3

47 C.F.R. § 1.17 ..............................................................20

47 C.F.R. § 2.1091 ...................................................................3

47 C.F.R. § 2.1093 ...................................................................3

47 C.F.R. § 2.803(a) .................................................................9

47 C.F.R. § 2.939(a)(1) ...........................................................20

47 U.S.C. § 151 ............................................................... 5, 6, 17

47 U.S.C. § 151 et seq. .............................................................2

47 U.S.C. § 152(a) ...................................................................6

47 U.S.C. § 152(b) ...................................................................7

47 U.S.C. § 157 ........................................................................6

47 U.S.C. § 301 ........................................................................5

47 U.S.C. § 302(a) & (b) ..........................................................7

47 U.S.C. § 303(b) ...................................................................6

47 U.S.C. § 303(c) ....................................................................6

47 U.S.C. § 303(e) ....................................................................6

47 U.S.C. § 303(g) ...................................................................6

47 U.S.C. § 303(r) ....................................................................6

47 U.S.C. § 309(j)(3)(A) .........................................................17

47 U.S.C. § 309(j)(3)(D) ...........................................................6

47 U.S.C. § 332 ........................................................................3

47 U.S.C. § 332(a) .......................................................... 6, 17

47 U.S.C. § 332(a)(2) ...............................................................6

47 U.S.C. § 332(c)(3) ....................................................... 7, 18

47 U.S.C. § 332(c)(7) ....................................................... 8, 18

47 U.S.C. § 332(c)(7)(B)(iv) ...........................................8, 11, 14

47 U.S.C. § 503(b)(1)(B) .........................................................20

47 U.S.C. §§ 303(a)-(c) ...............................................................6

National Environmental Policy Act of 1969 (NEPA), 42
U.S.C. § 4321 *et seq.* .................................................. 8, 14

Telecommunications Act of 1996, Pub. L. No. 104-104,
110 Stat. 56 ............................................................ 8, 9, 17

§ 704(a), 110 Stat. 152.............................................................10

§ 704(b), 110 Stat. 152......................................................... 9, 15

## Others

FCC, Office of Engineering and Technology, *Questions
and Answers about Biological Effects and
Potential Hazards of Radiofrequency
Electromagnetic Fields*, OET Bulletin No. 56 (4th
ed. Aug. 1999) ...................................................................5, 9

H.R. Rep. No. 104-204(I) (1995) ...................................... 15, 17

**PRELIMINARY STATEMENT AND STATEMENT OF INTEREST**

In this litigation, plaintiffs allege that they incurred injuries as a result of exposure to radiofrequency (RF) radiation emitted by the handheld wireless telephones they used. They filed suit against numerous parties, including manufacturers of handheld wireless telephones and providers of wireless telephone service. Plaintiffs seek relief on the basis of various causes of action, including: intentional fraud and misrepresentation; negligent misrepresentation; strict product liability; failure to warn and defective manufacture and design; negligence; breach of express warranty; breach of implied warranty; conspiracy; civil battery; loss of consortium; and violation of the District of Columbia Consumer Protection Act of 2000. To support their claims of intentional fraud and misrepresentation, plaintiffs allege that defendants made misrepresentations to federal regulators concerning the safety of handheld wireless telephones. In addition, in asserting their claims of failure to warn and defective manufacture and design, plaintiffs allege that the handheld wireless telephones manufactured and sold by defendants – telephones that have been approved under the federal RF testing and emission standards for nationwide distribution and use – are nonetheless "unreasonably dangerous" and defective products under local tort law.

By order dated November 2, 2005, the Court directed the parties to file memoranda of law regarding the significance of the Supreme Court's denial of certiorari in *Pinney v. Nokia, Inc.*, 402 F.3d 430 (4th Cir.), *cert. denied,* 74 U.S.L.W. 3269, 3274 (U.S. Oct. 31, 2005). In response to that order, the Federal Communications Commission (FCC or Commission) respectfully submits this

brief as amicus curiae to provide the Court with the agency's views concerning the preemption analysis conducted in *Pinney* by the United States Court of Appeals for the Fourth Circuit.

The FCC is responsible for implementing the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, which grants the FCC broad authority to regulate radio communications and devices such as handheld wireless telephones that use RF energy. Because the FCC has explicit authority to enforce the Communications Act, including the promulgation of RF regulations that balance competing national priorities, its interpretation of its own regulations, including their preemptive force, is entitled to substantial deference from the courts. Indeed, the Supreme Court has made clear that the agency's views regarding conflict preemption are entitled to "substantial weight," *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 496 (1996), and can be "dispositive." *Ibid.* (quoting *Hillsborough Cty. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 714 (1985)). The Supreme Court's analysis in *Geier v. American Honda Motor Co.,* 529 U.S. 861 (2000), applies squarely to this case. Here, as in *Geier,* "Congress has delegated to [the agency] authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive." *Geier,* 529 U.S. at 883. As a result, "[t]he agency is likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely qualified' to comprehend the likely impact of state requirements." *Ibid.* (quoting *Medtronic,* 518 U.S. at 496). Thus, in a case such as this one, the agency's interpretation of its own rules should be given substantial weight by this Court.

2

As explained herein, the FCC respectfully disagrees with – and this Court should not follow – the Fourth Circuit's conclusion that the RF emissions from wireless phones that are sold in compliance with current FCC rules nevertheless may be deemed "unreasonably dangerous" under state law, so that wireless carriers and equipment manufacturers potentially may be subject to civil liability on that basis.

The FCC has issued federal RF exposure standards to protect users of wireless telephones from harmful levels of RF emissions. *See* 47 C.F.R. §§ 1.1307(b)(2), 2.1091, 2.1093. The FCC's standards also preserve the important federal policy of facilitating the development of wireless communications services. The FCC's RF standards have been upheld by the United States Court of Appeals for the Second Circuit as a reasonable exercise of the agency's congressionally delegated policymaking discretion. *Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 91 (2d Cir. 2000), *cert. denied*, 531 U.S. 1070 (2001). *See also EMR Network v. FCC*, 391 F.3d 269, 364 U.S. App. D.C. 20 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 2925 (2005).

In *Pinney*, the Fourth Circuit determined that state courts may deem RF emissions from wireless phones that comply with FCC requirements "unreasonably dangerous" under state law and, on that basis, impose civil liability on wireless carriers and equipment manufacturers. The Fourth Circuit supported that result by reading 47 U.S.C. § 332, which promotes the development of wireless services by, *inter alia*, confining state and local authority over wireless services to specific,

statutorily-designated areas, to allow state regulation of the RF emissions from wireless handsets. But the Fourth Circuit failed to consider the preemptive effect of the FCC's regulatory actions. *See* 402 F.3d at 456-58. As a result, *Pinney* essentially allows state law to override both the FCC's determination that its RF standards protect wireless phone users from harmful levels of RF emissions, and the nationwide balancing of federal communications policy objectives that the FCC undertook in setting its RF exposure standards. That result cannot be squared with the federal government's longstanding primacy over the regulation of RF transmissions, or with the significant federal interest in implementing a uniform national communications policy.

The Supreme Court's denial of certiorari in *Pinney* has no precedential significance; and of course, this Court is not bound to follow the Fourth Circuit's decision in that case. Indeed, for the reasons discussed below, there are compelling reasons for this Court to reject the Fourth Circuit's preemption analysis in *Pinney*.

## STATEMENT

A. *The Use of RF Energy in Communications*. The term "radiofrequency" or "RF" refers generally to the portion of the electromagnetic spectrum that is used in "over the air" communications. Every form of wireless communications – from television, radio, cellular telephones, and pagers to garage door openers, remote-controlled cars, and cordless phones – uses RF energy to send and receive the

4

electromagnetic signals that make radio communication possible.[1] Certain types of communications (such as television broadcasting) generally require high-power RF signals to be effective. Other communication devices (such as cordless phones) use relatively low-power RF signals.

Wireless telephone systems use RF energy to provide subscribers a two-way communications service. Low-power radio transmitters embedded in wireless telephones enable callers to transmit a signal (containing a voice or other message) to "base stations," which then send the signal through the wireless network and often on to other telephone networks, to the person on the other end of the call. Base stations also transmit return messages that are delivered through the network and then picked up "off the air" by the radio receivers embedded in wireless phones. *See generally Pinney*, 402 F.3d at 439-40.

B. *The FCC's Authority over Radio Communications and Devices that Emit RF Energy.* The Communications Act designates the FCC as the "centraliz[ed] authority" responsible for "execut[ing] and enforc[ing]" federal communications policies. 47 U.S.C. § 151. The Act provides that the federal government shall "maintain . . . control . . . over all the channels of radio transmission" (*id.* § 301) and establishes an overarching policy goal of making available "to all the people of the United States . . . a rapid, efficient, Nation-wide, and world-wide . . . radio

---

[1] *See* FCC, Office of Engineering and Technology, *Questions and Answers about Biological Effects and Potential Hazards of Radiofrequency Electromagnetic Fields*, OET Bulletin No. 56 (4th ed. Aug. 1999), at 2-3, available at http://www.fcc.gov/Bureaus/Engineering_Technology/Documents/bulletins/oet56/oet56e4.pdf>.

communication service" and "promoting safety of life and property through the use of . . . radio communication." *Id.* § 151. The Act also provides that the FCC should encourage "new technologies and services to the public," the "efficiency of spectrum use," and the "efficient and intensive use of the electromagnetic spectrum." *Id.* §§ 157; 309(j)(3)(D); 332(a)(2).

To facilitate the FCC's implementation of those broad objectives, Congress granted the FCC expansive authority over radio transmissions. *National Broad. Co. v. United States*, 319 U.S. 190, 217 (1943) (observing that the FCC is granted "comprehensive powers to promote and realize the vast potentialities of radio"). The FCC is responsible for "licensing and regulating" the RF spectrum and devices that transmit RF signals. 47 U.S.C. § 152(a). The Act grants the FCC the power to "[p]rescribe the nature of the service to be rendered by each class of licensed stations," "determine the power which each station shall use," "[r]egulate the kind of apparatus to be used with respect to its external effects," "encourage the larger and more effective use of radio in the public interest," and generally "[m]ake such rules and regulations . . . as may be necessary to carry out the provisions of this Act." *Id.* § 303(b), (c), (e), (g), (r). The FCC carries out its duties by, among other things, allocating spectrum for specific uses and granting licenses authorizing the use of RF signals for wireless communications. *See, e.g., id.* §§ 303(a)-(c), 308, 309. In addition, the Act authorizes the FCC to regulate the manufacture and distribution of all devices that emit RF energy, including wireless phones, to

ensure that the RF signals they emit do not interfere with other forms of radio communications. *Id.* § 302(a) & (b).

In enacting the Communications Act, Congress sought to create a "unified and comprehensive regulatory system" governing the use of radio signals in the United States, *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 137 (1940), and it has long been settled that the FCC's regulation of "technical matters" concerning frequency allocation is "clearly exclusive" of state and local regulation. *Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424, 430 n.6 (1963); *see also Broyde v. Gotham Towers, Inc.*, 13 F.3d 994, 997 (6th Cir.) (noting the "irreconcilable conflict between the FCC's exercise of exclusive jurisdiction over the regulation of radio frequency interference and the imposition of common law standards in a damages action"), *cert. denied*, 511 U.S. 1128 (1994).

With respect to wireless telephone service in particular, the FCC has for many years preempted state and local regulation in order to promote the achievement of federal policy objectives.[2] More recently, Congress expressly adopted the principle of federal primacy in the emerging area of wireless communications. Although the states have traditionally exercised regulatory authority over intrastate communications (*see* 47 U.S.C. § 152(b)), Congress in 1993 preempted state and local regulation of "the entry of or the rates charged by" wireless telephone service providers. *Id.* § 332(c)(3). In the Telecommunications Act of 1996, Pub. L. No.

---

[2] *See, e.g., Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems*, 86 FCC 2d 469, 504-05 ¶ 82 (1981) (*Cellular Order*) (preempting state "technical standards" in order to preserve "federal primacy" and to promote the "rapid implementation of cellular service").

104-104, 110 Stat. 56 (1996 Act), Congress further preempted states and localities from, *inter alia*, independently regulating wireless telephone facilities "on the basis of the environmental effects of radio frequency emissions" (47 U.S.C. § 332(c)(7)(B)(iv)), notwithstanding the traditional authority of state and local governments to regulate zoning within their jurisdictions, *id.* § 332(c)(7).

The pro-competitive, deregulatory framework for wireless service prescribed by Congress and implemented by the FCC has enabled wireless competition to flourish, with substantial benefits to consumers. Wireless phone subscribership continues to increase at a rapid and steady rate. During 2004, for example, the number of subscribers to mobile telephone service increased from 160.6 million to 184.7 million, so that roughly 62 percent of the U.S. population now subscribes to such service.[3] Intense price competition has resulted in affordable rates as well as innovative pricing plans such as free night and weekend minutes and free mobile-to-mobile calling. Wireless carriers' average revenue per minute has fallen consistently, from 44 cents in 1993 to 9 cents in 2004. Consumers continue to increase the use of their wireless phones.[4]

C. *The FCC's Regulation of RF Emissions from Wireless Telephones.* In addition to implementing the policies underlying the Communications Act, the FCC is required under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*, to evaluate the environmental effects of "major" regulatory

---

[3] *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993*, FCC 05-173, 2005 WL 2429714, ¶ 5 (2005).

[4] *Id.* at ¶ 5, Table 8.

actions "significantly affecting the quality of the human environment." *Id.*
§ 4332(2)(C). In accordance with that obligation, the FCC has issued regulations to
ensure that users of wireless telephones and the general public are not exposed to
excessive levels of RF energy. The FCC's regulations set RF exposure limits that
are well below the levels that laboratory studies have shown can produce
potentially harmful biological effects. OET Bulletin No. 56, *supra* note 1, at 13
n.10. A wireless telephone provider cannot obtain the FCC's approval to sell or
distribute telephones in the United States unless it complies with the FCC's RF
safety standards or otherwise demonstrates on the basis of a detailed environmental
analysis that FCC authorization is warranted. *See* 47 C.F.R. §§ 1.1306(b)(3),
1.1307(b), 2.803(a).

The FCC first established RF exposure standards in 1985, when it adopted the
RF guidelines that had been developed by the American National Standards
Institute (ANSI), a non-governmental standards-setting body.[5] In 1993, the FCC
initiated a proceeding to revise those standards in light of newer standards that had
been developed by ANSI. *Guidelines for Evaluating the Environmental Effects of
Radiofrequency Radiation*, 8 FCC Rcd 2849, 2849 ¶ 1 (1993). That proceeding
was still pending before the agency when Congress enacted the 1996 Act. In
Section 704(b) of the 1996 Act, Congress directed the FCC to "complete action" to
"prescribe and make effective rules regarding the environmental effects of radio

---

[5] *Responsibility of the Federal Communications Commission to Consider
Biological Effects of Radio Frequency Radiation when Authorizing the Use of
Radio Frequency Devices*, 100 FCC 2d 543 (1985), *on recon.*, 58 Radio Reg.
(P&F) 2d 1128 (1985).

9

frequency emissions." 110 Stat. 152. As discussed above, Congress also provided that states and localities may not regulate "personal wireless service facilities on the basis of the environmental effects of radio frequency emissions" that do not exceed the FCC's RF standards. § 704(a), 110 Stat. 152.

As directed by Congress, the FCC released a Report and Order in August 1996 to revise its RF exposure standards. *Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 11 FCC Rcd 15123 (1996) (*RF Order*), *on recon.*, 12 FCC Rcd 13494 (1997) (*Second RF Order*). The *RF Order* established the current federal safety standards for RF emissions from wireless phones. *RF Order*, 11 FCC Rcd at 15147 ¶ 63. In issuing its new standards, the FCC explained that it was relying "substantially on the recommendations" of the Environmental Protection Agency, the Food and Drug Administration, and other federal health and safety agencies. *Id.* at 15124 ¶ 2. The FCC also concluded that its standards "represent[ed] the best scientific thought" on the RF limits necessary "to protect the public health," *id.* at 15184 ¶ 168; *see also id.* at 15146-47 ¶¶ 62-64, and "provide a proper balance between the need to protect the public and workers from exposure to excessive RF electromagnetic fields and the need to allow communications services to readily address growing marketplace demands," *Second RF Order*, 12 FCC Rcd at 13505 ¶ 29. The FCC committed to revisiting its RF exposure standards if future scientific research demonstrates that those standards are inadequate to protect the public. *Id.* at 13506 ¶ 32.

As part of the 1996 Act, Congress expressly preempted state and local regulation of "the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of [RF] emissions." 47 U.S.C. § 332(c)(7)(B)(iv). When the FCC adopted new RF guidelines, it rejected a proposal to adopt "a broad-based preemption policy to cover all transmitting sources," including facilities other than those covered by the statute. *RF Order,* 11 FCC Rcd at 15184 ¶ 168; *see also Second RF Order,* 12 FCC Rcd at 13529 ¶ 88. The agency expected that after states and localities had had an opportunity to review the new FCC guidelines, they would "agree that no further state or local regulation is warranted." *RF Order,* 11 FCC Rcd at 15184 ¶ 168. The FCC made clear, however, that if its expectations should "prove to be misplaced," and if "FCC licensees encounter a pattern of state or local activities which constitute an obstacle to the scheme of federal control of radio facilities set forth in the Communications Act," the agency reserved the right to revisit the preemption issue. *Ibid.*

On judicial review, the Second Circuit rejected arguments that the FCC's RF exposure standards were inadequate to protect the public against unhealthy levels of RF emissions. *Cellular Phone Taskforce*, 205 F.3d 82. The court noted that "[a]ll of the expert [federal] agencies consulted . . . found the FCC's approach to be satisfactory." *Id.* at 90. Observing that setting "safety margins" is "a policy question, not a legal one," the court held that the FCC acted reasonably in setting RF standards that, while protecting the public, also were calibrated to preserve "the

11

requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible." *Id.* at 91-92 (internal quotation marks omitted). Further, the Second Circuit determined that, to the extent new information was developed that suggested a need for stricter regulation, the FCC was satisfied that there was a "mechanism in place for accommodating changes in scientific knowledge." *Id.* at 90-91 (internal quotation marks omitted). Last year, the D.C. Circuit similarly recognized the FCC's continuing "determination to keep an eye on developments" to ensure that the agency is able to take account of new scientific evidence concerning RF safety. *EMR Network*, 391 F.3d at 273, 364 U.S. App. D.C. at 24.

## ARGUMENT

It is "well-settled" that the Supreme Court's denial of a petition for a writ of certiorari "imparts no implication or inference concerning the Court's view of the merits" of a case that it has declined to review. *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 365 n.1 (1973) (citing *Maryland v. Baltimore Radio Show, Inc.,* 338 U.S. 912, 919 (1950) (opinion of Frankfurter, J.)). Consequently, this Court should not construe the Supreme Court's denial of certiorari in *Pinney* as an endorsement of the Fourth Circuit's preemption analysis in that case. In any event, this Court is not bound to follow decisions of the Fourth Circuit; and as we explain below, there are compelling reasons for this Court to reject the Fourth Circuit's preemption analysis in *Pinney*.

1. Federal law generally preempts state law under the Supremacy Clause in three situations. First, state law is preempted when a federal statute "express[es] a

clear intent to pre-empt." *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984). Second, state law is preempted when a comprehensive federal statute "occup[ies] an entire field of regulation," leaving no room for state participation. *Ibid.* Third, when federal and state law conflict because compliance with both is impossible or state law "stands as an obstacle to the accomplishment and execution" of a valid federal policy, federal law must prevail. *Ibid.* (citation and internal quotation marks omitted); *see also Geier*, 529 U.S. at 874.

Federal agency regulations that are validly promulgated have the same preemptive effect as federal statutes. *Capital Cities Cable*, 467 U.S. at 699 (citing *Fidelity Fed. Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153-54 (1982)). The statutorily authorized regulations of an agency therefore "will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof." *City of New York v. FCC*, 486 U.S. 57, 64 (1988). In situations involving agency preemption, the relevant inquiry thus is "whether the federal agency has properly exercised its own delegated authority rather than simply whether Congress has properly exercised the legislative power." *Ibid.* The Fourth Circuit's *Pinney* decision incorrectly applies those principles. Rather than allowing state-law tort actions to proceed on the theory that RF emissions from wireless telephones are unreasonably dangerous, the court of appeals should have held that such suits are preempted because they conflict with, and prevent execution of, the FCC's

13

judicially approved policies concerning RF emissions from wireless communications devices.[6]

2. The Communications Act vests in the FCC exclusive federal authority to regulate the use of radio communications in the United States and grants the FCC broad regulatory powers over the technical aspects of RF transmissions. *See supra* pp. 3-7. Consistent with its obligations under NEPA and the Communications Act, including a specific Congressional directive in Section 704(b) of the Telecommunications Act of 1996, the FCC has provided that, in the absence of a detailed environmental analysis, it will not authorize the sale or distribution of any wireless telephone in the United States that does not comply with its RF safety standards. Conversely, the FCC has determined that wireless phones that do comply with its RF standards are safe for use by the general public and may be sold in the United States. *See RF Order*, 11 FCC Rcd at 15147-48 ¶¶ 63-66. In light of this regulatory framework, the Fourth Circuit in *Pinney* erred in failing to recognize that the FCC's establishment of national RF exposure standards, and its determination that wireless phones that comply with those standards are safe for

---

[6] In analyzing the preemption question, the Fourth Circuit in *Pinney* held that handheld wireless telephones fall outside the scope of 47 U.S.C. § 332(c)(7)(B)(iv), which preempts state and local regulation of "the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of [RF] emissions to the extent that such facilities comply with the [FCC's] regulations concerning such emissions." *Pinney*, 402 F.3d at 454-55. Even assuming that this reading of the statute is correct, the *Pinney* court's preemption analysis is nonetheless flawed because that court failed to take account of the preemptive force of the FCC's regulations. Under Supreme Court precedent, the absence of express statutory preemption cannot be read to create any "special burden" on the agency to demonstrate conflict preemption by agency rule. *See Geier*, 529 U.S. at 872-73.

14

sale to the general public, preempted the *Pinney* plaintiffs' attempts to obtain a contrary judicial ruling under state law.

As the district court in *Pinney* correctly noted, a judicial determination of plaintiffs' claims under state law would "necessarily require a judge and jury to usurp the regulatory function entrusted by Congress to the expertise and discretion of federal agencies." 248 F. Supp. 2d 452, 463 (D. Md. 2003). When directing the FCC to "complete action . . . to prescribe and make effective rules regarding the environmental effects of radio frequency emissions" (§ 704(b), 110 Stat. 152), Congress in the 1996 Act contemplated that the FCC's RF standards would "contain adequate, appropriate and necessary levels of protection to the public." *See* H.R. Rep. No. 104-204(I), at 95 (1995). The FCC issued its current RF standard for wireless phones after a lengthy and comprehensive rulemaking in which interested parties on all sides participated. Federal agencies that have specialized expertise in health matters also participated in the FCC's rulemaking and endorsed the agency's RF standards as adequate to protect the public against harmful RF emissions. *RF Order*, 11 FCC Rcd at 15129-31 ¶¶ 15-20. On judicial review, the Second Circuit rejected arguments that the FCC should have adopted stricter RF standards, concluding that the FCC had acted within the scope of its policymaking discretion in establishing its RF standards and in relying on the recommendations of other expert federal agencies. *Cellular Phone Taskforce*, 205 F.3d at 90-92. Further, as both the Second and D.C. Circuits have recognized, the FCC has a "mechanism in place" through its ongoing coordination with other

15

federal agencies and other expert bodies for accommodating changes in scientific knowledge. *See Cellular Phone Taskforce*, 205 F.3d at 90-91; *EMR Network*, 391 F.3d at 273, 364 U.S. App. D.C. at 24.

By permitting the *Pinney* plaintiffs' claims that wireless telephones are unreasonably dangerous devices to go forward, the Fourth Circuit condoned what is essentially a back-door challenge to the FCC's decision to allow the sale of those phones to the public and to the adequacy of the RF standards the FCC adopted. Because a state-law action that seeks to overturn federal agency determinations inherently "stands as an obstacle to the accomplishment and execution" of a valid federal policy, such an action conflicts with federal law and is therefore preempted. *See, e.g., Geier*, 529 U.S. at 874-75.

In adopting its RF regulations, the FCC made a finding that those regulations "represent the best scientific thought and are sufficient to protect the public health." *RF Order*, 11 FCC Rcd at 15184 ¶ 168. Plaintiffs' claims that handheld

wireless telephones are "unreasonably dangerous" conflict with that FCC finding. Those claims are therefore preempted.[7]

3. The *Pinney* court also erred when it concluded that it was permissible for state courts to undertake what is an exclusively federal responsibility for evaluating the utility of RF transmissions used in wireless telephone service. As the majority decision in *Pinney* noted, adjudication of the plaintiffs' claims in that case would require some courts to engage in a "risk/utility" analysis to evaluate whether RF emissions from wireless phones are "unreasonably dangerous." *Pinney*, 402 F.3d at 446-47. The *Pinney* court suggested that the FCC's policy judgments, as embodied in its RF standards, would carry little, if any, weight in that analysis. *Id.* at 447. Thus, under the Fourth Circuit's analysis, a state court could strike a balance different from, and inconsistent with, the policy decisions that the FCC made in issuing its RF regulations. That result cannot be squared with the uniform federal regulatory framework for the provision of wireless telephone services, or

---

[7] No negative inference should be drawn from the FCC's decision not to expressly preempt "state and local regulation of RF emissions in non-personal wireless services situations." *RF Order,* 11 FCC Rcd at 15183 ¶ 167; *see also Second RF Order,* 12 FCC Rcd at 13529 ¶ 88. The preemption proposals that the agency rejected in those orders were much broader than the preemption at issue here; they would have encompassed *all* RF transmitting sources, not just personal wireless service sources. *RF Order,* 11 FCC Rcd at 15183-84 ¶¶ 167-168. Moreover, preemption was unnecessary in that context because no actual conflict was brought to the agency's attention at that time. *Id.* at 15184 ¶ 168. Here, by contrast, plaintiffs are bringing claims that conflict directly with the Commission's determination that its regulations reflect the proper balance between the need to protect the health of the public and the need to allow communications services to be provided to the public in an efficient and practical manner.

the primacy that the Communications Act gives the FCC in technical matters relating to RF transmissions.

The Communications Act establishes a broad policy of promoting the development of an "efficient . . . radio communication service" in order to "promot[e] safety of life and property," among other objectives. 47 U.S.C. § 151; *accord id.* §§ 309(j)(3)(A), 332(a). As expressed in the legislative history of the 1996 Act, "[a] high quality national wireless telecommunications network cannot exist if each of its component[s] must meet different RF standards in each community." H.R. Rep. No. 104-204(I), at 95. Thus, the FCC has preempted state authority over the technical aspects of cellular service in order to promote "rapid implementation" of the service. *Cellular Order*, 86 FCC 2d at 504-05 ¶ 82. Congress likewise has sought to promote the development of wireless services by limiting the regulatory authority of state and local governments – notwithstanding the traditional role that those governments have had in regulating matters such as intrastate communications and zoning. *See, e.g.*, 47 U.S.C. § 332(c)(3)(A), (c)(7).

The *Pinney* court did not discern in Section 332 (or other provisions) of the Communications Act any "congressional objective of achieving preemptive national RF radiation standards for wireless telephones." *Pinney*, 402 F.3d at 457. That court, however, failed to consider the conflict that adjudication of plaintiffs' state-law claims would create with the FCC's valid policies implementing the Act. In developing its RF standards for wireless phones, the FCC considered not only the need to protect the public from the risks associated with excessive RF

18

exposure, but also the effect that its standards would have on achievement of federal communications objectives. The FCC concluded that the particular RF standards it had adopted were "appropriate" because they "addressed specific safety concerns" and "at the same time, allow [providers] to meet the growing marketplace demand for communications services." *Second RF Order*, 12 FCC Rcd at 13508 ¶ 39; *see also id.* at 13505 ¶ 29. In the agency's considered judgment, its RF guidelines "provide a proper balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible." *Id.* at 13496 ¶ 2.

The FCC's decision on where to set "safety margins" is a "policy question," in connection with which the agency legitimately took into account the objective of facilitating the efficient delivery of communications services. *Cellular Phone Taskforce*, 205 F.3d at 92. The FCC's resolution of that policy question constitutes "a ruling that no such [stricter] regulation is appropriate or approved pursuant to the policy of the statute" and, therefore, has the effect of preempting any state law that would impose such regulation. *Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 774 (1947).

The Fourth Circuit also erred in relying on a "presumption against preemption" because plaintiffs' claims relate to the health effects of wireless telephones, and health is a traditional area of state regulation. *Pinney*, 402 F.3d at 453-54 (citing *Medtronic*, 518 U.S. at 485). No such "presumption" applies "where there has been

a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108

(2000). The federal government's presence in the regulation of radio transmission

has been predominant for nearly a century. *See generally National Broad. Co.*, 319

U.S. at 210-14 (summarizing federal regulatory history). Moreover, that federal

presence is not just "significant," it is exclusive. The states have no authority to

regulate the RF transmissions used to provide wireless telephone service. *See*

*supra* pp. 4-5. By failing to recognize this, the *Pinney* court erred.[8]

---

[8] For similar reasons, the Supreme Court has held that there is no presumption
against preemption of claims that a defendant defrauded a federal agency when the
agency has its own established procedures for detecting, deterring, and punishing
fraud. *See Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 348 (2001).
In this case, if plaintiffs are correct that defendants have made false statements to
the FCC concerning the safety of handheld wireless telephones, the FCC has the
authority to take enforcement action against defendants. *See* 47 C.F.R. § 1.17
(requiring regulated entities to make truthful and accurate statements to the FCC);
47 U.S.C. § 503(b)(1)(B) (authorizing the FCC to impose monetary forfeitures on
regulated entities that violate FCC rules); 47 C.F.R. § 2.939(a)(1) (authorizing the
FCC to revoke the equipment authorization of an entity that has made false
statements or misrepresentations to the agency). Therefore, insofar as plaintiffs'
claims in this case rest on allegations that defendants misled the FCC about the
safety of handheld wireless phones, those claims would be preempted.

## CONCLUSION

For the foregoing reasons, this Court is not bound by, and should not adopt, the Fourth Circuit's preemption analysis in *Pinney* in addressing the question whether the plaintiffs' claims in this case are preempted by federal law.

Respectfully submitted,

OF COUNSEL:

SAMUEL L. FEDER
ACTING GENERAL COUNSEL

FEDERAL COMMUNICATIONS
COMMISSION
WASHINGTON, D.C. 20554

STUART E. SCHIFFER
ACTING ASSISTANT ATTORNEY GENERAL

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY

/s/
THEODORE C. HIRT, DC BAR # 242982
ATTORNEY, CIVIL DIVISION
ROOM 7106
(202) 514-4785
THEODORE.HIRT@USDOJ.GOV

ERIC R. WOMACK, ILLINOIS BAR # 6279517
ATTORNEY, CIVIL DIVISION
ROOM 7218
(202) 514-4020

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL PROGRAMS BRANCH
20 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20530
(202) 616-8470(FAX)

November 21, 2005

## CERTIFICATE OF SERVICE

I, Theodore C. Hirt, hereby certify that on November 21, 2005, I caused a copy of the foregoing Motion of the Federal Communications Commission for Leave to file Amicus Brief, accompanying Memorandum of Points and Authorities, and proposed Order, and accompanying Brief of Federal Communications Commission as Amicus Curiae, to be delivered electronically via the CaseFileXpress eFiling system to the parties on the attached service list:

Jeffrey B. Morganroth, Esq.
Mayer Morganroth, Esq.
Morganroth & Morganroth
3000 Town Center, Suite 1500
Southfield, MI 48075

Sheldon L. Miller, Esq.
Lopatin, Miller, Freidman, Bluestone & Herskovic
3000 Town Center, Suite 1700
Southfield, MI 48075

Joanne L. Suder, Esq.
The Suder Law Firm, P.A.
210 E. Lexington St., Suite 100
Baltimore, MD 21202

*Counsel for Plaintiffs*

Andrew McBride, Esq.
Joshua Turner, Esq.
Wiley Rein & Fielding LLP
1776 K St., N.W.
Washington, D.C. 20006

*Lead Counsel for Defendants*

_____/S/_____
Theodore C. Hirt