# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

---

| | |
|---|---|
| **IN RE WIRELESS TELPHONE RADIO FREQUENCY EMISSIONS PRODUCTS LIABILITY LITIGATION** | **MDL NO.  1421** |
| This Memorandum relates to: *Farina v. Nokia, Inc.* (E.D. Pa), CCB-06-1577 | **Civil Action No. 01-MD-1421** |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE THIRD AMENDED *FARINA* COMPLAINT

H. Russell Smouse
Glenn E. Mintzer
**LAW OFFICES OF**
**PETER G. ANGELOS, P.C.**
One Charles Center
100 North Charles Street
Baltimore, MD 21201
(410) 649-2000

Kenneth A. Jacobsen
**JACOBSEN LAW OFFICES LLC**
12 Orchard Lane
Wallingford, PA 19086
(610) 566-7930

Michael R. Allweiss
**LOWE, STEIN, HOFFMAN, ALLWEISS & HAUVER, LLP**
701 Poydas Street
One Shell Square
Suite 3600
New Orleans, LA 70139
(504) 581-2450

Joseph A. O'Keefe
**O'KEEFE & SHER, P.C.**
15019 Kutztown Road
Kutztown, PA 19530
(610) 683-0771

Michael D. Donovan
**DONOVAN SEARLES, LLC**
1845 Walnut Street
Suite 1100
Philadelphia, PA 19103
(215) 732-6067

INTRODUCTION ………………………………………………………1

I.  Defendants Engaged In A Joint Action To Mislead The Public;
    That Is, They Were In A Conspiracy As Alleged In Count I ……………...5

A.  Defendants acted in concert to deceive cell phone users …………………..5

B.  Defendants' deceptive acts were not
    merely negligent but malicious ………………………………………………10

II.  Defendants Jointly Engaged In A Scheme
     To Defraud Plaintiff In Violation Of The UTPCPL …………………………12

A.  The Complaint alleges valid UTPCPL
    claims against all defendants …………………………………………………...13

B.  The defendants defrauded plaintiff ……………………………………………..16

C.  Pennsylvania law presumes reliance ……………………………………………20

D.  Plaintiff has suffered an ascertainable loss ……………………………………..21

III.  Defendants Breached Warranties By Manipulating Information
      To Induce Plaintiff To Buy Products That Did Not Operate Properly …........22

A.  The cell phones manifested a defect and plaintiff suffered an injury……....…24

B.  The filing of the original complaint is sufficient notice
    that plaintiff discovered the unsafe condition of the phones
    defendants tried to hide ………………………………………………………..29

C.  The cell phones were not fit for the purpose
    for which defendants knew they were to be used ……………………………31

D.  The cell phones were not safe and useful as expressly provided ……………31

1.  The defendants expressly warranted that good scientific research
    supported defendants' affirmation that their phones were safe. ……………..32

2.  This warranty is breached every time the phones are used. …………………....33

3.  These breaches are part of defendants' conspiracy. …………………………....34

IV. Plaintiff Has Stated Valid Magnuson-Moss Act
        And UTPCPL Claims Grounded In Defendants'
        Breaches of Warranty ……………………………………………………….35

V.  Plaintiff Is Entitled To Seek All Necessary And Proper Relief …………………36

CONCLUSION …………………………………………………………………...37

## INTRODUCTION

After failing to convince the Fourth Circuit Court of Appeals and the United States Supreme Court that plaintiff's claims are preempted, defendants have returned to this Court and moved to dismiss plaintiff's Third Amended Complaint (hereinafter, the "Complaint"). The Complaint alleges a concerted effort of all defendants to suppress and manipulate information in order to sell their cell phones, despite at the very least significant scientific concerns that those cell phones expose users to radio frequency radiation ("RFR"). Therefore, those cell phones are not as safe as defendants represented them to be, nor are they fit for their ordinary use, because their use unquestionably exposes users to potentially harmful radiation. This Court, in considering this motion to dismiss under Fed.R.Civ.P. 12(b)(6), must accept all well-pleaded allegations in the Complaint as true. *Migdal v. Rowe Price-Fleming Int'l.*, 248 F.3d 321, 325 (4th Cir. 2001). The Complaint must only allege a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2), *see also Migdal* at 325-26. The Court can grant the motion only if those allegations, judged on the liberal standards of Rule 8(a)(2), appear certain not to state any set of facts entitling plaintiff to relief. *Migdal* at 325. Plaintiff's Complaint sets forth substantial claims, supported by the law, that give full notice to defendants of the facts on which the claims are grounded. Therefore, this Court must deny defendant's motion to dismiss the Complaint.

This motion, by and large, does not address the Complaint as it is written but some alternative version that defendants wish plaintiff had filed. The motion to dismiss says much less than it first appears, because its style of presentation produces much more heat than light. It uses two basic argumentative techniques. First, the memorandum

makes assertions of a very general principle of law, supporting those assertions with numerous string citations to decisions that bear no legal or factual resemblance to the Complaint here. The memorandum paraphrases, out of context, one sentence or another from some of those cited cases, and hopes that this Court does not notice that defendants' arguments rest primarily on assertion, not legal analysis.

The other central characteristic of defendants' memorandum is that it rarely refers to the Complaint at all and often argues against causes of action that do not even appear in the Complaint. Sometimes, defendants do address the actual counts of the Complaint, but even then their memorandum does not address any one count in any one place but disperses the arguments against a particular cause of action over disparate parts of the memorandum. One example of the failure to refer to the Complaint include defendants' blanket assertion that the Complaint supposedly does not allege specific acts of misrepresentation, ignoring paragraph after paragraph of the Complaint which give dates for and exact quotes of defendants' fraudulent statements. *See, e.g.*, Complaint ¶¶ 57, 58, 60. An example of how the memorandum argues against causes of actions that do not even appear in the Complaint is found at page 24 of defendants' memorandum, which states "It is an axiom of products liability law…." The rest of the sentence, and indeed that page, is completely irrelevant since the Complaint does not allege a products liability count. That entire page makes an argument against the inclusion of trade associations in products liability cases—a dubious argument, but one that is purely academic and unrelated to this case, as it is not a products liability case. Similarly, section II of the memorandum is an extended diatribe against claims for "future risk of harm" damages, but none of the plaintiff's actual causes of action seek such damages. Finally, as an

example of how defendants refuse to address the counts of the Complaint in any one place, defendants attempt to argue against the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") cause of action in different places—most of it beginning at page 19, but one key argument against the UTPCPL applying to trade associations, is found elsewhere at page 5-6.

A close look behind the distractions created by the chatter of string citations in defendants' memorandum of law reveals that the argument depends on a few rather obvious acts of sleight of hand.   The three central acts of misdirection in defendants' argument are first, repeatedly misstating that plaintiff is seeking damages for potential future harm, when the Complaint clearly speaks of curing current defects.  The second act of misdirection by defendants is their unsupported assertion that plaintiff has not alleged that defendants engaged in acts of intentional deception.  The third act of misdirection is found in the memorandum's repeated assertions that plaintiff has not alleged claims against all the defendants and hoping this Court will not notice that all defendants are part of the conspiracy alleged in Count I of the Complaint.  In fact, the memorandum only begrudgingly mentions the Complaint's first count, civil conspiracy, in the very last pages of the memorandum.

The most egregious sleight of hand in defendants' motion is the effort to try to direct this Court away from the claims plaintiff has made toward a straw man of defendants' own construction. What defendants want this Court to do is view this case as, in essence, a claim by an unharmed plaintiff seeking damages for injuries he may suffer some day in the future.  That is not, however, the case this Court has before it.  This case is about defendants who have knowingly marketed and sold a product that is exposing its

customers to radiation which causes present biological effects, and who were hiding that fact and representing it as safe. The plaintiff and all the other class members are currently in possession of cell phones that are not as safe or as good as he or they were led to believe, and the relief sought is to make the defendants do what is needed to make those cell phones as safe and harmless as defendants represented them to be.

Another act of misdirection throughout the memorandum is to attack the counts in plaintiff's Complaint that depend on defendants' acts of intentional deception and deliberate suppression of information without actually discussing what the Complaint says. These acts of deception are at the core of plaintiff's UTPCPL claims and are central to establishing the express warranties that defendants' have violated. As these acts of deception were engaged in by the industry as a whole, they are at the core of the civil conspiracy charge against all defendants. Most of defendants' argument against the allegations of deception is that they are not specific enough. (Defendants' also argue, halfheartedly, that deliberate acts of suppression of critical information cannot be actionable, a fallacious argument discussed below in further detail). The only way to argue lack of specificity and particularity is to ignore all the specific allegations of the Complaint; and that is what defendants do. They fail to even mention any of the very specific allegations of deceptive communications expressly included in the Complaint.

A third, critical attempt at sleight of hand in defendants' memorandum concerns plaintiff's claims against cell phone companies he did not deal with directly as a customer and against the cell phone companies' trade associations. In iteration after iteration of this act of misdirection, defendants assert that plaintiff has not and cannot state any claims against these defendants. Yet, only at the very end of thirty pages of string cites

do defendants belatedly acknowledge that all defendants are implicated in the civil conspiracy plaintiff has alleged.  That brief acknowledgment, however, undercuts every argument against standing and the like made in all the previous pages.

The civil conspiracy count, however, is the very first count in the Complaint and is incorporated by reference in every count that follows.  Defendants' failure even to address that count until after making every other argument is a perfect example of the inaccurate portrait of the Complaint defendants attempt to paint.  Of course defendants would like to ignore that count, as they would have the Court overlook entirely their concerted actions to mislead the public which gave rise to this case in the first place.

## I. Defendants Engaged in a Joint Action to Mislead the Public; That is, They Were in a Conspiracy as Alleged in Count I

The first count of the Complaint addresses the collaboration of all the defendants to suppress and manipulate information so that consumers would buy potentially unsafe and therefore defective cell phones without headsets.  That count alleges a civil conspiracy between all the defendants in that all agreed, collectively, to market their cell phones without headsets, and without warning customers of their exposure to RFR.  All acted, collectively, through their trade associations, to suppress information about the dangers of RFR.  Complaint ¶ 126.  In aid of this goal of suppressing information and misrepresenting the risks of their products, they all acted together to lobby various governmental and standard-setting bodies to prevent adequate scrutiny of their products.  Complaint ¶ 129.

### A. Defendants acted in concert to deceive cell phone users

Defendants' long delay in discussing the civil conspiracy count leads them to make a strangely obtuse argument against plaintiff's standing to sue many of them.  The

crux of their argument is that plaintiff has not alleged "dealing of any kind" with some of the defendants.  In making that claim, defendants apparently have overlooked the primary allegations of the Complaint, which describes all the actions defendants engaged in together to hurt him and all other members of the class.  Summarized, these allegations are that all the defendants together set standards for cell phones that ignored scientific evidence in defendants' possession; defendants acted jointly, through their trade associations, to suppress information that would show that the cell phones each defendant sold exposed class members to RFR; and defendants acted jointly to supply the buying public misleading information.  The buying public, including plaintiff, of course only bought a cell phone from one company at a time, but all the defendants and their trade associations acted together to sell that phone.

Defendants appear to believe that plaintiff's claims against those from whom he did not purchase a cell phone are "class-based"—that is to say, are based on the fact that other members of the class bought phones from some of the defendants from which plaintiff himself did not buy.  Def. Memo. at 4-5. But plaintiff's allegations are not so limited in scope. True, class members purchased cell phones from defendants with whom plaintiff did not deal directly, which confers standing on plaintiff—the proposed class representative—to represent their interests in this case. Defendants' standing argument is a matter for class certification proceedings, not this dismissal motion. But more to the point, the acts of fraudulent concealment and misrepresentation that enabled any particular defendant to sell a defective cell phone without a headset to plaintiff not only were joint acts, but they had to be joint acts.  There would be no chance for any single cell phone company to perpetrate this deception individually.  It took a united front to

control, suppress and manipulate the scientific information so that plaintiff would be deceived into irradiating his head using a cell phone when he could have used an inexpensive headset and been as completely safe as promised by defendants collectively.

The allegations in this count state a claim for all the elements of civil conspiracy. In order to allege civil conspiracy under Pennsylvania law, plaintiff must aver that: (1) two or more defendants agreed with intent to commit an unlawful act or to do otherwise lawful act by unlawful means; (2) defendants committed an overt act in furtherance of common purpose; and (3) plaintiff suffered actual legal damage. *Baker v. Family Credit Counseling Corp.*, 440 F.Supp.2d 392, 415 (E.D. Pa. 2006). All of these elements are alleged in the Complaint. Paragraph after paragraph describes the agreement and collective actions of all the defendants, as each defendant company joined with the others and took actions through defendant trade associations, with the purpose of hiding the truth about RFR from consumers. That very purpose was to defraud the public. As described throughout the Complaint, the defendants engaged in a wide variety of overt acts to further their purpose, and many of these overt acts were willful acts of fraud that are, in turn, the basis of the claims under the Pennsylvania UTPCPL. These acts of fraud, in turn, led to "ascertainable loss" on the part of all the users who bought the cell phones, including plaintiff. See *Solarz v. DaimlerChrysler Corp.*, 2002 WL 452218 at * 6 (Pa. Comm. Pl. 2002), ("[t]he ascertainable loss includes the cost of installing the park-brake interlock in [Daimler]Chrysler minivans and/or the difference in value between minivans with the park-brake interlock device and those without it") Similarly, plaintiff's ascertainable losses include the cost of purchasing a headset that makes the phones safe and the difference in value between cell phones with and without such headsets. This

ascertainable loss is the sort of legal damage that the UTPCPL recognizes and remedies.

*See Grant v. Bridgestone/Firestone, Inc.,* 2002 WL 372941,Sept. 2000, No. 3668, slip op.

at 4-8 (Pa. Com. Pl., Jan 10, 2002) ("Grant II") (the UTPCPL requires only that plaintiffs

sufficiently allege an ascertainable loss).

Other instances of industry-wide conspiracies have been pled successfully in

courts applying Pennsylvania law.  For instance, in *Baker v. Family Credit Counseling*

*Corp.*, 440 F.Supp.2d 392, 420-421 (E.D. Pa. 2006), the court held

> "Plaintiffs' Complaint paints a picture of interrelated corporate and individual
> defendants, conspiring together to defraud financially distressed consumers.
> Plaintiffs allege that they sought out defendants' debt-management services in
> an effort to reduce their debt and improve their credit, but instead were left
> with greater debt and worse credit.  The Court will allow plaintiffs to attempt
> to prove their allegations."

In the Complaint here, a similar picture of "interrelated" defendants is painted, and

paragraph after paragraph details their joint actions through trade associations to defraud

consumers by suppressing critical information.  In *Baker*, also a class action, the

defendants were credit repair companies who collaborated together in ways harmful to

the consumers.  Those credit repair companies could be found to have conspired to

breach fiduciary duties to consumers, and were liable to each of those consumers, even

though not every one of the defendants had dealings with every member of the class (or,

for that matter, with the named plaintiff and class representative).  As the court explained,

"A plaintiff may also allege a civil cause of action, such as breach of fiduciary duty,

against *any defendant who conspired* to commit that tort."  *Baker*, 440 F. Supp. 2d at 415

(emphasis supplied).  In other words, a plaintiff (like Mr. Farina) may allege a civil cause

of action against any defendant who conspired to defraud him and others as forbidden by

the UTPCPL, or to sell products that were not safe for their intended use to him and

others, and thus to breach implied warranties, whether or not Mr. Farina dealt with that defendant directly.

The overt act of one co-conspirator is sufficient to implicate all other co-conspirators in the conspiracy. *United States. ex rel. Barlett v. Tyrone Hosp., Inc*., 2006 WL 221494 (W.D. Pa. 2006). Not every conspirator must commit an overt act in furtherance of conspiracy, so long as at least one does. *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406 (3d. Cir. 2003).

All the defendants conspired together to suppress information and mislead the public, including plaintiff. This conspiracy manifested itself in acts of fraud. Even if some of the defendants, like the trade associations, were not subject to claims under the UTPCPL, as defendants mistakenly argue, the overt acts of those particular companies that violated the UTPCPL would sustain the conspiracy charge.

The overt acts of fraud include such acts as the press conference held in 1993 by the CTLA, representing many of the named defendants, which was accompanied by written statements boldly declaring that "Cellular telephones are safe!" and making other statements even challenged by the Deputy Director of the Food and Drug Administration as being false and misleading. (Complaint ¶¶ 58-59). These acts also include the joint funding and manipulation of research into RFR exposure and the subsequent suppression of critical information of the biological effects caused by RFR. (Complaint ¶ 54). It includes the production of a manual for public consumption, again by the CTLA acting on behalf of the industry, in 1993 or early 1994. That manual originally included language that acknowledged that holding a cell phone's antenna within four inches of the user's head could expose one to "RF energy in excess of the levels established by the

updated ANSI standard." This warning language was deliberately deleted from the final version of the manual (Complaint ¶ 60). That deletion made the manual itself deceptive and misleading. Moreover, although the public was not aware of the deleted language, the CTLA and its members were. The overt acts of fraud also included the particular misleading references to how safe the cell phones are to use, although the only manner available to users who do not have headsets would expose users to RFR radiation in excess even of the ANSI standards (themselves influenced by industry pressure).

### B. **Defendants' deceptive acts were not merely negligent but malicious**

Courts in Pennsylvania often also state that another essential element of a civil conspiracy is "malice," that is, an unjustified intent to deceive others. *See Reading Radio, Inc. v. Fink*, 833 A.2d 199 (Pa. Super. 2003). Defendants themselves describe the allegations of malice very well, showing how adequate the Complaint's allegations are. As defendants put it, "Plaintiff alleges that Defendants intended Plaintiff to be exposed to RF emissions at allegedly unsafe levels…." Def. Memo. at 27. That succinctly describes an act of great malice. Defendants, knowing that scientific evidence showed that the RFR emissions in its cell phones caused viological changes in the head and other areas of the body, suppressed that knowledge and sold the phones anyway, well aware that the purchasers would be exposed, unknowingly, to those radioactive emissions. If that does not describe malice, what does?

Defendants, however, argue that plaintiff's allegations that they purposefully exposed class members to RFR emissions are insufficient to state malice. Defendants assert that their acts could not be malicious because defendants did them "for their own economic and pecuniary benefit." Def. Memo. at 27, quoting the Complaint. This,

according to defendants, does not meet the definition of "malice" because malice must be the "sole purpose of the conspiracy." *Id*. In other words, defendants are arguing a conspiracy can only be a conspiracy if the conspirators commit their torts solely for the sake of being evil. To be even more blunt, defendants seem to be arguing that no matter how harmful their concerted actions were, and no matter how much harm they knew they caused plaintiff and other users, they are immune from suit if they committed their wrongs for the purpose of making a profit!

This is a clear distortion of what "malice" means under Pennsylvania law. When courts say malice is a requirement of a tort, all they mean is that the overt act cannot be an act of mere negligence. It must be an intentional tort. For example, in *Burnside v. Abbott Laboratories,* 351 Pa.Super. 264, 505 A.2d 973 (Pa. Super. 1985), one of the cases defendants cite, the conspiracy alleged was an industry-wide conspiracy to sell DES which later was found to cause birth defects. However, the underlying substantive tort sounded in negligence, and the court explained that "the plaintiffs [are] required to allege and prove that the defendant had entered into an unlawful agreement for the express purpose of committing either a criminal act or an intentional tort. Negligence [is] insufficient." *Id.* at 981. Similarly, in *Reading Radio*, which concerned a claim by a radio station that its former employee and a rival station were liable for civil conspiracy, the court found that

> "Malice is shown in this agreement because it was made between Appellants
> in reckless disregard of both Appellant Kline's duty of loyalty to WAGO and
> WAGO's contract rights with Fink and Ulrich at a time when WAGO's sales
> staff was short-handed."

833 A.2d at 213. In other words, malice means that the conspiracy involves intentional or at least reckless decisions to do what is harmful to others. Here, of course, defendants

intentionally withheld information about cell phones' safety knowing that they would mislead users like plaintiff.

The Complaint pleads all the elements of a conspiracy against all the defendants. That conspiracy manifested itself in acts of fraud and of suppressing information and misleading the public. The Complaint addresses those acts of fraud additionally in Count V, alleging a claim under the UTPCPL of Pennsylvania. Therefore, plaintiff addresses defendants' fraudulent acts included in that count.

## II. Defendants Jointly Engaged In A Scheme To Defraud Plaintiff In Violation Of The UTPCPL

Defendants' willful suppression and misrepresentation of information makes them liable under Pennsylvania's UTPCPL. As defendants admit, see Def. Memo. at 19, the "underlying foundation" of the UTPCPL is "fraud prevention." *Toy v. Metropolitan Life Insurance Insurance Co*., 836 A.2d 1, 10-11 (Pa. Super. 2004). "[T]he Pennsylvania Supreme Court mandated that the UTPCPL is to be liberally construed to prevent unfair or deceptive practices and place the seller and consumer on more equal footing." *Zwiercan v. General Motors Corp.*, 2002 WL 310538538 *3 (Ct. Comm. Pl. 2002), *citing Commonwealth v. Monumental Properties Inc.,* 459 Pa. 450, 458-60, 329 A.2d 812, 816-17 (1974). The UTPCPL is found at 73 P.S. § 201-1 *et seq.* It defines the acts it forbids in 73 P.S. § 201-2, the definitions section, which states in relevant part:

> (4) "Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:
> …
>  (xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;
> …
>  (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

12

Plaintiff has alleged that defendants committed both of these types of unfair trade practices. The first is, as defendants acknowledge, a form of warranty claim, as is the Magnuson-Moss claim of Count IV of the Complaint. The second deceptive practice is what is often called the "catchall" provision of the UTPCPL, and requires the plaintiff to allege the common law elements of fraud. It is these acts of fraud, arising from the conspiracy in which all of defendants participated, that are in many ways at the core of the Complaint.

As detailed above, not only did all the defendants, including the trade associations, engage in ongoing acts of fraud, but these trade associations were integral to the success of the scheme. Given that the trade associations were so integral to this scheme of fraud, and given that the UTPCPL is to be liberally construed, one must be suspicious of defendants' attempt to claim that act's coverage does not extend to trade associations.

A. **The Complaint Alleges Valid UTPCPL Claims Against All Defendants**

At page 24 of their memorandum, after other arguments against the UTPCPL, defendants tucked in an argument against holding the defendant trade associations liable. Although it appears that argument is meant to suggest that these trade associations are not liable under the UTPCPL, it never mentions that statute. In fact, that argument never mentions any cause of action brought by plaintiff. Instead, for reasons known only to defendants, it discusses what it calls "an axiom of products liability law" that defendants must be direct manufacturers or sellers. Def. Memo. at 24. Whether that is an accurate statement of "products liability law" might make an interesting discussion but it is one unrelated to this action. Plaintiff alleges no products liability claims. What plaintiff *does*

allege—in more than sufficient detail under Rule * and other applicable Rules, is that defendants conspired together to engage in deceptive practices.

Defendants, while neglecting to mention the UTPCPL in their argument about the UTPCPL's applicability to trade association on page 24, did make a passing reference to that statute earlier, hidden away in their so-called "standing" argument, on page 6. In that portion of the argument they argue that the UTPCPL does not apply to claims against trade associations, though they do not explain why. Oddly enough, in arguing for an excessively restrictive reading of the UTPCPL, a reading which would limit plaintiffs to claims against only the ones who sold goods to them directly, the defendants cite cases that hold that the UTPCPL is read more broadly than that. For example, in *Commonwealth by Creamer v. Monumental Properties*, 329 A.2d 812 (Pa. 1974) (cited by defendants at page 6 of their memorandum), the court expanded the coverage of the UTPCPL to include landlords who rent properties. Similarly, in *Clugston v. Nationwide Mutual Insurance Co.*, 2006 WL 1290450 (M.D. Pa., May 10, 2006), which defendants also cite, the UTPCPL was found to include claims against insurers who decline coverage.

In fact, the UTPCPL allows a consumer to sue any person who commits a deceptive trade practice. Plaintiff's right to sue defendants arises under 73 P.S. § 201-9.2, which states that

> (a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment *by any person* of a method, act or practice declared unlawful by section 3 of this act, may bring a private action ….

(Emphasis supplied).  This right is not limited to merchants, as was the Maryland statute

interpreted in *Newman v. Motorola, Inc.*, 125 F.Supp.2d 717 (D.Md. 2000).  In *Newman*

(see Def. Memo. at 6, 24) the consumer protection claims against the trade defendants

were brought under the Maryland statute, under which claims only can be brought against

a "merchant." That statute defined a "merchant" as "a person who directly or indirectly

either offers or makes available to consumers any consumer goods, consumer services,

consumer realty or consumer credit." *Id*. at 724, *citing* Md. Code Ann. Com. Law § 13-

101.  On the other hand, there is no definition for either "merchant" or "seller" in the

UTPCPL, because neither term is used except in 73 P.S. § 201-7, which allows a buyer to

rescind a contract in certain circumstances after notifying the "seller." The UTPCPL

reaches not only those who actually sell the products in question, but also those with

whom they partner to control information about those products, and who help the sellers

market their products through deceptive practices like those alleged at length in the

Complaint.

      The error in defendants' assertion that trade associations cannot be liable under

the UTPCPL is highlighted in their brief reference to *DeFazio v. Gregory*, 836 A.2d 935

(Pa. Super. 2003) (Def. Memo. at 6), for the proposition that a seller is "one that offers

for sale."  In that decision, however, the court was interpreting a very different provision

of the UTPCPL.  There, a landowner brought action against a timber company for breach

of contract and violation the UTPCPL, characterizing the contract as one for the purchase

of timber-cutting services.  The Superior Court held that the landowner, being the seller

and not the consumer, could not bring a UTPCPL claim.  The particular section of the

UTPCPL under which the landowner sued was 73 P.S. § 201-7, which allows a buyer of

goods to rescind the contract within three days under certain circumstances. That section, of course, used the terms "buyer" and "seller," and the court explained that though these terms are not defined, the plaintiff in that case definitely was the seller, not the buyer. What is most notable about the citation of that decision by defendants is that it is the best they can do in trying to come up with an argument that the UTPCPL does not cover the trade associations despite the clear and unambiguous language of the statute expanding liability to "any person" who engages in deceptive conduct proscribed by the statute. Nowhere in the statutory language of the UTPCPL or in any decision interpreting that law are deceptive practices claims restricted to "sellers" or to "merchants."

All defendants participated in the scheme to suppress and distort the scientific data in the defendants' possession concerning cell phones. Therefore, all are liable under the UTPCPL, regardless of whether they are "sellers" or "merchants" or any other definitional term defendants would like to borrow from other statutes that are not part of this Complaint.

**B.  Defendants Defrauded Plaintiff**

The core of plaintiff's UTPCPL count is the collective scheme in which all the defendants engaged to suppress and manipulate information. This scheme made them all participants in the fraud against plaintiff.

Some of that fraud consisted of affirmative statements of fact, such as the statement that "thousands of studies" show cell phones to be "safe," a false and misleading statement that suppressed information all defendants knew through their trade association, *see* Complaint at ¶¶53-55, 57, and some of it consists of suppressing information. For example, the defendant trade association CTLA prepared a manual for

responsible use of cell phones, which deleted reference to RFR emissions contained in its original draft, thus suppressing a warning that should have been given to consumers. Complaint ¶ 60. The association acted on behalf of all defendants to engage in deceptive marketing and fraudulently concealing information. This was not "mere silence" but volunteering information that was, by selective suppression, intentionally misleading.

Failure to disclose material information is not "mere silence." Pennsylvania, like virtually every other state, recognizes that omissions of material fact can give rise to a claim for fraudulent misrepresentation. *See, e.g., In re Thome's Estate*, 344 Pa. 503, 25 A.2d 811, 816 (1942); *Frowen v. Blank*, 493 Pa. 137, 435 A.2d 412, 415 (1980). "[D]eliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than an international false affirmation." *Marian Bank v. Intern. Harvester Credit Corp.*, 550 F. Supp. 456, 461 (E.D. Pa. 1982), *aff'd mem.*, 725 F.2d 668 (3d Cir. 1983). *Accord Moser v. Desetta*, 527 Pa. 157, 589 A.2d 679, 682 (1991). For instance, in *Sewak v. Lockhart*, 699 A.2d 755 (Pa. Super. 1997), the court held that the sellers of a house could be liable for fraud, and therefore under the UTPCPL, after the buyers discovered that the sellers had removed a structural support column from the house they sold. Shortly after buyers moved into the house, they noticed that the kitchen floor was uneven. A contractor they hired determined the lack of the support beam would cause the house to collapse. Of course, the buyers never asked whether the house had all the structural elements needed to keep standing, and the sellers never mentioned it. The court explained, however, that,

> "Concealment of a material fact can amount to actionable fraud if the seller intentionally concealed a material fact to deceive the purchaser….[A]ctive concealment of defects *known to be material* to the purchaser is legally equivalent to an affirmative misrepresentation."

17

*Id.* at 759 (citations omitted).  As the court explained, fraud means anything "calculated to deceive, whether by single act or combination, or by *suppression of truth*, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Id.*, *quoting Moser v. DeSetta,* 527 Pa. 157, 163, 589 A.2d 679, 682 (1991) (emphasis supplied).  *Accord Hart v. Arnold*, 884 A.2d 316 (Pa. Super. 2005).

"Suppression of truth" certainly describes the actions of defendants here.  They did more than that, however.  They did not merely hide scientific information, but made positive assertions and affirmative representations that misleadingly suggested that the science showed cell phones were completely safe and innocuous for use against one's ear and head.

The elements of fraud by intentional misrepresentation under Pennsylvania law are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance. *Colacicco v. Apotex, Inc*., 2006 WL 1443357 (E.D. Pa. 2006).  All of these elements are alleged in detail in the Complaint. Defendants' false and misleading statements were directed to the consuming public and were intended to and did create the impression that their cell phones without headsets attached were safe for normal use and posed no health risks whatsoever. It was defendants' intention to influence plaintiff and other consumers concerning the safety of using their phones in order to create a favorable market for them.

Defendants intended plaintiff to rely on their misrepresentations and plaintiff's reliance was foreseeable. *Woodward v. Dietrich*, 548 A.2d 301, 303 ( Pa. Super. 1988).

Defendants not only are liable for what they said about their cell phones but for what they failed to say.  Defendants were aware of critical scientific information and suppressed it, even as they misrepresented to buyers the results of what they suggested was exhaustive testing.  In those circumstances, failure to disclose information is not "mere silence," but active fraud.  In *Zwiercan v. General Motors Corp.*, 2002 WL 310538538 (Ct. Comm. Pl. 2002), the court's analysis of the UTPCPL "fraud claim" found that such fraud can include a manufacturer's fraudulent concealment. In that case, the class brought an action against GMC for selling vehicles that had front seats that were prone to collapse in rear end collisions.  The class included buyers, such as the named plaintiff, who did not suffer rear end collisions and therefore their front seats never collapsed.  In *Zwiercan* the complaint alleged a cause of action under the "catch-all" provision of Section 201-2(4)(xxi), which includes as unfair methods of competition or unfair or deceptive acts or practices "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" (the same catch-all provision alleged in the Complaint here). The *Zwiercan* court held that "a manufacturer has a duty to disclose a known latent defect to a purchaser when the purchaser is unsophisticated and does not have access to the same information as the manufacturer." 2002 WL 310538538 at *3.  The court further explained: "Recognizing a duty to speak in the present case is consistent with general fraud concepts and is in line with the purpose of the UTPCPL."  *Id.*

Defendants here not only misrepresented the facts with their affirmative statements but also failed to fully and completely disclose information about the emission of harmful radiation by their cell phones and the adverse biologically effects caused by those emissions. Defendants also suppressed scientific information which conflicted with their bold, sweeping pronouncements of "safety."  In these circumstances, Pennsylvania law recognizes allegations under the UTPCPL that defendants acted fraudulently.

### C. Pennsylvania law presumes reliance

Defendants' show their further misunderstanding of Pennsylvania law which governs this case when they entitle one of their principal arguments: "Plaintiff Has Not Alleged Reliance." As the court in *Zwiercan v. General Motors Corp.*, 2002 WL 310538538 *2 (Ct. Comm. Pl. 2002) held, "this Court's holdings establish that 'reliance' is not a required element for a Plaintiff to proceed under a 'deceptive' practice claim."  In that case, the court found a plaintiff who purchased a vehicle with a defective front seat, which defect was never disclosed to him, had a valid UTPCPL claim even though the defect in the front seat never manifested itself.

Furthermore, "the Pennsylvania Supreme Court has held that 'reliance' can be presumed when a party makes material misrepresentations."  *Id.* at *4, citing *New York Life Ins. Co. v. Brandwene et ux.,* 316 Pa. 218, 172 A.2d 669 (1934); *In Re McClellan's Estate,* 365 Pa. 401, 408, 75 A.2d 595 (1950).  Moreover, a Pennsylvania court, in certifying a class for a UTPCPL claim, has held that when a duty to speak exists, reliance by the class plaintiffs is implicit and is established by operation of law. *Katlin v. Tremoglie,* 1999 WL 1577980 (Pa.Com.Pl.), 43 Pa. D. & C. 4th 373, 391 (1999). As noted above, no less of a duty to speak existed here than it did in *Zwiercan, supra.*

### D.  Plaintiff has suffered an ascertainable loss

The defect that defendants tried to conceal--that their phones irradiate users--caused users like plaintiff to suffer an ascertainable loss. The difference in value between the cell phones he bought and one with a headseat needed to make it safe is the "ascertainable loss" under the UTPCPL that plaintiff has suffered.  *See Solarz v. DaimlerChrysler Corp.*, 2002 WL 452218 (Pa. Comm. Pl. 2002) * 6 ("The ascertainable loss includes the cost of installing the park-brake interlock in [Daimler]Chrysler minivans and/or the difference in value between minivans with the park-brake interlock device and those without it.").  *See also Grant v. Bridgestone/Firestone, Inc.,* 2002 WL 372941, Sept. 2000, No. 3668, slip op. at 4-8 (P. Com. Pl., Jan 10, 2002) ("Grant II") (overruling objections for failure to allege manifest injury when the UTPCPL requires only that plaintiffs sufficiently allege an ascertainable loss).  In *Grant* the plaintiff alleged that the defendant sold a line of tires that had a tendency to suffer sudden and complete tread separation, especially when used in Ford Explorer SUVs.  The plaintiff's tires, however, did not fail.  Despite that fact, the court found that an ascertainable loss existed in the cost of replacing the tires after learning they had this dangerous tendency. To the same effect is *Zwiercan v. General Motors Corp.*, 2002 WL 310538538 (Ct. Comm. Pl. 2002), where the court allowed an UTPCPL "fraud" claim where the plaintiff purchased a vehicle with a defective front seat which was prone to collapse in a rear end collision, but where the plaintiff's vehicle never experienced such a collapse.  The court there explained:

> "Despite the fact that the front seats have not yet injured anyone, and the Plaintiff cannot bring a breach of contract claim, the Plaintiff's UTPCPL claim for intentional concealment and deceptive practices is ripe. The Plaintiff need not wait until she is physically injured to bring a claim for deceptive practices when the manufacturer had a duty to inform her of a known defect."

2002 WL 310538538 at *6.

Plaintiff and other cell phone users also have ascertainable losses that include the cost of purchasing a headset that makes the phones as safe as represented by defendants (eliminating any possible exposure to RFR and adverse and potentially harmful biological effects) and the difference in value between cell phones with and without such headsets. These losses are just as "ascertainable" as the costs of replacing potentially dangerous tires, as in *Grant*, or defectively designed front seats, as in *Zwiercan*, or the difference in value between mini-vans with and without park interlock devices, as in *Solarz.*

### III. Defendants Breached Warranties by Manipulating Information to Induce Plaintiff to Buy Products That Did Not Operate Properly

In addition to the conspiracy of all defendants to defraud consumers, the sale of these cell phones in the defective condition in which they were sold constitutes a breach of express and implied warranties. Count II of the Complaint alleges breaches of the implied warranties of merchantability and fitness of purpose. Count III alleges breaches of express warranties. Defendants argue that all the warranty claims do not allege the proper sorts of injury (an argument based on a complete misstatement of the Complaint's allegations) and they further argue that, after more than five years of litigation, they have not receive sufficient notice of plaintiff's claims. Defendants also make particular arguments against plaintiff's claims for implied warranty of fitness for a particular purpose and express warranty, but do not otherwise mention the implied warranty of merchantability. Presumably, then, defendants recognize that by selling a product that is "unfit for the purpose for which it was intended, a safe, reliable form of

[communication]," *Solarz v. DaimlerChrysler Corp.*, 2002 WL 452218 *5 (Pa. Comm, Pl. 2002), they have breached that implied warranty. The Complaint alleges that the cell phones breach the implied warranty of merchantability because those phones are not fit for the ordinary purposes for which such phones are used. As the Pennsylvania Supreme Court explained,

> "The concept of 'merchantability' does not require that the goods be the best quality ...or the best obtainable,... but it does require that they have an inherent soundness which makes them suitable for the purpose for which they are designed,... that they be free from significant defects, that they perform in the way that goods of that kind should perform ... and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used."

*Gall v. Allegheny County Health Department,* 521 Pa. 68, 555 A.2d 786 (1989). Just as SUVs without park/interlock devices are not suitable for driving, and not able to perform in the way that goods of that kind should perform, see *Solarz v. DaimlerChrysler Corp.*, 2002 WL 452218 (Pa. Comm, Pl. 2002) at * 7, so too are cell phones without headsets to allow the phones to be used without irradiating users' heads not suitable for use, and not able to perform in the way that goods of that sort should perform.

The Complaint lists in paragraph after paragraph at the beginning of Count II various representations and promises of defendants in their various manuals. These descriptions are illustrative of the sorts of promises of safety made by all defendants, although it admittedly is true that these *illustrations* do not list all of the defendants' various promises to plaintiff and other consumers (nor is plaintiff required to do so under the pleading rules). There is no need to list each and every such express statement to set forth the elements of breach of the two *implied* warranties of merchantability and fitness for a particular purpose. The foundation for those torts is laid in some very basic

historical facts, and described in great detail in the Complaint.  These torts, moreover, can be alleged against all the defendants because all defendants conspired to commit them. "A plaintiff may also allege a civil cause of action, … against *any defendant who conspired* to commit that tort."  *Baker*, 440 F. Supp. 2d at 415 (emphasis supplied).

### A.  <u>The cell phones manifested a defect and plaintiff suffered an injury</u>

As part of defendants' strategy of arguing propositions of law that do not tie to any particular cause of action actually pled by plaintiff, section II of defendants' memorandum attacks the Complaint because it is "premised on allegations of biological injury and increased risk of harm."  (Def. Memo. at 7). Defendants' misapprehension of the nature of plaintiff's claims could not be more starkly clear than in that heading. Whatever cause of action the defendants had in mind with that argument, it does not apply to plaintiff's warranty claims.

In his breach of warranty claims, plaintiff is not seeking damages for any sort of "increased risk of harm," for any personal injury, or for any present or future pain and suffering.  Plaintiff is not seeking damages for any future medical costs that he may incur.  Plaintiff is not seeking compensation for any fear he may experience when he uses his cell phone.  Plaintiff's claim is not about future risks of harm but the current inadequacy of the cell phones.  He is not seeking damages for future harm or injury but to force the defendants to remedy the cell phones they sold, so that those phones are as safe and good as defendants, both individually and collectively, represented those phones to be.

Throughout that argument against a phantom Complaint, defendants repeatedly state that "biological injury …[is]… not compensable…." Def. Memo.at 8.  That

statement is puzzling, since of course "biological injury," if it means anything at all, means injury to the body, which of course courts in personal injury cases of all kinds have been compensating since the Middle Ages.  It is far from clear what defendants are trying to say with this claim.

The word "biological injury," however, is coupled in defendants' memorandum with increased risks of future harm, so a generous reading of what defendants' are saying is that current damage to the users' bodies from the defendants' products cannot  be remedied until that damage gets so bad it is a diagnosable illness.  The very notion is chilling.  It is also a confused understanding of the law and of the Complaint.

While plaintiff may not be able to recover for the pain, suffering and medical costs of an illness he does not yet have, he is not seeking to do so.  What plaintiff is seeking is to have defendants repair the products they have sold and marketed to him as completely safe, but which are currently irradiating plaintiff and all other consumers every time they use the product in the manner and form that defendants' cell phones were sold to them.

Defendants correctly note that a breach of warranty must allege an actual defect, not a potential one.  What defendants ignore, however, is that the phones they sold are defective right now, and that defect is manifesting itself every time one is used without a handset, right now.  Every time someone uses that defective product he or she is being exposed to RFR which can and does cause biological changes in the body. Even defendants cannot dispute that basic fact.

The case upon which defendants most heavily rely illuminates how inapplicable defendants' argument is to the actual Complaint plaintiff has filed.  *In the Matter of*

*Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002), the putative class action concerned tires which were defective because they failed too easily—that is, the tires blew out-- and which were recalled. *Id.* at 1014. The court's holding—reversing class certification of a nationwide class--was that the different laws of different states applied to the class members' breach of warranty and consumer fraud claims, and that therefore the action was not manageable as a class action. That this is the decision on which defendants principally rely exposes the weakness of defendants' argument, since its holding has nothing whatsoever to do with the Complaint under review here (which involves only Pennsylvania residents and Pennsylvania law and a motion to dismiss the Complaint, not a motion for class certification). The apparent reason defendants cite the *Bridgestone* decision is because it contains dicta that states would differ on how to treat their consumer fraud and warranty claims. *Id.* at 1017. That may be true, but here, only one state (Pennsylvania) is involved, and the claims are very different indeed. In *Bridgestone/Firestone*, the tires did not blow out. The defect never manifested itself. *See also Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982) (Firestone-manufactured steel-belted radial tires which lived full, productive lives were "fit for ordinary purposes" for which they were used and thus were merchantable).This is a far cry from the cell phones involved here, every one of which is irradiating consumers every time that consumer uses them in the manner specifically and expressly approved by defendants. Here, the defect manifests itself every single time a user holds the phone to his or her ear. That exposure to RFR causes present biological effects, whether or not those effects ultimately manifest themselves in any disease. Thus, this case is completely different than the decision defendants cite in their memorandum at 10 and 12, *Zwiercan*

*v. General Motors Corp.*, 2002 WL 310538538 (Ct. Comm. Pl. 2002), in which a class

action was brought against GMC for selling vehicles that had front seats that were prone

to collapse in rear end collisions. The class representative's vehicle had never suffered

such a front seat collapse, however.  While the court upheld plaintiff's claim under the

UTPCPL because of the ascertainable loss all buyers of that defective vehicle suffered,

and further held that a UTPCPL claim could be based on failure to disclose material

information to a consumer (both holdings defendants failed to mention in their

memorandum, for obvious reasons), that court did not find that an implied breach of

merchantability was properly pled.  That court reasoned the defect in the front seat did

not actually manifest until a front seat collapsed in a rear end collision.  That is quite

different from the circumstances at the case here, in which the defect is something that

happens right now each time the cell phones are used.  The cell phones irradiate users

now—not in some circumstance that might happen, such as when they are in a "rear end

collision" type of event.

The major import of the *Zwiercan* decision, in any event, is not about the

warranty claims but rather, in finding that even buyers of cars where the defect never

"manifested" alleged valid UTPCPL claims.  These same sorts of claims under the

UTPCPL are the core of this Complaint as well.

Defendants mention, briefly, the decision in *Briehl v. General Motors Corp.*, 172

F.3d 623 (8th Cir. 1999), a decision that found there to be no breach of warranty where

the ABS system of the vehicle in question always worked fine, so the defect never

manifested itself.  Here, though, the cell phones are more like a vehicle with a defect in

the exhaust system that directs some of the carbon monoxide into the vehicle as it is

being driven.  The buyer could drive that car for many miles, and either because the

windows were down or because the buyer never quite drove long enough to pass out,

there was in fact no accident or death caused.  The buyer could learn, however, of the

defect in the exhaust system, and seek to have defect repaired before the worst did occur.

Would it be a valid defense to say there is no defect in the exhaust system because the

buyer was not yet dead?  Would the defense be that there is no breach of warranty until

the driver passed out from inhaling the carbon monoxide?  Would a court tell the buyer to

come back after he had crashed? Of course not.  The defect in that exhaust system would

be manifest even though the potential harm it could cause had not yet occurred.

At times, defendants appear to confuse the defect with the various possible harms

users might suffer because of the defect.  A defect exists in the cell phones because they

irradiate users through the emission of RFR which cause biological changes in the body.

Even defendants cannot dispute that fact. What defendants dispute is the possible adverse

future health effects and consequences from that exposure—issues not involved in this

case. The harm to the user—and their "ascertainable loss" under the Pennsylvania

UTPCPL—is the economic harm suffered for buying a product that is not fit for its

intended use and is therefore not worth what was paid for it.  This harm can be rectified

by requiring that the product be made safe using cheap and available technology--the

headset.  Not only the defect, but the direct harm of owning a product that is not

performing as warranted, *currently* exist.  This defect, and the harm it causes, are not

speculative and contingent but current and real.

The decision in *Solarz v. DaimlerChrysler Corp.*, 2002 WL 452218 (Pa. Comm,

Pl. 2002) sheds light on the difference between the personal injury case defendants want

this Complaint to be and the consumer protection case it really is.  In *Solarz* class

plaintiffs also asserted breach of warranty claims against the defendant.   The SUV's

defendant DaimlerChrysler sold did not include a park-brake interlock, which ensures

that a vehicle cannot be shifted out of "park" unless the brake pedal is pressed down.

None of the class plaintiffs was actually injured physically by that defect, and none of the

SUVs were in accidents that caused property damage either.  In other words, there was no

"manifest injury" if that term means a harm to the plaintiff like a personal injury, or even

something like damage to the vehicle because the lack of an interlock caused an accident.

Still, there was "manifest injury" that led to cognizable implied warranty claims, because

without the interlock feature  the SUVs "are left with a vehicle unfit for the purpose for

which it was intended, safe, reliable form of transportation."  *Id*. at 5.  It did not matter

that the unsafe condition of the SUV had not yet caused an accident.  The defective cell

phones defendants promote, market and sell here are "unfit for the purpose for which

they are intended"—to be a safe form of communication—exactly like the SUVs in

*Solarz* were not a "safe, reliable form of transportation."

> **B.  The filing of the original Complaint and more that five years of litigation
> is sufficient notice that plaintiff discovered the unsafe condition of the phones
> <u>defendants tried to hide</u>**

As the Complaint alleges repeatedly, the unsafe and defective condition of the cell

phones was something of which defendants were aware and which defendants tried to

hide.  They always were on notice of the conditions that established that there was a

breach of express and implied warranties.  Despite that fact, defendants assert that the

Complaint's breach of warranty claims fail because they did not receive "notice" of the

defects.  However, the defendants have received all the notice to which they are entitled.

In *Solarz,*, 2002 WL 452218, in which plaintiffs filed class action breach of warranty claims because defendant's SUV lacked a park interlock device, the defendant made a similar argument that it had not received notice of the defect. In response, the court held "that DaimlerChrysler received proper notice of the plaintiffs' breach of warranty claims when the plaintiffs filed their original Complaint in May 2001." *Id*. at *12. In so holding, the court relied on "…the sound reasoning and holding of *Bednarski v. Hideout Homes & Realty, Inc.,* 709 F. Supp. 90 (M.D.Pa.1988)." In *Bednarski,* home owners began an action in federal court against an electrical contractor to recover damages resulting from a fire. The electrical contractor then brought a third party action against the maker of a circuit breaker box which was thought to have caused the fire. The manufacturer moved to dismiss the contractor's breach of warranty claim for failing to provide adequate notice, as the first notice the manufacturer received was the third-party complaint. The court, in denying the manufacturer's motion, concluded that the contractor's third-party complaint against the manufacturer served as sufficient "notice" of breach of warranty under Pennsylvania law. *Bednarski,* 709 F. Supp. at 94.   After noting that the U.C.C. must be liberally construed, and that the purpose of notice is certainly fulfilled by initiating action in a lawsuit, the court held that "the filing of a civil complaint satisfies the requirement of providing breach of warranty notice under section 2607." *Id.* (relying on *Yates v. Clifford Motors, Inc.,* 283 Pa.Super. 293, 423 A.2d 1262 (1980).

Defendants here, have received all the notice to which they are entitled, just as was the case for the defendants in *Solarz* and *Bednarski*.

### C.  The cell phones were not fit for the purpose
### for which defendants knew they were to be used

The decision in *Keirs v. Weber National Stores, Inc.*, 507 A.2d 406 (Pa. Super. 1986), upon which the defendants place great reliance, does not help them, but rather illustrates why Mr. Farina and other cell phone customers have claims for breach of the implied warranty of fitness for a particular purpose.  In *Keirs*, the plaintiff purchased a baseball jacket which was later doused in gasoline.  After being doused with gasoline, the jacket caught fire. The court quite logically pointed out that the plaintiff had never let the seller know he wanted a fireproof jacket.  *Id.* at 410.  That use for clothing was never understood between the parties.

On the other hand, the plaintiff and the other class members all bought cell phones for the obvious and intended purpose, to make and receive phone calls.  As defendants chose not to include headsets with those phones or make it known to plaintiff and the other class members that headsets were needed for safe use, defendants knew when the cell phones were used for their understood and intended purpose, the phone necessarily would emit RFR when placed against the users' ears.  This was very much the intended and understood use of the units, and it was this use that exposed the plaintiff and other class members to constant radiation.

### D.  The cell phones were not safe and useful as expressly provided

The sum total of defendants' express statements that form a warranty include statements that its phones are safe for their intended use, that they meet all applicable standards, and that those standards were based on good science.  When they made these statements, defendants were aware the science on which the standards were based had been subverted and suppressed by defendants' own efforts, and that there was good

31

reason to believe the phones were not safe for their intended use.  The express promises and affirmations of fact of safe operation that defendants made to plaintiff, upon which a claim of express warranty is predicated, cannot be limited only to some written statement labeled "Warranty."  Under the UCC, a seller's description of the goods that becomes part of the basis of the bargain creates an express warranty that the goods will conform to that description. 13 Pa.C.S. §2-313. In general, all of the statements of the seller become part of the basis of the bargain "unless good reason is shown to the contrary." §2-313, Cmt 8. In this case, the sellers' statements include their manuals and all the materials to which the manuals referred and on which they relied to create the impression that their products were safe for the user.

### 1. The defendants expressly warranted that good scientific research supported defendants' affirmation that their phones were safe

The Complaint describes written statements to which all the defendants contributed and which must be considered part of the description of these cell phones and thus are part of the express warranty provided with each cell phone. Each cell phone sold by any of the defendants included a user's manual, and each such manual set out an express warranty "for Safe and Efficient Use" (*See* Exhibit A to the Complaint).   Various parts of those manuals varied, but each one made specific reference to the 1996 FCC RF exposure guidelines, to the standards set by ANSI C95.1 in 1992, and represented that a number of scientists reviewed "the available body of research" to develop the ANSI standards.  (*See* Complaint ¶ 141).  Each cell phone manual stated that the unit sold fully complied with these standards.

Therefore, defendants not only warranted that the cell phones complied with standards set by the FCC or ANSI but stated that these standards were good science.  As

the defendants were aware that, acting collectively, they dominated and controlled ANSI (Complaint ¶ 53) and that they had both funded and manipulated the research on which ANSI relied, suppressing critical information of the harm RFR causes (Complaint a¶ 54), they knew that the claim that their phones met safety standards that reflected the best scientific evidence was seriously misleading. Defendants also knew that although the FCC has RFR exposure guidelines, the FCC does not consider itself the agency responsible for evaluating cell phones' health effects. (Complaint ¶ 58).

In addition, one of the trade association defendants, the Cellular Telecommunications Industry Association ("CTLA") prepared a manual for public use in 1993 or early 1994 on behalf of the industry as a whole and which was used by each of the defendants. That manual originally included language that acknowledged that holding a cell phone's antenna within four inches of the user's head could expose one to "RF energy in excess of the levels established by the updated ANSI standard." This warning language was deleted from the final version. (Complaint ¶ 60). That deletion made the manual itself deceptive and misleading. Moreover, although the public was not aware of the deleted language, the CTLA and its members were, and thus were aware that their express warranties that their cell phones met ANSI standards were false. After all, by 1993 they were aware that use of the cell phones in the only way available without use of a headset, *i.e*, holding the unit next to the user's head and brain, would expose the user to RFR radiation above that even ANSI allowed—yet their manuals falsely claimed that their cell phones met ANSI standards.

## 2.  This warranty is breached every time the phones are used

As noted at the beginning of this Memorandum, one of defendants' constant

themes is that the Complaint supposedly speaks only of a future risk of harm. This theme recurs in their attack on the express warranty claim (Def. Memo. at 15), where the memorandum states that plaintiff has not suffered any personal injury so the breach is only a potential future breach. This mischaracterizes the nature of the breach, however. Again, the claim in *Solarz* is instructive. There, a minivan that was missing a park interlock device was in breach of an express warranty even though the missing device did not lead to any actual car accidents or damage to the vehicle. The device was missing, and that made the minivan in breach of warranty. Similarly, the cell phones are irradiating users now, so the cell phones are, right now, in breach of their warranties.

### 3. These breaches are part of defendants' conspiracy

The allegations of Count III include, by reference, the lengthy discussion elsewhere in the Amended Complaint that pertain to defendants' many express statements about its products. These statements must be evaluated against the background of industry-wide efforts to suppress and manipulate information. All acted together, through their trade associations, to obtain dominance and control of the American National Standards Institute. (Complaint ¶ 53) All acted together, through their trade associations, to suppress scientific evidence of dangers that their jointly sponsored research supported. (Complaint ¶ 54). The defendants, acting through their trade association, defendant CTLA, held a press conference that fraudulently misrepresented by omission and misleading statements that the FCC is the agency responsible for health effects from cell phone use, when the agency itself denied such responsibility. This statement was part of an industry-wide marketing and promotional effort that inured to the benefit of all the manufacturers and sellers and helped all

defendants. (Complaint ¶ 58). These industry-wide actions are an integral part of the scheme which made it possible for each individual seller to provide cell phones to users, representing that they were safe and knowing that consumers did not and could not know better. That is, the industry-wide conspiracy made it possible to offer express warranties that reassured customers even though defendants had reason to know those warranties could not be kept. As all defendants are part of this conspiracy, all can be liable for the consequent breach of warranty. *See, e.g.*, *Baker*, 440 F. Supp. 2d at 415 ("A plaintiff may also allege a civil cause of action, such as breach of fiduciary duty, against *any defendant who conspired* to commit that tort") (emphasis supplied).

## IV. Plaintiff Has Stated Valid Magnuson-Moss Act And UTPCPL Claims Grounded In Defendants' Breaches of Warranty

Defendants quite correctly note that the claims alleged in Count IV under the Magnuson –Moss Warranty Improvement Act, and in Count V under the UTPCPL,73 P.S. § 201-2 (xiv), for "[f]ailing to comply with the terms of any written guarantee or warranty given to the buyer," depend on the same facts as does plaintiff's express warranty claims. It is equally clear that defendants' own arguments against those claims are "derivative" as well. In other words, their arguments against those claims (which they call the "derivative warranty" claims) simply reassert their assumption that plaintiff does not adequately allege any cognizable express warranty claim.

To the contrary, plaintiff has alleged at length in the Complaint the many written statements, including manuals that refer to scientific standards and assert that those standards are supported by sound scientific studies that make up the express written warranties defendants made to plaintiff. For all the same reasons that plaintiff's express

warranty claims in Count III, which are based on defendants' written statements, are well grounded and well pled, these "derivative warranty" claims are as well.

Moreover, not only did each defendant make these written statements, but all the other defendants contributed to making those representations through the written statements of the trade associations to which they belong. All the allegations found in the Complaint, and all the counts alleged, point towards this conspiracy among all the defendants.  As much as defendants hope this Court will not address their concerted action, that concerted action is at the core of all of plaintiff's claims.

### V.  Plaintiff Is Entitled To Seek All Necessary And Proper Relief

The UTPCPL not only defines what constitutes unfair trade practices but provides for private rights of action to obtain relief from those practices, at 73 P.S. §201-9.2.  That section is quite broad, in that it states:

> "The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide *such additional relief as it deems necessary or proper*. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees."

(Emphasis supplied).

This provision allows for, among other modes of relief, the bringing of class actions like this one. *Oslan v. Law Offices of Mitchell N. Kay*, 232 F. Supp. 2d 436 (E.D. Pa. 2002).  It also authorizes injunctive relief, *see In re Strong*, 2004 WL 5032530 at *15 (Bkrptcy. E.D. Pa 2004) such as, for example, requiring a defendant to install park interlock devices in SUVs, *see Solarz v. DaimlerChrysler Corp.*, 2002 WL 452218 (Pa. Comm. Pl. 2002) or to cease selling tires that are defective, *see Dorian v. Bridgestone/Firestone Inc.*,  2000 WL 1570627 (E.D. Pa. 2000); *Lennon v.*

*Bridgestone/Firestone Inc.*, 2000 WL 1570645 (E.D. Pa. 2000). Similarly, plaintiff here

can require defendants to supply users with a headset to make their cell phones safe and

to comply with the express representations under which they were sold.

Plaintiff's substantive request for injunctive relief may be contained under a

heading seeking "declaratory relief" but that fact is irrelevant. Defendants have sufficient

notice of the relief sought, and the facts upon which that request for relief is grounded.

Furthermore, plaintiff is entitled to declaratory relief. Defendants rather

mystifyingly point out the uncontroversial, but totally irrelevant, proposition that

declaratory judgments are not meant to be advisory opinions, and then for some reason

feel the need to string cite that obvious proposition. Def. Memo. at 29. The Complaint

shows a very real and justiciable controversy—as expressed in counts for breach of

warranties, for unfair trade practices, and for civil conspiracy.

The argument against the declaratory relief sought is completely irrelevant

because the only way there could be no justiciable controversy is if all of plaintiff's

substantive causes of action fail. If that were the case, then no claim for relief would be

available, not just declaratory relief. More to the point, though, the Complaint states very

real and cognizable causes of action. Therefore, declaratory relief is justified to provide

one of the remedies needed to right the wrongs defendants committed.

## CONCLUSION

Defendant's concerted and deceptive actions have put deficient cell phones into

the hands of plaintiff and many other users throughout Pennsylvania. The Third

Amended Complaint alleges current manifestations of defect that support the claim that

defendants have breached the warranties on the cell phones they sell, and alleged a joint

action to suppress the facts that would allow users to be aware of those defects.

Therefore, defendants' latest attempt to derail this litigation must be denied.

Dated: December 13, 2006


H. Russell Smouse                          **JACOBSEN LAW OFFICES LLC**
Glenn E. Mintzer                            By:_/s/_Kenneth A. Jacobsen_
**LAW OFFICES OF**                          Kenneth A. Jacobsen
**PETER G. ANGELOS, P.C.**                  12 Orchard Lane
One Charles Center                          Wallingford, PA 19086
100 North Charles Street                    (610) 566-7930
Baltimore, MD 21201
(410) 649-2000


Michael R. Allweiss                    Joseph A. O'Keefe
**LOWE, STEIN, HOFFMAN, ALLWEISS**     **O'KEEFE & SHER, P.C.**
**& HAUVER, LLP**                      15019 Kutztown Road
701 Poydas Street                      Kutztown, PA 19530
One Shell Square                       (610) 683-0771
Suite 3600
New Orleans, LA  70139
(504) 581-2450


Michael D. Donovan
**DONOVAN SEARLES, LLC**
1845 Walnut Street
Suite 1100
Philadelphia, PA 19103
(215) 732-6067