**TAB B**

Kenneth A. Jacobsen (Attorney I.D. No. 31208)    H. Russell Smouse
**JACOBSEN LAW OFFICES LLC**    Glenn E. Mintzer
12 Orchard Lane    **LAW OFFICES OF**
Wallingford, PA 19086    **PETER G. ANGELOS, P.C.**
(610) 566-7930    One Charles Center
    100 North Charles Street
    Baltimore, MD 21201
    (410) 649-2000

*Attorneys for Plaintiff* (Additional Counsel Listed On Signature Page)

| | | |
|---|---|---|
| **FRANCIS J. FARINA,** | : | |
| **577 Gregory Lane** | : | |
| **Devon, PA 19333** | : | |
| | : | |
| | : | |
| *individually and on behalf of*: | | |
| *all those similarly situated,* | : | |
|         *Plaintiff,* | : | **APRIL TERM 2001** |
| | : | |
| **v.** | : | **NO. 2527** |
| | : | |
| **NOKIA INC.** | : | **CLASS ACTION** |
| **6000 Connection Drive** | : | |
| **Irving, TX 75039** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **and** | : | |
| | : | |
| **NEC AMERICA** | : | |
| **8 Old Sod Farm Road** | : | |
| **Melville, NY 11747** | : | |
| | : | |
| **and** | : | |
| | : | |
| **ERICSSON WIRELESS COMM., INC.** | : | |
| **740 East Campbell Road** | : | |
| **Richardson, Texas 75081** | : | |
| | : | |
| **and** | : | |

1

```
                                      :
MOTOROLA, INC.                        :
5725 E. River Road                    :
Chicago, Illinois  60631              :
                                      :
          and                         :
                                      :
SPRINT PCS, L.P.             :
4900 Main Street, 12th Floor               :
Kansas City, Missouri  64112          :
                                      :
          and                         :
                                      :
AUDIOVOX COMMUNICATIONS               :
CORPORATION                           :
150 Marcus Boulevard                  :
Hauppauge, New York  11788            :
                                      :
          and                         :
                                      :
NEXTEL COMMUNICATIONS OF              :
THE MID-ATLANTIC, INC.                :
2001 Edmund Halley Drive              :
Reston, Virginia  20191               :
                                      :
          and                         :
                                      :
MATSUSHITA CORPORATION                :
OF AMERICA                            :
A/K/A Panasonic Corporation           :
9401 West Grand Avenue                :
Franklin Park, Illinois  60131        :
                                      :
          and                         :
                                      :
PHILIPS ELECTRONIC NORTH              :
AMERICA CORP.                         :
100 East 42nd Street                  :
New York, NY  10017                   :
                                      :
          and                         :
                                      :
QUALCOMM INCORPORATED                 :
A/K/A Qualcomm, Inc.                  :
6455 Lusk Boulevard                   :
San Diego, California  92121          :
```

:

and    :

    :

SAMSUNG TELECOMMUNICATIONS :

AMERICA, L.P.    :

105 Challenger Road    :

Ridgefield Park, NJ 07660    :

    :

and    :

    :

SANYO NORTH AMERICA, INC.    :

A/K/A Sanyo North America Group    :

218 State Route 17 North    :

Rochelle Park, New Jersey 07662    :

    :

and    :

    :

SONY ELECTRONICS, INC.    :

The Corporation Trust Incorporated    :

300 East Lombard Street    :

Baltimore, Maryland 21202    :

    :

and    :

    :

AT&T WIRELESS SERVICES, INC.    :

195 Broadway    :

New York, New York    :

    :

and    :

    :

CELLCO PARTNERSHIP    :

d/b/a Verizon Wireless    :

Mobile, 180 Washington Valley Road    :

Bedminster, New Jersey 07921    :

    :

and    :

    :

CINGULAR WIRELESS LLC    :

Formerly Known As:    :

Southwestern Bell Mobile Systems, Inc.    :

A/K/A Southwester Bell Wireless    :

2711 Centerville Road, Suite 400    :

Wilmington, DE 19808    :

    :

and    :

    :

3

**CELLULAR ONE GROUP**                          :
**A/K/A Cellular One**                          :
**5001 Lyndon B. Johnson Freeway**              :
**Suite 700**                                   :
**Dallas, Texas  75244**                        :
                                                :
       and   :
                                                :
**VOICESTREAM WIRELESS**                        :
**CORPORATION**                                 :
**A/K/A VoiceStream Wireless**                  :
**3650 131st Avenue SE, Suite 200**             :
**Bellvue, Washington  98006**                  :
                                                :
       and   :
                                                :
**LG ELECTRONICS, INC.**                        :
**LG ELECTRONICS U.S.A., INC.**                 :
**1000 Sylvan Avenue**                          :
**Englewood Cliffs, New Jersey 07632**          :
                                                :
       and   :
                                                :
**CELLULAR TELECOMMUNICATION** :
**INDUSTRY ASSOCIATION**                        :
**1250 Connecticut Avenue, N.W.,**              :
**Suite 200**                                   :
**Washington, D.C.  20036**                     :
    **SERVE ON:**           :
    **Resident Agent**      :
    **John M. Townsend**     :
    **1775  I Street  N.W , Suite 600** :
    **Washington, D.C. 20006** :
                                                :
       and   :
                                                :
**TELECOMMUNICATIONS**                          :
**INDUSTRY ASSOCIATION**                        :
**A/K/A TIA**                                   :
**Washington, D.C**                             :
    **SERVE ON:**           :
    **Resident Agent**      :
    **Mathew T. Kranz**      :
    **1201 Pennsylvania Avenue, NW** :
    **Suite 315**            :

Washington, D.C. 20044   :
           :
    and      :
           :
**JOHN DOES NOS. 1-100,**   :
           :
      **Defendants.** :

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff Francis J. Farina brings this class action pursuant to Rule 1701 *et seq.* of the

Pennsylvania Rules of Civil Procedure individually and on behalf all others similarly situated,

and alleges the following:

## I. INTRODUCTION

1.  This class action seeks damages and declaratory relief on behalf of plaintiff and a

class of persons who purchased or leased wireless handheld telephones ("WHHPs"). For

purposes of this action, WHHPs refers to: 1) those wireless telephones that are designed and

manufactured so as to readily allow for the use of a headset in conjunction with the WHHP; and

2) those wireless telephones which are not designed and manufactured to allow for such use. The

purpose of this action is to obtain for members of the Class properly designed headsets that

eliminate the Class' exposure to radio frequency radiation ("RFR") generated and emitted by the

WHHPs as described below together with proper notice of and instructions for the use of such

headsets, and replacement of those WHHPs which are not designed to allow for the use of

headsets.

2.  Through a common and uniform course of conduct, the defendants have

manufactured, supplied, promoted, sold, leased and provided wireless service for WHHPs when

they knew or should have known that their products generate and emit RFR that causes adverse

biological effects through: calcium and ion distribution across the cell membrane; melatonin

5

production; neurological function; DNA single and double strand breaks and chromosome

damage; enzyme activities; cell stress and gene transcription; and the permeability of the blood

brain barrier. Additional biological effects may also exist.

3.     Through a common and uniform course of conduct, the defendants, acting

individually and collectively, failed to adequately disclose to the consuming public the fact that

WHHPs emit RFR that causes these and other biological effects.

4.     The purpose of this action is to hold accountable and to obtain maximum legal

and equitable relief from those corporations and entities that are responsible for producing and

placing into the stream of commerce WHHPs which create and cause these biological effects.

## II. THE PARTIES

5.     Plaintiff Francis J. Farina is an adult individual who resides at 577 Gregory Lane,

Devon, Pennsylvania 19333.

6.     At all times relevant to this Complaint, defendant NOKIA, Inc. a/k/a Nokia

Mobile Phones, Inc. ("Nokia") was a Delaware corporation with its principal place of business at

6000 Connection Drive, Irving, Texas 75039. At all times relevant herein, Nokia, through its

agents, distributors, servants and/or employees engaged in the design, manufacture, marketing

and sale of WHHPs nationally and internationally.

7.     At all times relevant to this Complaint, defendant NEC America, Inc. ("NEC")

was a corporation organized and existing under the laws of the State of New York, with its

principal place of business at 8 Old Sod Farm Road, Melville, New York 11747. At all times

relevant herein, NEC, through its agents, distributors, servants and/or employees engaged in the

design, manufacture, marketing and sale of WHHPs nationally and internationally.

6

8.     At all times relevant to this Complaint, defendant Ericsson Wireless Communications, Inc. a/k/a Ericsson, Inc. ("Ericsson") was a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 740 East Campbell Road, Richardson, Texas 75081. At all times relevant herein, Ericsson, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs nationally and internationally.

9.     At all times relevant to this Complaint, defendant Motorola, Inc. ("Motorola") was a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 5725 E. River Road, Chicago, Illinois 60631. At all times relevant herein, Motorola, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs nationally and internationally.

10.     At all times relevant to this Complaint, defendant Sprint PCS, L.P. was a limited partnership organized and existing under the laws of the State of Delaware, having its principal place of business at 4900 Main Street, 12th Floor, Kansas City, Missouri 64112. At all times relevant herein, Sprint, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services to cellular telephone owners and users throughout its service areas.

11.     At all times relevant to this Complaint, defendant Audiovox Communications Corporation ("Audiovox") was a corporation organized and existing under the laws of the State of Delaware having its principal place of business in the State of New York at 150 Marcus Blvd, Hauppauge, New York 11788. At all times relevant herein, Audiovox, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs nationally and internationally.

7

12.    At all times relevant to this Complaint, defendants Nextel Communications of the Mid-Atlantic, Inc., Nextel Boost of the Mid-Atlantic, LLC, Nextel West Corp. and Nextel Boost West, LLC (jointly, "Nextel") were corporations and limited liability companies organized and existing under the laws of the State of Delaware having their principal places of business at 2001 Edmund Halley Drive, Reston, Virginia 20191. At all times relevant herein, Nextel, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services, as well as to cellular telephone owners and users throughout its service areas.

13.    At all times relevant to this Complaint, defendant Matsushita Corporation of America A/K/A Panasonic Corporation. ("Panasonic") was a corporation organized and existing under the laws of the State of Delaware having its principal place of business at 9401 West Grand Avenue, Frankin Park, Illinois 60131. At all times relevant herein, Panasonic, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs nationally and internationally.

14.    At all times relevant to this Complaint, defendant Philips Electronic North America Corporation ("Philips") was a corporation organized and existing under the laws of the State of Delaware having its principal place of business at 100 East 42nd Street, New York, New York 10017. At all times relevant herein, Philips, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs nationally and internationally.

15.    At all times relevant to this Complaint, defendant Qualcomm Incorporated A/K/A Qualcomm, Inc. ("Qualcomm") was a corporation organized and existing under the laws of the State of Delaware having its principal place of business at 6455 Lusk Boulevard, San Diego, California, 92121. At all times relevant herein, Qualcomm, through its agents, distributors,

8

servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs and WHHP services nationally and internationally.

16.    At all times relevant to this Complaint, defendant Samsung Telecommunications America, L.P. ("Samsung") was a Delaware limited partnership having its principal place of business at 105 Challenger Road, Ridgefield Park, NJ 07660.  At all times relevant herein, Samsung, through its agents, distributors, servants and/or employees engaged in the marketing and sale of WHHPs nationally and internationally.

17.    At all times relevant to this Complaint, defendant Sanyo North America, Inc. A/K/A Sanyo North America Group ("Sanyo") was a corporation having its principal place of business at 218 State Route 17 North, Rochelle Park, New Jersey 07662.  At all times relevant herein, Sanyo, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacting business nationally and internationally.

18.    At all times relevant to this Complaint, defendant Sony Electronics, Inc. ("Sony") was a corporation organized and existing under the laws of the State of Delaware having its principal place of business at The Corporation Trust Incorporated, 300 East Lombard Street, Baltimore, Maryland 21202.  At all times relevant herein, Sony, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacting business nationally and internationally.

19.    At all times relevant to this Complaint, defendant AT&T Wireless Services, Inc. ("AT&T") was a corporation organized and existing under the laws of the State of New York, having its principal place of business at 195 Broadway, New York, New York.  At all times relevant herein, AT&T, through its agents, distributors, servants and/or employees engaged in

the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services to cellular telephone owners and users throughout its service areas.

20.    At all times relevant to this Complaint, defendant Cellco Partnership d/b/a Verizon Wireless (jointly "Cellco"), was a partnership organized and existing under the laws of the State of Delaware having its principal place of business at 180 Washington Valley Road, Bedminster, New Jersey, 07921. At all times relevant herein, Cellco, through its agents, servants, distributors and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services to cellular telephone owners and users throughout its service areas.

21.    At all times relevant to this Complaint, defendant Cingular Wireless LLC, formerly known as Southwestern Bell Mobile Systems, Inc. A/K/A Southwestern Bell Wireless ("Cingular"), was a corporation organized and existing under the laws of the State of Delaware having its principal place of business at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. At all times relevant herein, Cingular, through its agents, servants, distributors and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services to cellular telephone owners and users throughout its service areas.

22.    At all times relevant to this Complaint, defendant Cellular One Group A/K/A Cellular One ("Cellular One"), was a partnership organized and existing under the laws of the State of Delaware having its principal place of business at 5001 Lyndon B Johnson Freeway, Suite 700, Dallas, Texas 75244. At all times relevant herein, Cellular One, through its agents, servants, distributors and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services to cellular telephone owners and users throughout its service areas.

10

23.    At all times relevant to this Complaint, defendant VoiceStream Wireless Corporation, A/K/A VoiceStream Wireless ("Voicestream"), was a partnership organized and existing under the laws of the State of Delaware having its principal place of business at 3650 131st Avenue SE, Suite 200, Bellvue, Washington, 98006. At all times relevant herein, Voicestream, through its agents, servants, distributors and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services to cellular telephone owners and users throughout its service areas.

24.    At all times relevant to this Complaint, defendant LG Electronics, Inc. was a Korean company doing business in the United States and Pennsylvania through various subsidiaries, including defendant LG Electronics U.S.A., Inc. (jointly "LG"), having its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. At all times relevant herein, LG, through its agents, servants, distributors and/or employees engaged in the design, manufacture, marketing and sale of WHHPs nationally and internationally.

25.    At all times relevant to this Complaint, defendant Cellular Telecommunication Industry Association N/K/A Cellular Telecommunication Internet Association ("CTIA"), was a trade association existing under the laws of the District of Columbia, having its principal place of business at 1250 Connecticut Avenue, N.W., Washington, D.C. 20036, and CTIA was conducting its business at all times relevant herein through its agents, servants and/or employees and represented the safety in the use of WHHPs to the to cellular telephone owners and users in Pennsylvania.

26.    At all times relevant to this Complaint, defendant Telecommunications Industry Association ("TIA") was a trade association existing under the laws of the District of Columbia, having its principal place of business in Washington, D.C., and TIA was conducting its business

11

at all times relevant herein through its agents, servants and/or employees and represented the safety in the use of WHHPs to cellular telephone owners and users in Pennsylvania.

27.    Defendants John Does 1 through 50 are as yet unidentified defendants who at all times relevant hereto were engaged in the business of manufacturing, selling, promoting, marketing and distributing the WHHPs herein.

28.    Defendants John Does 51 through 100 are as yet unnamed defendants who at all times relevant hereto were engaged in the business of owning, selling, promoting, marketing, distributing and operating the wireless networks necessary for the use and operation of the WHHPs herein.

29.    On information and belief, all defendants conduct business in Pennsylvania and in Philadelphia County.

### III. FACTUAL BACKGROUND

30.    WHHPs are sold in the United States and throughout the world.  More than 190 million Americans use WHHPs and over 2 billion have been sold internationally.

31.    Service providers are an integral component of the WHHP industry, without which WHHPs could not be used.  Such providers (hereinafter referred to as "Cell Phone Carriers") are granted licenses by the Federal Communication Commission ("FCC") to broadcast wireless signals on specific frequency bands to provide cellular telephone service to consumers.

32.    Each cell phone manufacturer designs and manufactures its WHHPs to fit the specifications of the Cell Phone Carriers.

33.    Each Cell Phone Carrier provides manufacturers and/or sellers of WHHPs with specifications based on its specific frequency band.  The specifications for the battery and circuitry for all WHHPs in a Cell Phone Carrier's network are determined by the Cell Phone Carrier's license and frequency granted by the FCC.

12

34.    Each time a WHHP user makes or receives a call, a wireless signal is transmitted from the WHHP antenna to the nearest cell tower or from the nearest cell tower to the WHHP antenna, respectively, thereby exposing the WHHP user to RFR.

35.    Land lines also play a central role in the operation and use of WHHPs. Based upon the license granted by the FCC and the frequency specifications provided to sellers and/or manufacturers of WHHPs, the defendant Cell Phone Carriers create a network by which the wireless signal is transferred to land lines and the call is sent to a receiver or sent to the cell phone customer.

36.    The WHHPs purchased and used by plaintiff, as alleged in paragraphs 137-148 below, were sold without a hands free earpiece or headset ("headset") and/or without instructions for proper headset use and why it is important to use the headset whenever possible (*i.e.* to prevent biological effects to the head and other risks described below).

37.    While placing calls and while receiving calls, plaintiff held the WHHPs in the manner for which they were designed and intended to be used by defendants, so that the receiver was resting against the plaintiff's ear (the "customary position"), the same manner in which other similarly situated Class members customarily use and have used WHHPs.

38.    Each time plaintiff used the WHHPs in the customary position without a headset, the antenna was located next to plaintiff's head.

39.    Each time plaintiff used the WHHPs in the customary position without a headset, he was exposed to RFR which emanated from the antenna, thereby subjecting plaintiff to RFR and, in the absence of a headset, to RFR's biological effects arising therefrom.

40.    The biological effects to which plaintiff was exposed by his use of the WHHPs were identical to the effects to which all other Class members were exposed.

41.    Appropriately designed headsets, when properly used, eliminate RFR exposure to

the WHHP user's head. Headsets used in conjunction with WHHPs have been commercially available at all relevant times. Indeed, at all relevant times, defendants marketed headsets as a convenience accessory at an additional cost.

42. At all relevant times, defendants knew or should have known that plaintiff and Class members are exposed to RFR while using WHHPs in the customary position and that, as a result, they are at increased risk for exposure to adverse biological effects therefrom.

43. At all relevant times, defendants knew or should have known that the increased risk of biological effects decreases the farther away the WHHP is located from the user during use.

44. At all relevant times, defendants knew or should have known that a properly designed headset, when used with a WHHP, greatly reduces the risk of biological effects to the head. Knowing of this great reduction in risk, defendants have designed and marketed inexpensive headsets.

## HISTORY OF MEDICAL AND SCIENTIFIC RESEARCH

45. Scientific and medical research, published in peer reviewed journals, has demonstrated adverse biological effects from exposure to RFR within the radio frequency band of 300 megahertz to 2.4 gigahertz.

46. Defendants were aware or should have been aware of numerous studies and experiments that demonstrated the adverse biological effects of RFR dating back to the late 1920s.

47. Decades of research have demonstrated that adverse biological effects result from exposure to varying levels of RFR.

48. During this same period of time, research was also developed regarding the risk to human health posed by exposure to RFR and those adverse biological effects.

14

49.     By the early 1960's, it was well established in the scientific and medical communities that RFR is efficiently absorbed into human tissue and is capable of producing biological injury.

50.     It was equally well known in the scientific and medical community by the early 1960's that an antenna is the most efficient means of depositing RFR into the human body while penetrating human tissue, and that the temporal lobe of the brain was the most sensitive area of the body to this type of radiation.

51.     Medical and scientific inquiry and research into the harmful biological effects of RFR continued unabated from the 1960's to the present. Throughout this period, dozens of peer reviewed research papers were published which, individually and collectively, raised serious and credible questions regarding whether the RFR to which WHHP users were and are exposed posed a risk or threat to their health.

52.     Throughout this entire period, defendants, acting individually and collectively through their respective trade associations, acted affirmatively to suppress, discredit and/or minimize this emerging science.

53.     Throughout this same period, defendants, acting individually and collectively through their respective trade associations, took steps to ensure that they would be free to manufacture and mass market WHHPs to the consuming public, free from the constraints of any reasonable and necessary safety standards regulating RFR exposure. They accomplished this by obtaining and exercising dominance and control over the American National Standards Institute ("ANSI") Committee responsible for developing safety standards for RFR emitting devices.

54.     Defendants, individually and through their trade associations, undertook with great public fanfare to fund scientific inquiry into the potential health hazards posed by the use of WHHPs. When this industry-funded research failed to corroborate the industry's reckless and

premature claims of safety, and, in fact, presented new evidence of potential health concerns, the industry responded by terminating the research funding and publicly disparaging, suppressing and minimizing the results.

55.    Despite their knowledge of the literature, research and the industry's own studies, defendants continued falsely and wrongfully to maintain that WHHPs posed no threat to human health despite mounting abundant evidence to the contrary.

56.    At all relevant times, the biological effects caused by low level RFR of WHHPs which, in turn, gives rise to risks to the users' health, was fully known and appreciated by the defendants. At all relevant times, defendants should have and easily could have minimized, reduced and/or eliminated this health risk by acknowledging its existence and providing to each purchaser of WHHPs a hands free earpiece or headset designed to eliminate and/or reduce RFR exposure to the user's head with appropriate instructions for use. Defendants failed and/or refused to take this simple step to reduce the biological effects and health risks to consumers for fear that such action would inhibit their ability to mass market WHHPs to the consuming public, including to plaintiff and others members of the Class.

57.    On January 26, 1993, defendant Motorola, through one of its senior executives, announced to the news media, which subsequently reported to the public, that "thousands of studies" had shown that cellular phones were "safe". This statement was false and misleading.

58.    On July 16, 1993, in furtherance of its dishonest campaign to assure the consuming public of the purported "safety" of WHHPs, the Cellular Telecommunications Industry Association ("CTIA"), representing many of the named defendants, held a press conference and issued a report entitled "Safety Update-Fast Facts: Portable Cell Phone Safety," which, in bold print, falsely and deceptively stated: **"Rest assured. Cellular telephones are safe!"** The report further stated that WHHPs fell within the safety standards of the FCC.

However, the defendants fraudulently and deceitfully omitted the fact that the FCC had declared

that it does *not* consider itself the "agency" responsible for evaluating the health effects of RFR

and WHHPs.

59.    This industry deception prompted Elizabeth Jacobson, Deputy Director for

Science at the Center for Devices and Radiological Health of the U.S. Food and Drug

Administration ("FDA"), on July 19, 1993 to send a letter to CTIA president Thomas Wheeler,

which clearly questioned and challenged the false and misleading statements made by the

defendants to the public regarding the "safety" of WHHPs.  In pertinent part, that letter stated:

> "I am writing to let you know that we were concerned about two
> important aspects of your press conference on July 16 concerning
> the safety of cellular phones, and to ask that you carefully consider
> the following comments when you make future statements to the
> press.
>
> First, both the written press statements and your verbal comments
> during the conference seemed to display an unwarranted
> confidence that these products will be found to be absolutely safe.
> In fact, the unremittingly upbeat tone of the press packet strongly
> implies that there can be no hazard, leading the reader to wonder
> why any further research would be needed at all. (Some readers
> might also wonder how impartial the research can be when its
> stated goal is "a determination to reassure consumers," and when
> the research sponsors predict in advance that "we expect the new
> research to reach the same conclusion, that the cellular phones are
> safe.") . . . .
>
> We are even more concerned that your press statements did not
> accurately characterize the relationship between CTIA and the
> FDA. . . . [S]ince it is not yet clear whether we will help to direct
> the research program, it is premature to state that we will
> credential the research.
>
> To sum up, Mr. Wheeler, our role as a public health agency is to
> protect health and safety, not to "reassure consumers." I think it is
> very important that the public understand where we stand in
> evaluating the possibility that cellular phones might pose a health
> risk. . . .

60.    In or about late 1993 or early 1994, the cell phone industry, including the named

defendants, through CTIA, organized a committee to prepare a manual for public consumption

discussing "responsible" WHHP use. After receiving a draft of the manual, Thomas Wheeler,

president of CTIA at the time, sent a memorandum to the drafting committee expressing his

concerns over certain language in the draft which acknowledged and/or implied that the use of

WHHPs could pose health risks. Mr. Wheeler's memorandum suggested significant substantive

deletions from the draft. The committee thereafter deleted the offending material, set forth

below in brackets and bold typeface:

> "Do not operate your transportable cellular telephone when
> holding the antenna, or when any person is within 4 inches (10
> centimeters) of the antenna. **[Otherwise you may impair call
> quality, may cause your phone to operate at a higher power
> level than is necessary, and may expose that person to RF
> energy in excess of the levels established by the updated ANSI
> Standard.**
>
> **If you want to limit RF exposure even further, you may choose
> to control the duration of your calls or maintain a distances
> from the antenna of more than 4 inches (10 centimeters)].**
>
> For best call quality, keep the antenna free from obstructions and
> point it straight up."

61.    Subsequent to, and as a direct consequence of the filing of other proceedings

raising concerns about biological injury from RFR, the defendants (or some of them) began to

provide to purchasers and lessees of WHHPs with a copy of the FDA's "Update on Mobile

Phones" dated October 2000 (the "Update"). The Update is included by some defendants as an

insert to the packaging for newly purchased WHHPs.

62.    The FDA's "Update" informs the consuming public as follows:

> **The U.S. Food and Drug Administration's Center for Devices
> and Radiological Health Consumer Update on Mobile Phones.**
>
> ...Why the concern?
>
> Mobile phones emit low levels of radio frequency energy (i.e.,
> radio frequency radiation) in the microwave range while being

18

used. They also emit very low levels of radio frequency energy (RF), considered non-significant, when in the stand-by mode. It is well known that high levels of RF can produce biological damage through heating effects (this is how your microwave oven is able to cook food).

*However, it is not known whether, to what extent, or through what mechanism, lower levels of RF might cause adverse health effects as well. Although some research has been done to address these questions, no clear picture of the biological effects of this type of radiation has emerged to date. Thus, the available science does not allow us to conclude that mobile phones are absolutely safe, or that they are unsafe...* (Emphasis added).

**How much evidence is there that hand-held mobile phones might be harmful?**

Briefly, there is not enough evidence to know for sure, either way; however, research efforts are on-going. The existing scientific evidence is conflicting and many of the studies that have been done to date have suffered from flaws in their research methods.

**...What is FDA's role concerning the safety of mobile phones?**

Under the law, FDA does not review the safety of radiation emitting consumer products such as mobile phones before marketing, as it does with new drugs or medical devices...

Although the existing scientific data do not justify FDA regulatory actions at this time, FDA has urged the mobile phone industry to take a number of steps to assure public safety. The agency has recommended that the industry:
support needed research into possible biological effects of RF of the type emitted by mobile phones;

- design mobile phones in a way that minimizes any RF exposure to the user that is not necessary for device function; and

- cooperate in providing mobile phone users with the best possible information on what is known about possible effects of mobile phone use on human health.

63.    In addition to furnishing this FDA Update as a package insert, some defendants

also began including headsets as part of the package of newly purchased WHHPs.

64.    More recently, a government agency familiar with the issues surrounding RFR

and the current FCC guidelines acknowledged publicly that "Federal health and safety guidelines have not yet developed policies concerning possible risk from long-term, non-thermal exposures."

65.    The agency also stated that "[t]he FCC's exposure guideline is considered protective of effects arising from a thermal mechanism but not from all possible mechanisms. Therefore, the generalization by many that the guidelines protect human beings from harm by any or all mechanisms is not justified."

66.    The agency also confirmed that "[m]ost people's greatest exposures result from the use of personal communications devices that expose the head. In summary, the current exposure guidelines used by the FCC are based on the effects resulting from whole-body heating, not exposure of and effect on critical organs including the brain and eyes."

## IV. THE CELLULAR TELEPHONE INDUSTRY TRADE ASSOCIATIONS

67.    There are several industry trade groups and/or organizations including defendants CTIA and TIA , as well as, the CDMA Development Group, and the Mobile Manufacturers Forum of which many of the defendants are members.

68.    CTIA is in constant contact with all branches of government regarding policy issues, as well as the FCC. CTIA has specific committees to deal with safety and regulations. CTIA states on their website: "CTIA also coordinates the industry's efforts to be responsible and responsive to concerns about wireless health and product usage issues, while operating an equipment testing and certification program to ensure high quality and reliability for consumers."

69.    On the Mobile Manufacturers Forum ("MMF") website it states:  "The MMF was formed in 1998 to facilitate joint funding of key research projects and cooperation on standards, regulatory issues and communications concerning health and mobile phones."  According to

20

their website MMF's members include Alcatel, Ericsson, Mitsubishi Electric, Motorola, Nokia, Panasonic, Philips, Sagem, Siemens, Sony Ericsson and TCL & Alcatel Mobile Phones.

70.    According to its website the CDMA Development Group ("CDG") was founded in December 1993. It further states: "The CDG is comprised of CDMA service providers and manufacturers, application developers and content providers." It also states that its members work together to: "Establish strategic relationships with government ministries, regulatory bodies, and worldwide standards and industry organizations to promote cooperation and consensus on issues facing the CDMA community."

71.    It is through these various trade organizations that the industry works together to undermine the legitimate independent scientific research that is conducted regarding the biological effects of RFR. As members of one or more of these trade groups defendants pool resources for their common goal to prolong definitive answers to many of the outstanding questions facing the scientific and medical communities not to mention governmental bodies regarding the effects of RFR.

72.    Beginning in 1992, to the present, CTIA and TIA represented many of the manufacturer and service provider defendants. In 1993, CTIA and TIA participated in a Surveillance Program to research, inquire into, and assure the public of the safety of WHHPs.

73.    CTIA and TIA were integral participants in the formation of the Surveillance Program which was formed to study the safety of WHHPs and report its findings to the public and to governmental bodies.

74.    CTIA, with input and assistance from TIA, hired George Carlo ("Carlo") an epidemiologist to chair the Surveillance Program. Thomas Wheeler, president of CTIA at the time, handpicked Carlo to lead the Surveillance Program, and on January 29, 1993 announced that "it is time for truth and good science to replace emotional videotape and unsupported

21

allegations. Therefore, the cellular communications industry is today announcing that it will fund research to re-validate the findings of the existing studies, which have found that the radio waves from cellular phones are safe."

75.    With the knowledge and approval of CTIA and TIA, Carlo formed Wireless Technology Research ("WTR") the entity which was responsible for the Surveillance Program. CTIA, TIA, and Carlo, through WTR, appointed two Committees to oversee research, the Scientific Advisory Group (SAG) and the Peer Review Board (PRB).

76.    CTIA and TIA, concealed evidence and research of the SAG and PRB which demonstrated that (1) WHHPs were hazardous to the health of consumers, and (2) that more research was necessary to assure the public that WHHPs were safe for use.

77.    CTIA and TIA, intimidated other researchers and consultants hired by WTR and the SAG. CTIA and TIA cut and reduced funding of WTR to prevent the research necessary to assure the public that WHHPs were safe for use.

78.    On June 26, 1993, a Motorola executive stated, with the acknowledgment and support of CTIA and TIA, that "thousands of studies" had already shown cellular phones were safe. In the fall of 1993, the cell phone industry appointed a committee to write and develop a consumer's manual. The draft manual included wording which indicated and warned consumers that (1) radio frequency emissions may exceed ANSI safety standards; (2) limit the duration of phone calls; and (3) maintain a distance of four inches from the antenna. The CTIA and the TIA, intentionally and/or negligently changed the wording of the warning/label to omit the warnings and wording listed in this paragraph.

79.    CTIA and TIA were aware in the fall of 1994 that Henry Lai and N.P. Singh, notable and respected scientists at the University of Washington in Seattle, WA were hired, had conducted research that demonstrated single and double strand DNA breaks from radio

22

frequency exposure.

80.    It has been reported that in response to Dr. Lai's study CTIA prepared a media strategy that would publicly denounce Dr. Lai's findings. A researcher was hired who said that they could not reproduce Lai's results. An internal CTIA memo proclaimed victory and stated the industry has successfully "war gamed" the Lai study. http://www.wave-guide.org/news/coneofsilence.html.

81.    In March 1994, Dr. Leif Salford, a respected researcher and physician from Stockholm, Sweden, advised the CTIA of his research which found a significant leakage, or breakdown in the blood brain barrier in rats exposed to radio frequency radiation at 915 megahertz at specific absorption rates within the range of cellular telephones.

82.    CTIA and TIA, upon notification by Dr. Leif Salford of his findings (1) failed to warn the public of the findings; (2) failed to fund further research of blood brain barrier effects; and (3) failed to attempt to replicate such research.

83.    CTIA and TIA were aware of research conducted by Motorola at the Veterans Administration in Loma Linda, California by Dr. Ross Adey. The research showed that biological effects were being induced by exposing rats, headfirst, to radio waves generated by a digital WHHP. CTIA and TIA (1) failed to warn the public of the findings; (2) failed to fund further research at Loma Linda by Dr. Adey; and (3) failed to attempt to replicate such research.

84.    In May 1997, Dr. Michael Repacholi from the Royal Adelaide Hospital in South Australia published the findings of their work in Radiation Research, an authoritative scientific journal, that showed a higher incidence of lymphoma in mice exposed to radiation than in mice that were not exposed. CTIA and TIA (1) failed to warn the public of the findings; (2) failed to fund further research by Dr. Repacholi; and (3) failed to attempt to replicate such research.

85.    CTIA and TIA were made aware of several significant epidemiological studies,

23

namely the (1) 1994 Canadian study of electric utility workers who had a statistically significant

increase in lung cancer who had jobs in close proximity to mobile communications equipment;

(2) a 1996 Air Force personnel studies of more than 800,000 workers exposed to RFR that

showed a statistical significance in brain tumors; and (3) a Polish military study of workers

exposed to radio waves that showed a statistically significant increase in brain and blood

cancers. CTIA and TIA (1) failed to warn the public of such findings; (2) failed to fund further

research to validate their work; and (3) failed to replicate such research.

86.    In December, 1998, CTIA and TIA were aware of the research conducted by

Doctors Ray Tice and Graham Hook of the Integrated Laboratory Systems in Research Triangle

Park, North Carolina. The project was coordinated under a contract with WTR. The research

exposed human blood cells to RFR in the cellular frequency band and showed a 300 percent

increase in the incidence of genetic damage through the formulation of micro nuclei. CTIA and

TIA (1) failed to warn the public of such findings; (2) failed to fund further research by Tice and

Hook to validate their work; and (3) failed to replicate such research.

## V. BIOLOGICAL EFFECTS AND/OR INJURIES FROM
## RFR EXPOSURE THROUGH WHHPs

87.    The industry has been deficient in their efforts to inform and protect the public.

The industry has merely done all that is technically necessary to comply with the current

guidelines even though WHHPs have not been determined safe for their intended use. All

WHHPs do not emit the same specific absorption rate ("SAR") level.

88.    By making the SAR data difficult to locate and understand, manufacturers

obscure vital information that consumers should be able to easily access. Consumers do not

realize that they are receiving unwanted RFR every time they use their WHHP while located

next to their head and/or body.

89.     Additionally, by insisting that WHHPs are "safe," even though they neglect to explain to the consumer what "safe" means (*i.e.* not yet proven unsafe), defendants are sending a misleading and mixed message. Until all of the evidence has been gathered, the possibility of biological effects and/or long term health risks should be acknowledged and disclosed to consumers and not ignored by defendants.

90.     Many peer-reviewed published studies describe many WHHP user's common complaints such as headaches, heating behind the ear, and sleep problems, none of which were disclosed to plaintiff, members of the Class or the public by defendants.

91.     The published studies describe such effects as disturbances in normal sleeping EEG patterns, unpleasant sensations, including a burning feeling or a dull ache mostly occurring in the temporal, occipital or auricular areas of the head, fatigue, headache, warmth behind or on the ear, and a burning skin sensation.

92.     A study found that the risk of experiencing fatigue, headache, warmth behind or on the ear, and a burning skin sensation was increased in as little as fifteen (15) minutes of WHHP use. Another study reported in the Lancet, that exposure to RFR for thirty-five minutes causes an increase in resting blood pressure.

93.     Yet another study reported that exposure to WHHP radiation produced faster reaction time in human subjects, thus showing that WHHP RFR induces biological changes in the brain.

94.     Still other published studies describe biological changes in experiments using animals when exposed to microwave radiation. The effects reported include: changes in the blood-brain barrier, calcium efflux in brain cells, immune system effects, changes in the electrically evoked potentials and in long-term potentiation of hippocampal brain sections, and production of high levels of "heat shock proteins."

25

95.    Several studies have been conducted over the last several years that have led to published papers in scientific journals which describe increased risks for various tumor types and/or cancer. In the fall of 2004, Michael Kundi of the Institute of Environmental Health medical faculty at the University of Vienna, reported in the Journal of Toxicology and Environmental Health that a review of nine studies of cell phone users found an increased risk of cancer.

96.    Another study reported an increased risk for developing an acoustic neurinoma for those using an analog WHHP for greater than five years. This study also found an increased risk for developing brain cancer for those who have used an analog WHHP. Additionally, in another study the authors discuss data showing an increased risk of brain tumors associated with the use of WHHPs. The study also reported increased mortality for analog WHHP users.

97.    Additional studies have reported an increased risk for melanoma in the eye associated with the use of WHHPs and an increased risk for Neuroepitheliomatous tumors.

98.    Recent epidemiological studies have found increased risk for brain cancer associated with the use of analog WHHPs. One of these studies found that brain cancer was twice as likely in individuals who used an analog WHHP and the other study found the risk of brain cancer increased by two and a half times when using an analog WHHP.

99.    Many of the more recent studies were not considered by scientific regulating bodies in arriving at their current positions regarding whether or not WHHPs are safe.

## VII. FACTS RELATING TO INCREASED CONCERN FOR CHILDREN

100.    Today, the fastest growing group of WHHP users are children and young people. This growth is actively encouraged by advertising campaigns from the WHHP industry, extolling how indispensable the phones are to their active life styles.

101.    However, within the scientific community, there is a growing number of experts

26

that are urging caution because if there are adverse health effects from WHHP use, it will be the children who will be on the front line.

102.    The still developing nervous system and associated brain-wave activity in a child are more vulnerable to aggression by the pulses of microwaves used in Global System for Mobile Communications ("GSM") WHHPs than a mature adult. The current SAR standard for RFR exposure from WHHPs is based on exposure testing of a model of an adult male head. No consideration is given to the smaller heads of both females and children.

103.    Additionally, the increased mitotic activity in the cells of developing children makes them more susceptible to genetic damage from RFR.

104.    A child's immune system's efficiency is reduced by WHHP radiation. Children's immune systems are generally less strong than that of an adult. Children will be less able to fend off any adverse health effect provoked by (chronic) exposure to WHHP radiation.

105.    The World Health Organization Expert Group recommends that children less than sixteen years of age be discouraged from using mobile phones. Their recommendation is based on the fact that such children:

    1.    Have developing nervous systems that are likely to be more vulnerable to potentially hazardous agents than mature nervous systems;

    2.    Have smaller heads, thinner skulls, and higher tissue conductivity which may mean that children can absorb more energy from a given phone than do adults; and

    3.    If detrimental effects are found to be caused by mobile phones, those using phones for a longer period of their lives will tend to accumulate greater risk.

106.    Researchers with the World Health Organization stated in an article in the

journal of Pediatrics (August 2005) that until more is known, pediatricians "could advise parents that their children's exposure can be reduced by restricting the length of calls or by using hands-free devices to keep the phones away from the head and body."

107.    The British Government through an independent expert group called the Stewart Inquiry, the German Academy of Pediatrics, the "Bundesamt füür Strahlenschutz", which is the federal authority for radiation protection in Germany, Sianette Kwee, Professor, Department of Medical Biochemistry, University of Aarhus, the Denmark Member of the Editorial Board of *Bioelectrochemistry* who is the Danish expert representative in the European Union's COST 281 project "Potential health effects from Emerging Wireless Communication systems", Thailand's interior minister, Dr. Gro Harlem Brundtland, the Director General of the World Health Organization ("WHO"), and the French Government have all cautioned that children are at increased risk for experiencing adverse health effects from the use of WHHPs.

108.    Sir William Stewart, of the National Radiological Protection Board in a statement made on January 11, 2005, urged parents not to give cell phones to children under eight, and said that those between eight and 14 should use them only when absolutely necessary. He stated further that there was enough uncertainty about mobile phones to adopt the precautionary approach, particularly when it comes to children.  Professor Stewart admitted that new research being carried out across Europe meant he was know "more concerned" about health risks than five years ago.  Stewart also called for clearer information regarding how much radiation is absorbed in the body from different mobile phones.

109.    Governmental, consumer and physician groups in England, Italy, Russia, Germany and France have all advised a precautionary approach.  The governments of Thailand and Bangladesh have also expressed concern regarding the use of mobile phones by children. On December 8, 2000 the German Academy of Pediatrics advised parents to restrict their

children's use of mobile phones.  On July 31, 2001, the head of the Bundesamt fur

Strahlenschutz, Wolfram Koenig, the federal authority for radiation protection in Germany stated

that "Parents should take their children away from that technology [mobile phones]".  On June

20, 2005 the French Agency for Environmental Health Safety recommended that children use

mobile phones only under certain conditions and that they use a hands-free set until more is

known about possible health risks.

110.    Nicolas Johnson, former Federal Communications Commission

member signed a petition and sent a letter to the members of Congress in 2005 asking them to

investigate the marketing of cell phones to children. The International Commission for Non-

Ionizing Radiation Protection stated that children's use of cell phones may be of special concern.

111.    On April 27, 2000, Norbert Hankin, an environmental scientist at the

EPA's Office of Radiation and Indoor Air, wrote in a letter that "[r]ecent studies involving short-

term exposures have demonstrated that the subtle effects on brain functions can be produced by

low-intensity pulse modulated radiofrequency (RF) radiation.  Some research involving rodents

has shown adverse effects on short-term and long-term memory.  The concern is that if such

effects may occur in young children, then even slight impairment of learning ability over years

of education may negatively affect the quality of life that could be achieved by these individuals,

when adults.  The potential effect on learning of exposure from telecommunication devices used

by children should be considered for study by the Radiation Protection Project."

112.    A recent study determined that a WHHP call for just two minutes can

continue to effect the electrical activity in a child's brain for up to an hour after use.  The same

study showed that a child's use of a WHHP results in radiation penetrating deep into a child's

brain.  Disturbed brain activity can lead to psychiatric or behavioral problems and may also

cause learning difficulties in children.

113. Another published study showed that WHHPs could cause memory loss and epilepsy in young users. In the study it was found that non-thermal radiation from the WHHPs changed the structure of human cells and that children were particularly vulnerable because their skulls were smaller and thinner, making it easier for radiation to penetrate.

## VIII. FACTS RELATING TO DRIVING SAFETY

114. In addition to the biological effects and risks to health detailed above, using a WHHP without a headset or other "hands free" device also increases the risk of accidents and injury while operating a motor vehicle. Two states contiguous to Pennsylvania—New Jersey and New York—ban the use of WHHPs while operating motor vehicles, as does the District of Columbia. Since many Class members travel to these states, the marketing, distribution and sale of WHHPs without a headset or other appropriate "hands free" device facilitates the violation of these laws.

## IX. CLASS ALLEGATIONS

115. The class consists of:

> (a) all persons in the Commonwealth of Pennsylvania who purchased or leased WHHPs who have not been diagnosed with any illness or injury resulting from the use of WHHPs; and

> (b) all future purchasers and lessees of WHHPs who have not been diagnosed with any illness or injury resulting from the use of WHHPs (the "Class").

116. Plaintiff is a member of the Class.

117. It is estimated that the Class consists of hundreds of thousands, if not millions, of persons throughout the Commonwealth of Pennsylvania and is so numerous that joinder of all

30

members, whether otherwise required or permitted, is impracticable. The exact number of Class members is presently unknown to plaintiff.

118.    There are questions of law or fact common to the members of the Class which predominate over any questions affecting only individual members and which make class certification appropriate in this case, including:

(a)    whether defendants, acting individually or collectively, failed to conduct appropriate, reasonable and adequate testing of WHHPs to determine the association between RFR and biological effects and any risk to human health arising therefrom;

(b)    whether defendants, acting individually or collectively, failed to conduct appropriate, reasonable and adequate research and studies to determine the association between RFR and the biological effects and health risks;

(c)    whether defendants, acting individually or collectively, failed to warn or otherwise inform plaintiff and other members of the Class of the association between RFR and biological effects and the risks to human health arising therefrom;

(d)    whether the defendants, acting individually or collectively, failed to provide headsets or other devices which would have eliminated, reduced or minimized the biological effects from RFR and the risk to human health arising therefrom;

31

(e)     whether defendants falsely or deceptively misrepresented or failed to adequately disclose in their advertisements, promotional materials and other materials, among other things, the biological effects and potential health risks associated with the use of WHHPs;

(f)     whether defendants failed to adequately disclose the risk to driver safety from WHHPs and failed to provide headsets or other devices which would reduce or minimize those risks;

(g)     whether defendants made express or implied, direct or indirect, misrepresentations of fact or omitted and concealed material facts about the WHHPs; and

(h)     whether defendants' conduct constituted a breach of express and/or implied warranties, violated the Pennsylvania Unfair and Deceptive Trade Practices Act, 73 Pa. C.S.A. § 201-1 et seq., or violated other provisions of Pennsylvania statutory and common law.

119.    The claims asserted by the named plaintiff are typical of the claims of the members of the Class.

120.    This class action satisfies the criteria set forth in Pa.R.Civ.P. 1709 in that plaintiff is a member of the Class; plaintiff will fairly and adequately protect the interests of the members of the Class; his interests are concurrent with and not antagonistic to, those of the Class; he has retained attorneys experienced in class action and complex litigation as his counsel; and he has, or through his counsel, has access to, adequate financial resources to assure that the interests of the Class are protected.

121.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

(a)     It is economically impractical for most members of the Class

to prosecute separate, individual actions; and

(b)     After the liability of the defendants has been adjudicated, the

individual and aggregate claims of all members of the Class

can be determined by the Court.

122.    Litigation of separate actions by individual Class members would create the risk

of inconsistent or varying adjudications with respect to the individual Class members which

would substantially impair or impede the ability of other Class members to protect their interests.

123.    Class certification is also appropriate because defendants have acted or refused on

grounds generally applicable to the Class, thereby making appropriate declaratory relief with

respect to the claims of plaintiff and the Class members.

## COUNT I
## CIVIL CONSPIRACY

124.    Plaintiff and the Class incorporate by reference each preceding and succeeding

paragraph as though fully set forth at length herein.

125.    At all times relevant hereto, defendants formed confederacies and entered into

agreements and/or tacit understandings to individually, jointly, and in conspiracy with each

other, market defective WHHPs, by collective means including their concerted conduct of

suppressing their knowledge of the hazards of RFR emissions from WHHPs and of placing into

the stream of commerce defective WHHPs which can cause biological damage/injury to plaintiff,

the Class and the public; with an intent to deceive plaintiff, the Class and the public; while

failing to warn plaintiff and the public of the biological effects and risks to health from RFR

emissions from WHHPs.

126.    Defendants acting collectively reached a common agreement or understanding to

33

market their defective WHHPs by:

> a)    marketing, producing and promoting the use of WHHPs without proper tests or warnings and without regard to the dangerous RFR emitted therefrom and the biological effects and potential risks to health those RFR emissions could cause to plaintiff and the Class;

> b)    suppressing, discouraging and/or delaying appropriate research, testing, regulation and public dissemination of information concerning RFR emissions and the adverse effects those RFR emissions would have on the plaintiff, the Class and the public at large; and

> c)    ignoring, disparaging and misleading the public about medical and scientific data available to them which clearly indicated that RFR emissions from WHHPs cause adverse biological effects which could be potentially hazardous to the health and safety of the plaintiff, the Class and the public at large.

127.    Defendants jointly and in conspiracy with each other knowingly committed the acts described in this Complaint, as well as other similar acts, in furtherance of their agreement or understanding to promote and market WHHPs.

128.    Defendants were aware of the biological effects and the potential risks to health to those exposed to RFR emissions from WHHPs prior to their sale or lease of the WHHPs to plaintiff and the Class.

129.    At all times relevant hereto, notwithstanding their knowledge of the biological effects and potential risks to health from RFR emissions from WHHPs, defendants collectively lobbied various government officials and standard setting bodies to prevent adequate levels of regulation and control of WHHPs. Through their actions defendants intended the plaintiff, the

34

class and the public at large be exposed to RFR emissions at levels that defendants knew caused biological effects and risk of injury/damage to the WHHP user. There could be no other justification for defendants' joint actions but to unlawfully expose the plaintiff, the Class and the public at large to RFR emissions and the resulting biological effects and risk of injury in order to continue receiving profits from the sale of WHHPs.

130.    At all times relevant hereto, defendants collectively spent thousands of dollars per year to finance selective research and to rebut growing evidence that RFR emissions from WHHPs cause adverse biological effects and potential health risks to users.

131.    Notwithstanding their extensive knowledge of the hazards of RFR emissions from WHHPs, defendants continued to sell and promote WHHPs as "safe" and appropriate for use in order to deceive the plaintiff, the Class and the public at large.

132.    Defendants, acting collectively, reached a common understanding or agreement so that to this very day, defendants continue to fail and refuse to instruct and warn consumers about the adverse biological effects and potential health risks associated with RFR emissions from WHHPs notwithstanding their knowledge of such effects.

133.    Defendants' collective and conspiratorial activities were knowingly and purposefully designed for their own economic and pecuniary benefit and were performed in furtherance of defendants' respective and joint business interests.

134.    At all relevant times hereto, notwithstanding their knowledge of the adverse biological effects of RFR emissions from WHHPs and the potential risks to health therefrom, defendants continued, and continue to this very day, to place into the stream of commerce these WHHPs.

135.    As a direct and proximate result of defendants' conspiratorial conduct, plaintiff and the Class have been damaged.

WHEREFORE, plaintiff and the Class respectfully pray for the following relief:

(a) an Order certifying the Class as defined above and appointing the undersigned as counsel for the Class, pursuant to Rule 1701 *et seq.* of the Pennsylvania rules of Civil Procedure;

(b) judgment in favor of plaintiff and the Class and against defendants, awarding damages for defendants' unlawful concerted conduct, including punitive damages; and

(c) an order requiring defendants to provide notice to the Class.

## COUNT II
## BREACH OF IMPLIED WARRANTIES
### 13 Pa. C.S.A. §§ 2-314, 2-315 and the Common Law

136.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

137.    In or around June 1997, plaintiff commenced WHHP service with Bell Atlantic/NYNEX Mobile Service and purchased a Motorola DPC 650 WHHP in connection with that service. The Motorola DPC 650 did not come with a headset. The account is still in service and is now a Verizon Wireless account using an LG-510 WHHP. The LG-510 WHHP manufactured by LG Electronics, Inc. and sold by Verizon Wireless, also was delivered without a headset.

138.    In or around October 1998, plaintiff commenced WHHP service with AT&T Wireless and purchased an Ericsson KH-668 WHHP in connection with that service. The Ericsson KH-668 was not delivered with a headset. As a result of a merger, the AT&T Wireless service was assumed by Cingular Wireless while plaintiff was still a customer. During the service period, plaintiff purchased two additional WHHPs for use on this account: a Nokia 8260 and a Motorola V60i. The Nokia and Motorola WHHPs came with ear pieces, but they did not come with full headsets.

36

139.    In August 2001, plaintiff purchased WHHP service from AT&T Wireless and, in connection with that service, purchased a Nokia 5165 WHHP.  Subsequently, a Motorola V60i WHHP was purchased for use with this account.  The Nokia and Motorola WHHPs were delivered with ear pieces, but not with full headsets.  In August 2003, the AT&T Wireless service was changed to a Verizon Wireless account.

140.    In or around March 2003, plaintiff purchased WHHP services from Verizon Wireless and, in connection therewith, purchased two Sony Ericsson T61c WHHPs.  Since then, both of the Ericsson WHHPs have been replaced with the purchase of an LG VX4400 B WHHP and a Samsung BST 235 ASE WHHP.  On information and belief, neither the Ericsson, the LG or the Samsung WHHPs was delivered with a headset.

141.    The manuals (exemplar Exhibit A hereto) delivered with the phones plaintiff purchased set forth an express warranty "for Safe and Efficient Use" of the WHHPs that is substantially similar for all of the WHHPs sold by the defendants herein to each of the members of the Class.  The promises and affirmations of fact state, in virtually identical language for all of the manufacturers and sellers, as follows:

### "Exposure to Radio Frequency Signals

Your wireless handheld portable telephone and receiver is a low power radio transmitter and receiver.  When it is ON, it receives and also sends out radio frequency (RF) signals.

In August, 1996, the Federal Communications Commission (FCC) adopted RF exposure guidelines with safety levels for handheld wireless phones.  Those guidelines are consistent with the safety standards previously set by both U.S. and international standards previously set by both U.S. and international standard bodies:

- ANSI C95.1 (1992)
- NCRP Report 86 (1986)*
- ICNIRP (1996)

Those standards were based on comprehensive and periodic evaluations of the relevant scientific literature. For example, over 120 scientists, engineers, and physicians from universities, government health agencies, and industry reviewed the available body of research to develop the ANSI Standard (C95.1).

The design of your phones complies with the FCC guidelines (and those standards)."

142.    The Warranty (Exhibit B hereto) delivered with the Ericsson WHHP plaintiff purchased promised, in pertinent part, "Ericsson warrants this product to be free of defects in material and workmanship at the time of its original purchase and for the subsequent period of one (1) year. . . . If, during the period of Warranty, this product proves defective under normal use and service due to improper materials or workmanship, the Company [Ericsson] will repair or replace the defective item with a new or factory rebuild replacement."

143.    Given the foregoing express promises of safety and warranties against defects in materials and workmanship, the purported disclaimer of such warranties by defendants in their warranty manuals and service agreement are ineffective pursuant to 13 Pa. C.S.A. § 2-316(1), Comment 1, thereto, and the principles of unconscionability, 13 Pa. C.S.A. § 2-302.

144.    In addition, pursuant to 15 U.S.C. § 2308(a), the Magnuson-Moss Warranty Improvement Act (the "MMWA"), defendants, as the sellers and/or manufacturers of the WHHPs, were and are prohibited from disclaiming the express and implied warranties delivered with the phone. Thus, the statements by defendants in their manuals and service agreements that "WE MAKE NO EXPRESS WARRANTY REGARDING THE SERVICE OR THE PHONE AND DISCLAIM ANY IMPLIED WARRANTY, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE," were and are contrary to the MMWA and the UCC. The promises and affirmations of fact delivered by each of the defendants with respect to "Safe and Efficient Use" of the phones are express warranties that may not be contradicted by inconsistent warranty disclaimers without being rendered unfair,

38

deceptive and unconscionable. To the extent such disclaimers attempt to disclaim any promise of safety, they are, therefore, unfair and deceptive. To the extent defendants cannot prove that the WHHPs are safe for ordinary consumer use, the WHHPs do not conform to the express warranties and affirmations of fact and, therefore, are not "free of defects in materials and workmanship," as promised. Each of defendants' manuals and service agreements allocated the burden of proving safe operation and the risk of unsafe operation from radio frequency signals to defendants, thus requiring defendants herein to meet their promise of safety.

145.    Similarly, the Nokia WHHP plaintiff purchased contained the same promise respecting safe use as the Ericsson WHHP and also expressly warranted as follows: "Nokia Inc. ("Nokia") warrants that this cellular phone ("Product") is free from defects in material and workmanship that result in Product failure during normal usage, according to the following terms and conditions: 1. The limited warranty for the Product extends for ONE (1) year beginning on the date of the purchase of the Product. ... 4. During the limited warranty period, Nokia will repair, or replace, at Nokia's option, any defective parts, or any parts that will not properly operate for their intended use with new or factory rebuilt replacement items if such repair or replacement is needed because of product malfunction or failure during normal usage . . . ."

146.    The Samsung WHHP plaintiff purchased likewise was delivered with a manual promising the same "Safe Usage" terms as reflected in the language quoted above in paragraph 141 and the exemplar attached as Exhibit A hereto. In addition, in the manual provided with the WHHP, Verizon Wireless and Samsung (as seller and manufacturer respectively) also expressly warranted: "Samsung Telecommunications America, L.P. (Samsung) warrants the original ("Purchaser") that Samsung's phones and accessories ("Products") are free from defects in material and workmanship under normal use and service for a period commencing on the date of purchase and continuing for the specified period of time after the date: ● Samsung Phone – 1

year. . . .3. During the applicable warranty period, Samsung will repair or replace at Samsung's sole option, without charge to purchaser, any defective component part of the phone or accessory."

147.    The Motorola WHHPs plaintiff purchased also were delivered with manuals promising "safe usage," as reflected in the language quoted above in paragraph 141 and the exemplar attached as Exhibit A hereto. The manuals further promised: "Defects in materials and workmanship in the following new "**Products**" manufactured, sold or certified by Motorola, with which this limited warranty is included in/on the package: (a) wireless cellular telephones . . . together with software imbedded in any of these products . . . Subject to the following exceptions [relating to imbedded software, accessories and replacements], one year from the date the Products are purchased by the first end-user. . . . At no charge to you, we will have the option to repair or replace the Products that do not conform to the warranty, or to refund the Products' purchase price. We may use functionally equivalent reconditioned/refurbished/pre-owned or new Products or parts. No software updates are provided."

148.    The LG WHHPs plaintiff purchased likewise were delivered with manuals promising "safe usage," as reflected in the language quoted above in paragraph 141 and the exemplar attached as Exhibit A hereto. The manuals further promised: "WHAT THIS WARRANTY COVERS: LG offers you a limited warranty that the enclosed subscriber unit and its enclosed accessories will be free from defects in material and workmanship, according to the following terms and conditions: (1) The limited warranty for the product extends for ONE (1) year beginning on the date of purchase of the product. . . ."

149.    All of the WHHPs sold by defendants expressly and uniformly promised in their manuals and service agreements delivered to all consumers that the WHHPs defendants sold and delivered were and would be safe to operate without the use of a headset and that they were and

40

would be free from defects. Attempts by the manufacturers and sellers to disclaim responsibility for these promises constitute a uniform unfair and deceptive practice with respect to all consumers who purchased the WHHPs, as such disclaimers are directly contrary to the express promises and affirmations of fact reflected in the manuals and the service agreements. Indeed, the promise of "Safe and Efficient Use" was a basis of the bargain for all consumer purchases of the WHHPs sold by these defendants. All of the manuals and service agreements allocated the burden and risk with respect to RFR emissions and driver safety to defendants, requiring defendants to prove safe operation in order to show conformity with their express promises, affirmations of fact and non-defective condition for use and operation. Defendants herein cannot show, as is their burden, that consumers still would have purchased the WHHPs had defendants not promised "Safe and Efficient Use."

150.    Defendants are all merchants with respect to the WHHPs at issue herein.

151.    Defendants' WHHPs were sold and delivered to plaintiff and each member of the Class with a uniform latent design, materials and workmanship defect because the WHHPs all emit RFRs that present health and safety risks to consumers when the WHHPs are operated without a headset that enables use of the WHHP at least six (6) inches from the consumer's head. In addition, a design that permits use of the WHHP without a hands-free headset presents safety risks with respect to driving and other activities and, therefore constitutes an additional defect. Defendants cannot show, as is their contractual burden, that the WHHPs are safe to operate without a headset.

152.    The WHHPs sold and delivered to plaintiff and each member of the Class did not and do not conform to the promises and affirmations of fact made by defendants with respect to the "Safe Usage" of the WHHPs. In addition to the express promises and affirmations of fact by defendants, the course of dealing and usage of trade with respect to the defendants' sales of

41

WHHPs to consumers have given rise to the promise to and reasonable expectation by consumers that WHHPs are physically safe for ordinary, long-term consumer usage without a headset. In fact, defendants have not uniformly delivered headsets (free of charge) with the WHHPS or designed and constructed the WHHPS in a manner in which they may only be used with a headset. Nor have defendants advertised any concerns or doubts about the long-term biological effects of WHHP usage without headsets. The WHHPs are not fit for the ordinary purposes for which the WHHPS are used, however, because defendants cannot demonstrate their safety, as is their burden for these consumer products.

153.    Defendants, by reason of the design of their WHHPS, each had reason to know of the particular purpose and manner in which the WHHPs would be used. Moreover, as experts in wireless engineering and radio transmissions, defendants all knew that a fundamental basis of the bargain in each of the sales contracts with plaintiff and the Class was defendants' promise that the WHHPs were safe for consumer use.

154.    Thus, defendants have promised in their manuals, their affirmations of fact, their product descriptions, and their course of conduct and the usage of trade that WHHPs are safe as designed and delivered. But, by not delivering WHHPs that are accompanied by headsets, or WHHPs designed to be used only with headsets, defendants have breached their implied warranties of merchantability and fitness for a particular purpose, because defendants have not delivered WHHPs that defendants can prove are safe, as defendants have promised. In other words, the WHHPs delivered by defendants were and are nonconforming and defective goods because defendants have been allocated the burden to prove safety as a matter of law and public policy, and defendants cannot and have not established that WHHPs are safe for consumer use without headsets.

155.    As a direct and proximate result of defendants' breach of these implied warranties, plaintiff and the Class have suffered an ascertainable loss in the form of increased costs for the purchase of headsets necessary for the safe use of defendants' WHHPS.

WHEREFORE, plaintiff and the Class respectfully pray for the following relief:

(a)    an Order certifying the Class as defined above and appointing the undersigned as counsel for the Plaintiff and the Class, pursuant to Rule 1701 *et seq.* of the Pennsylvania Rules of Civil Procedure;

(b)    judgment in favor of plaintiff and the Class and against defendants, awarding actual damages in the form of the greater of $100 or (i) the variance in value between Defendants' WHHPs as warranted to be safe (which requires a headset) and Defendants' WHHPs as delivered without the required headsets; (ii) those funds necessary to modify, repair or replace each WHHP using proper parts to permit safe use and operation; and (iii) compensation for out-of- pocket monies spent on repair attempts, including the purchase by Plaintiff and Class members of headsets from Defendants or third parties;

(c)    an Order requiring Defendants to provide notice to the Class;

(d)    an Order declaring defendants' conduct as set forth herein to be a breach of the implied warranties of merchantability and fitness for a particular purpose, and a violation of the MMWA;

(e)    an Order affording the Class final injunctive relief compelling defendants to notify members of the Class of the defect complained of herein and providing them a right of free repair and replacement;

(f)    an Order awarding plaintiff and the Class the costs and expenses associated with the prosecution of this action, including reasonable attorney's fees; and

(g)    such other and further legal or equitable relief as to the Court shall seem just,

43

proper and fair.

## COUNT III
## BREACH OF EXPRESS WARRANTY
### 13 Pa. C.S.A. § 2313 and the Common Law

156.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein

157.    The WHHPs sold and delivered by defendants uniformly fail to conform to the express promises of safe operation and the affirmations of fact with respect to safe operation because defendants have not demonstrated and cannot demonstrate that the RFR emitted by the WHHPs are safe to consumers in the absence of a headset required for the use of the WHHPs. The WHHPs are, therefore, defective in materials and workmanship (which includes design), and each of the defendants has breached its express warranty.

158.    As a direct and proximate result of defendant's breach of warranty, plaintiff and the Class have suffered an ascertainable loss in the form of increased costs for the purchase of headsets necessary for the safe use of defendants' WHHPS. Defendants have not repaired and replaced the WHHPs with conforming products, nor have they provided, without charge, WHHPs with headsets required for use. Each of defendants' Limitations of Remedies have failed of their essential purpose as set forth in 13 Pa. C.S.A. § 2719(b), because defendants uniformly have failed to construe "repair and replacement" to include the addition of headsets required to utilize the WHHPs in a safe manner.

WHEREFORE, plaintiff and the Class respectfully pray for the following relief:

(a)    an Order certifying the Class as defined above and appointing the undersigned as counsel for the plaintiff and the Class, pursuant to Rule 1701 *et seq.* of the Pennsylvania Rules of Civil Procedure;

44

(b)    judgment in favor of plaintiff and the Class and against defendants, awarding actual damages in the form of the greater of $100 or (i) the variance in value between defendants' WHHPs as warranted to be safe (which requires a headset) and defendants' WHHPs as delivered without the required headsets; (ii) those funds necessary to modify, repair or replace each WHHP using proper parts to permit safe use and operation; and (iii) compensation for out-of- pocket monies spent on repair attempts, including the purchase by plaintiff and Class members of headsets from defendants or third parties;

(c)    an Order requiring defendants to provide notice to the Class;

(d)    an Order declaring defendants' conduct as set forth herein to be a breach of express warranty, a breach of the implied warranties of merchantability and fitness for a particular purpose, and a violation of the MMWA;

(e)    an Order affording the Class final injunctive relief compelling defendants to notify members of the Class of the defect complained of herein and providing them a right of free repair and replacement;

(f)    an Order awarding plaintiff and the Class the costs and expenses associated with the prosecution of this action, including reasonable attorney's fees; and

(g)    such other and further legal or equitable relief as to the Court shall seem just, proper and fair.

## COUNT IV
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY IMPROVEMENT ACT
## 15 U.S.C. §§ 2301-2312 ("MMWA")

159.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

160.    Plaintiff and the Class are "consumers" as defined by 15 U.S.C. § 2301(3).

45

161.    Each defendant is a "supplier," "warrantor," and "service contractor," as defined by 15 U.S.C. §§ 2301(4), 2301(5), and 2301(8).

162.    The WHHPs constitute a "consumer product" as defined by 15 U.S.C. § 2301(1).

163.    The MMWA requires defendants to be bound by all warranties implied by state law and by all written warranties.

164.    Section 15 U.S.C. § 2310(d)(1) of the MMWA provides that a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this title, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief in any court of competent jurisdiction in any State.

165.    As a direct and proximate result of defendants' breach of warranty, defendants have violated the MMWA.

WHEREFORE, plaintiff and the Class respectfully pray for the following relief:

(a)    an Order certifying the Class as defined above and appointing the undersigned as counsel for the Plaintiff and the Class, pursuant to Rule 1701 *et seq.* of the Pennsylvania Rules of Civil Procedure;

(b)    judgment in favor of plaintiff and the Class and against defendants, awarding actual damages in the form of the greater of $100 or (i) the variance in value between defendants' WHHPs as warranted to be safe (which requires a headset) and Defendants' WHHPs as delivered without the required headsets; (ii) those funds necessary to modify, repair or replace each WHHP using proper parts to permit safe use and operation; and (iii) compensation for out-of- pocket monies spent on repair attempts, including the purchase by plaintiff and Class members of headsets from defendants or third parties;

(c)    an Order requiring defendants to provide notice to the Class;

(d)     an Order declaring defendants' conduct as set forth herein to be a breach of express warranty, a breach of the implied warranties of merchantability and fitness for a particular purpose, and a violation of the MMWA;

(e)     an Order affording the Class final injunctive relief compelling defendants to notify members of the Class of the defect complained of herein and providing them a right of free repair and replacement or rescission and a refund;

(f)     an Order awarding plaintiff and the Class the costs and expenses associated with the prosecution of this action, including reasonable attorney's fees; and

(g)     such other and further legal or equitable relief as to the Court shall seem just, proper and fair.

**COUNT V**
**UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**73 Pa. C.S.A. §§ 201-2(xiv) & 201-9**

166.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

167.    Defendants' actions and omissions described above constitute unfair and deceptive acts or practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.* ("CPL"), constituting, among other things, "a failure to comply with a written warranty," 73 P.S. § 201-2(xiv), and deceptive conduct which created a likelihood of confusion or of misunderstanding, 73 P.S. § 201-2(xxi).

168.    As a direct and proximate result of defendants' violations of Pennsylvania law, plaintiff and the Class have suffered ascertainable losses representing the difference in the price they paid for a WHHP delivered without a headset required for safe operation and a WHHP designed and delivered with a headset, which is required for defendants to conform with their

47

promises, affirmations of fact and the course of dealing and usage of trade concerning the safe operation of WHHPs.

169.    Because safe operation of the WHHPs was a basis of the bargain in all of defendants' sales of the WHHPs to consumers. defendants bear the burden of proving consumers' "non-belief" in this promise and affirmation of fact.  13 Pa. C.S.A. § 2313 (Comment 3) ("no particular reliance need be shown"); *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.,* 171 F.3d 818, 825 & n.7 (3d Cir. 1999) (reliance is only relevant if the warrantor first "has proven non-belief" by the consumer in the alleged promise or affirmation).

170.    Defendants' uniform breach of their written warranties, their use of purported warranty disclaimers and exclusive or limited remedies, and their uniform violations of the MMWA constitute violations of the CPL, thereby entitling plaintiff and the Class to a minimum of $100 in damages and an award of treble damages and attorneys' fees as set forth in the CPL.

WHEREFORE, Plaintiff, on behalf of himself and all other individuals similarly situated, respectfully requests this Court to enter judgment in his favor, and against Defendants, and Order the following relief:

(a)    Certification of this action as a class action under Rule 1701 *et seq.* of the Pennsylvania Rules of Civil Procedure and appointing the undersigned counsel as counsel for the Class;

(b)    A declaratory judgment that defendants violated the CPL;

(c)    Statutory damages of $100 per class member;

(d)    Actual and treble damages pursuant to the CPL, together with an award of reasonable attorney's fees and costs of suit to plaintiff and the Class pursuant to the CPL; and

(e)    Such other relief as allowed by law.

48

## COUNT VI
## DECLARATORY RELIEF

171.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

172.    This claim is asserted on behalf of plaintiff and the Class in accordance with the Pennsylvania Declaratory Judgments Act, 42 Pa.C.S.A. § 7531 *et. seq.*, and Rules 1601 *et. seq.* of the Pennsylvania Rules of Civil Procedure.

173.    Plaintiff and the Class are entitled to a declaration that defendants' conduct described herein constitutes violations of applicable Pennsylvania statutory and common law. The declaratory relief requested is an order declaring defendants' conduct, as alleged herein, to be unlawful, and requiring defendants to supply WHHP users with headsets for the WHHPs currently in use (and, if necessary, a new WHHP) and headsets for all WHHPs sold in the future, together with appropriate instructions for their use as alleged herein.

WHEREFORE, plaintiff respectfully requests that the Court grant the following relief:

(a)    an Order pursuant to Rule 1701 *et seq.* of the Pennsylvania Rules of Civil Procedure permitting this Count to be maintained as a class action on behalf of the Class as specified herein, appointing plaintiff as the representative of the Class, and undersigned plaintiff's counsel as counsel for the Class;

(b)    an Order requiring defendants to furnish plaintiff and the Class with a headset and appropriate instructions;

(c)    award plaintiff and the Class his attorneys' fees, litigation expenses and costs; and

(d)    award such other and further relief as the Court deems just and proper.

49

## JURY DEMAND

Plaintiff and the Class demand a trial by jury on all Counts so triable.

Dated: December 23, 2005

H. Russell Smouse
Glenn E. Mintzer
**LAW OFFICES OF
PETER G. ANGELOS, P.C.**
One Charles Center
100 North Charles Street
Baltimore, MD 21201
(410) 649-2000

**JACOBSEN LAW OFFICES LLC**

By: _Kenneth A. Jacobsen, by AD_
Kenneth A. Jacobsen
I.D. No. 31208
12 Orchard Lane
Wallingford, PA 19086
(610) 566-7930

**LOWE, STEIN, HOFFMAN,
ALLWEISS & HAUVER, LLP**
701 Poydras Street
One Shell Square, Suite 3600
New Orleans, LA 70139
(504) 581-2450

**DONOVAN SEARLES, LLC**
Michael D. Donovan
I.D. No. 51895
1845 Walnut Street
Suite 1100
Philadelphia, PA 19103
(215) 732-6067

**O' KEEFE & SHER, P.C.**
Joseph A. O'Keefe
I.D. No. 77068
15019 Kutztown Road
Kutztown, PA
(610) 683-0771

**Attorneys for Plaintiff and the Class**