**Westlaw.**

2004 WL 1943678 (U.S.)
(Cite as: 2004 WL 1943678)

Page 1

For Opinion See 125 S.Ct. 1413, 125 S.Ct. 2688, 125 S.Ct. 655, 125 S.Ct. 1105
Briefs and Other Related Documents
Supreme Court of the United States.
FEDERAL COMMUNICATIONS COMMISSION
and the United States of America, Petitioners,
v.
BRAND X INTERNET SERVICES, et al.
No. 04-281.
August 27, 2004.

On Petition for a Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit

Petition for a Writ of Certiorari
John A. Rogovin, General Counsel.Austin C. Schlick, Deputy General Counsel.Daniel M. Armstrong, Jacob M. Lewis, Associate General Counsel.Nandan M. Joshi, Counsel, Federal Communications, Commission, Washington, D.C. 20554.Paul D. Clement, Acting Solicitor General, Counsel of Record.R. Hewitt Pate, Assistant Attorney General.Thomas G. Hungar, Deputy Solicitor General.Makan Delrahim, Deputy Assistant Attorney, General.James A. Feldman, Assistant to the Solicitor, General.Catherine G. O'Sullivan, Nancy C. Garrison, Attorneys, Department of Justice, Washington, D.C. 20530-0001, (202) 514-2217.
QUESTION PRESENTED

Whether the court of appeals erred in holding that the Federal Communications Commission had impermissibly concluded that cable modem service is an "information service," without a separately regulated telecommunications service component, under the Communications Act of 1934, 47 U.S.C. 151 et seq.

**IIPARTIES TO THE PROCEEDING**

Petitioners are the Federal Communications Commission and the United States of America.

Respondents who were petitioners in the court of appeals below are: Brand X Internet LLC, the National League of Cities, the National Association of Telecommunications Officers and Advisors, the United States Conference of Mayors, the National Association of Counties, the Texas Coalition of Cities for Utility Issues, Earthlink, Inc., Verizon Internet Solutions d/b/a/ Verizon.net, Verizon Telephone Companies, Consumer Federation of America, Consumers Union, Center for Digital Democracy, People of the State of California ex rel. Bill Lockyer, the Public Utilities Commission of the State of California, Buckingham Township, Conestoga Township, East Hempfield Township, Martic Township, and Providence Township.

Respondents who were intervenors in the court of appeals below are: National Cable & Telecommunications Association, SBC Communications Inc., World-Com, Inc., Cox Communications, Inc., AT&T Corp., Competitive Telecommunications Association, Vermont Public Service Board, the Information Technology Association of America, Focal Communications Corporation, Charter Communications, Inc., Vermont Public Service Board, the State of Vermont, the Vermont Department of Public Service, Utility, Cable & Telecommunications Committee of the City Council of New Orleans, Association of Communications Enterprises, Time Warner, Inc., Time Warner Cable, the City and County of San Francisco, BellSouth Corporation, and BellSouth Telecommunications, Inc.

**\*III TABLE OF CONTENTS**

Opinions below ... 1

Jurisdiction ... 1

Statutory provisions involved ... 2

Statement ... 2

Reasons for granting the petition ... 15

I. The FCC permissibly concluded that cable modem service is solely an information service under the Communications Act ... 16

II. The court of appeals misconstrued this Court's precedents and exacerbated a circuit conflict by declining to defer to the Commission's reasonable construction of the Act ... 19

III. The classification of cable modem service under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Communications Act presents an issue of exceptional national importance ... 24

Conclusion ... 29

TABLE OF AUTHORITIES

Cases:

*AT&T Corp. v. City of Portland*, 216 F.3d 871 (9th Cir. 2000) ... 2-3, 8, 9, 10

*Bankers Trust N.Y. Corp. v. United States*, 225 F.3d 1368 (Fed. Cir. 2002) ... 20

*Bova v. Cox Comms., Inc.*, No. 7:01CV00090, 2001 WL 1654708 (W.D. Va. Dec. 12, 2001) ... 10

*Chapman v. United States*, 500 U.S. 453 (1991) ... 22

*Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984) ... 2

*Federal-State Joint Bd. on Universal Serv.*, 13 F.C.C.R. 11,501 (1998) ... 7, 8, 11, 18, 19

*Federation of Homemakers v. Schmidt*, 539 F.2d 740 (D.C. Cir. 1976) ... 21

*IV *Grocery Mfrs. of Am., Inc. v. Gerace*, 755 F.2d 993 (2d Cir.), aff'd, 474 U.S. 801 (1985) ... 21

*GTE.Net LLC v. Cox Comms., Inc.*, 185 F. Supp. 2d 1141 (S.D. Cal. 2002) ... 10

*Gulf Power Co. v. FCC*, 208 F.3d 1263 (11th Cir. 2000), rev'd sub nom. *National Cable & Telecomm. Ass'n v. Gulf Power Co.*, 534 U.S. 327 (2002) ... 10, 16, 26

*Heimmermann v. First Union Mortgage Corp.*, 305 F.3d 1257 (11th Cir. 2002), cert. denied, 123 S. Ct. 2641 (2003) ... 20-21

*Implementation of Section 703(e) of the Telecommunications Act of 1996: Amendment of the Commission's Rules and Policies Governing Pole Attachments, In re*, 13 F.C.C.R. 6777 (1998), aff'd in part and rev'd in part sub nom. *Gulf Power Co. v. FCC*, 208 F.3d 1263 (11th Cir. 2000), rev'd sub nom. *National Cable & Telecomm. Ass'n v. Gulf Power Co.*, 534 U.S. 327 (2000) ... 8

*Industrial Turnaround Corp. v. NLRB*, 115 F.3d 238 (4th Cir. 1997) ... 20

*Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992) ... 23

*Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116 (1990) ... 23

*MediaOne Group, Inc. v. County of Henrico*:

97 F. Supp. 2d 712 (E.D. Va. 2000), aff'd, 257 F.3d 356 (4th Cir. 2001) ... 10

257 F.3d 356 (4th Cir. 2001) ... 9

*Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers*, 861 F.2d 1124 (9th Cir. 1988) ... 14, 20

*National Ass'n of Regulatory Util. Comm'rs v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) ... 17

*Neal v. United States*, 516 U.S. 284 (1996) ... 22

*V *Parish of Jefferson v. Cox Comms. La., LLC*, No. Civ. A 02-3344, 2003 WL 21634440 (E.D. La. July 3, 2003) ... 10

*Satellite Broad. & Communications Ass'n of Am. v. Oman*, 17 F.3d 344 (11th Cir.), cert. denied, 513 U.S. 823 (1994) ... 20

*Schisler v. Sullivan*, 3 F.3d 563 (2d Cir. 1993) ... 21

*Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735 (1996) ... 21

*Stinson v. United States*, 508 U.S. 36 (1993) ... 22

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ... 22

*Virgin Islands Tel. Co. v. FCC*, 198 F.3d 921 (D.C. Cir. 1999) ... 6

Statutes and regulations:

Communications Act of 1934, 47 U.S.C. 151 et seq.:

Tit. I, 47 U.S.C. 151:

47 U.S.C. 153(20) ... 6, 11-12, 16

47 U.S.C. 153(43) ... 6

47 U.S.C. 153(46) ... 6, 16, 17, 18, 27

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1943678 (U.S.)                                                                                           Page 3
(Cite as: 2004 WL 1943678)

47 U.S.C. 160 (§ 10) ... 28

47 U.S.C. 160(a) (§ 10(a)) ... 28

47 U.S.C. 160(a)(1) ... 28

47 U.S.C. 160(a)(2) ... 28

47 U.S.C. 160(a)(3) ... 28

Tit. II, 47 U.S.C. 201 et seq. (2000 & Supp. I 2001) ... 6, 27, 28

47 U.S.C. 201 ... 6

47 U.S.C. 201(a) ... 25

47 U.S.C. 201(b) ... 25

47 U.S.C. 202 ... 6, 25

47 U.S.C. 202(a) ... 25

47 U.S.C. 203 ... 25

47 U.S.C. 206 ... 25

47 U.S.C. 207 ... 25

47 U.S.C. 222 ... 26

47 U.S.C. 224 ... 26

*VI    47 U.S.C. 230(e)(1) ... 8

47 U.S.C. 230(a)(4) ... 4, 24

47 U.S.C. 230(b)(1) ... 4

47 U.S.C. 230(b)(2) ... 4, 24

47 U.S.C. 251(a) ... 6, 25

47 U.S.C. 254 (2000 & Supp. I 2001) ... 6

47 U.S.C. 254(b) ... 3

47 U.S.C. 254(b)(2) ... 3

47 U.S.C. 254(d) ... 26

47 U.S.C. 255 ... 26

Tit. IV, 47 U.S.C. 401:

47 U.S.C. 401 ... 25

Tit. VI, 47 U.S.C. 521 et seq ... 7

47 U.S.C. 522(6) ... 7

47 U.S.C. 522(6)(A) ... 12

47 U.S.C. 522(14) ... 7, 12

47 U.S.C. 541 ... 7

47 U.S.C. 541(b)(3) ... 10

47 U.S.C. 541(b)(3)(D) ... 9

47 U.S.C. 542 ... 7

47 U.S.C. 551 ... 26

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ... 3, 24

Preamble, 110 Stat. 56 ... 3

§ 706, 110 Stat. 153 ... 3, 24

§ 706(a), 110 Stat. 153 ... 3, 24

§ 706(b), 110 Stat. 153 ... 3, 24

§ 706(c)(1), 110 Stat. 153 ... 27

21 U.S.C. 841(b)(1) ... 22

28 U.S.C. 2112(a)(3) ... 13, 23

28 U.S.C. 2349(a) ... 24

47 C.F.R.:

Section 52.17 ... 26

Section 64.604(c)(5)(iii) ... 26

*VII Miscellaneous:

*Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities, In re,* 17 F.C.C.R. 3019 (2002) ... 4

Kenneth A. Bamberger, *Provisional Precedent: Protecting Flexibility in Administrative Policymaking,* 77 N.Y.U.L. Rev. 1272 (2002) ... 22

H.R. Rep. No. 204, 104th Cong., 1st Sess. Pt. 1 (1995) ... 18

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Industry Analysis & Technology Div., FCC, *High-Speed Services for Internet Access: Status as of December 31, 2003* (June 2004) ... 5, 25

*Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities, In re*, 15 F.C.C.R. 19,287 (2000) ... 10, 25

*Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion, and Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996*, 19 F.C.C.R. 5136 (2004) ... 4

National Research Council, *Broadband: Bringing Home the Bits* (2002) ... 4-5

FCC, *Proposed Third Quarter 2004 Universal Service Contribution Factor, Public Notice*, DA 04-1613 (rel. June 4, 2004) ... 26

S. Rep. No. 23, 104th Cong., 1st Sess. (1995) ... 18

Vauhini Vara, *High-Speed Surpasses Dial-Up as Top Home Web Access in U.S*, Wall St. J., Aug. 18, 2004, at D4 ... 5

White House, *A New Generation of American Innovation* (Apr. 2004) ... 4

*1 The Acting Solicitor General, on behalf of the United States and the Federal Communications Commission, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Ninth Circuit in this case.

OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a-39a) is reported at 345 F.3d 1120. The declaratory ruling and notice of proposed rulemaking of the Federal Communications Commission (Pet. App. 40a-203a) is reported at 17 F.C.C.R. 4798.

JURISDICTION

The judgment of the court of appeals was entered on October 6, 2003. Petitions for rehearing were denied on March 31, 2004 (Pet. App. 204a-207a). On June 16, 2004, Justice O'Connor extended the time within which to file a petition for a writ of certiorari to and including July *2 29, 2004, and on July 20, 2004, Justice O'Connor further extended the time within which to file a petition for a writ of certiorari to and including August 30, 2004. The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

STATUTORY PROVISIONS INVOLVED

Relevant provisions of the Communications Act of 1934, 47 U.S.C. 151 *et seq.* (Communications Act or Act), are set out in an appendix to this petition. Pet. App. 208a-213a.

STATEMENT

This case is likely to determine the regulatory classification under the Communications Act that will apply to broadband (*i.e.*, "high-speed") Internet access services in the United States. The Federal Communications Commission concluded that broadband service provided over cable television facilities, known as "cable modem" service, should be classified as an "information service" under the Communications Act, a classification that would presumptively keep cable modem providers free from regulation as telecommunications common carriers under the Act. In this case, the Ninth Circuit, acting in a series of cases that had been filed in various circuits but consolidated and by lottery assigned to that court, rejected the FCC's conclusion without evaluating the substance of the agency's decision or applying the standards for administrative deference set forth in *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984). Instead, the court held that stare decisis compelled adherence to its own circuit precedent - dating from *before* the FCC had reached its conclusion on the issue - that classified cable modem service as partly an information service and partly *3 a telecommunications service. See *AT&T Corp. v. City of Portland*, 216 F.3d 871 (9th Cir. 2000). Absent this Court's review, therefore, a vastly important aspect of national telecommunications policy will have been settled in the Ninth Circuit, and for all practical purposes throughout the country, without any evaluation whatever of the FCC's contrary interpretation of the statute it is charged with administering.

1. Promoting the rapid deployment of broadband services is a cornerstone of federal communications policy. In enacting the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, Congress sought to "promote competition and reduce regulation in order to *** encourage the rapid deployment of new telecommunications technologies." Preamble, 110 Stat. 56. Section 706 of the Telecommunications Act directs the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications

2004 WL 1943678 (U.S.)
(Cite as: 2004 WL 1943678)

Page 5

capability" - a category that includes cable modem service, see Pet. App. 132a - "to all Americans" and, if the Commission concludes that such deployment is not reasonable and timely, to "take immediate action to accelerate deployment of such capability." § 706(a) and (b), 110 Stat. 153. Congress further directed the Commission to "base policies for the preservation and advancement of universal service" on the principle that broadband services should be made available to "all regions of the Nation." 47 U.S.C. 254(b) and (b)(2). Recognizing that the "Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation," Congress established that the policy of the United States is to "promote the continued development of the Internet" and to "preserve the vibrant and competitive free market that presently exists for the Internet *4 *** unfettered by Federal or State regulation." 47 U.S.C. 230(a)(4), (b)(1) and (2).

The Commission has explained that the deployment of broadband infrastructure is "the central communications policy objective of the day," because "ubiquitous broadband deployment" is likely to "bring valuable new services to consumers, stimulate economic activity, improve national productivity, and advance economic opportunity for the American public." *Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities,* 17 F.C.C.R. 3019, 3020-3021, para. 1 (2002). In April 2004, the President announced that it was the government's objective to achieve "universal, affordable access for broadband technology by the year 2007," and explained that broadband technology "will enhance our Nation's economic competitiveness and will help improve education and health," as well as provide consumers other "life-enhancing activities." White House, *A New Generation of American Innovation* 2 (Apr. 2004).

Broadband enables U.S. businesses to serve customers more effectively and efficiently, fueling economic growth. Consumers benefit from new opportunities in areas such as telecommuting, education, and telemedicine. See *In re Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion, and Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996,* 19 F.C.C.R. 5136, 5137, paras. 2-5 (2004). Broadband services also enable new consumer offerings such as Internet-delivered audio and video programming and voice communications, sometimes in competition with former monopoly providers. See National *5 Research Council, *Broadband: Bringing Home the Bits* 1, 89-104 (2002).

The promise of broadband technologies is reflected by their quick acceptance in the marketplace. Broadband service providers had fewer than 3 million subscribers at the end of 1999, but more than 28 million subscribers by the end of 2003, for an average growth of nearly 250% per year. Industry Analysis & Technology Div., FCC, *High-Speed Services for Internet Access: Status as of December 31, 2003,* Table 1 (June 2004). According to a recent report, home usage of broadband connections has now surpassed that of dial-up connections for the first time. Vauhini Vara, *High-Speed Surpasses Dial-Up As Top Home Web Access in U.S.,* Wall St. J., Aug. 18, 2004, at D4.

2. Cable modem service consists of the use of cable television system facilities to provide subscribers with high-speed Internet access. It is one of several technologies that are being used to meet the growing consumer demand for broadband services. Telephone companies are deploying a competing technology known as digital subscriber line (DSL) service to provide broadband access over their networks. Other types of networks - including satellite, wireless, and electric power networks - are being or may soon be upgraded to enable the provision of broadband services to consumers. Pet. App. 4a-5a, 49a-52a.

As is relevant here, a communications service is classified for regulatory purposes under the Communications Act in one of three distinct ways: as an "information service," a "telecommunications service," or a "cable service." The dispute in this case concerns how cable modem service should be classified for purposes of regulation under the Communications Act, and, in particular, whether it is a "telecommunications service," an *6 "information service," or, as the court of appeals concluded, a hybrid of those statutorily distinct services under the Act.

a. *Telecommunications Service.* The Communications Act defines "telecommunications" as the "transmission between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. 153(43). The Act defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public." 47 U.S.C. 153(46). Providers of telecommunications that do not offer their services for a fee generally to the public are considered private carriers, whereas providers of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1943678 (U.S.)  Page 6
(Cite as: 2004 WL 1943678)

telecommunications for a fee to the public - such as local telephone companies - are regulated as common carriers under Title II of the Act, 47 U.S.C. 201 et seq. See *Virgin Islands Tel. Co. v. FCC*, 198 F.3d 921, 926-927 (D.C. Cir. 1999). Title II imposes numerous federal obligations on telecommunications service providers, including requirements to interconnect with other carriers; to charge just, reasonable, and nondiscriminatory rates; and to contribute to the federal universal service program, which helps to support the provision of certain communications services to schools, libraries, and persons in rural and other high-cost service areas. See 47 U.S.C. 201, 202, 251(a), 47 U.S.C. 254 (2000 & Supp. I 2001).

b. *Information Service.* The Communications Act defines "information service" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 U.S.C. 153(20) (emphasis added). As the FCC has interpreted the Act, the categories of "information service" and "telecommunications*7 service" are mutually exclusive; information service providers use telecommunications, but they do not necessarily provide "telecommunications service" to the public. See *Federal-State Joint Bd. on Universal Serv.*, 13 F.C.C.R. 11,501, 11,522-11,523, paras. 41, 43-44 (1998) (*Universal Service Report*); Pet. App. 96a-97a. Information service providers therefore are not subject to the common carrier requirements that govern telecommunications carriers, and they are minimally regulated under the Communications Act. See Pet. App. 6a, 14a. Examples of information services for purposes of the Communications Act include Internet access services like AOL or Earthlink, and voice mail.

c. *Cable Service.* The Communications Act defines "cable service" to mean "(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C. 522(6). "Other programming service" is defined as "information that a cable operator makes available to all subscribers generally." 47 U.S.C. 522(14). Providers of cable service are subject to regulation under Title VI of the Communications Act, 47 U.S.C. 521 et seq. Among other obligations, providers of cable service may be required to obtain franchises from, and to pay franchise fees to, local franchising authorities. 47 U.S.C. 541, 542.

3. Because of the evolving nature of broadband services and the broadband market, the FCC has proceeded cautiously in making pronouncements concerning the regulatory classification of broadband generally, and cable modem services in particular. In 1998, the FCC determined (subject to further examination in *8 another pending proceeding) that Internet services provided over cable facilities are not telecommunications services under the Communications Act and therefore that mixed cable/Internet traffic is not subject to the generally higher pole attachment rates authorized for telecommunications service attachments under 47 U.S.C. 224(e)(1).[FN1] Later the same year, the FCC addressed the statutory classification under the Act of Internet Service Providers (ISPs) in its *Universal Service Report*, concluding that they provide information services rather than telecommunications services because they conjoin "data transport with data processing, information provision, and other computer mediated offerings." 13 F.C.C.R. at 11,539-11,540, paras. 80-81. The FCC, however, expressly declined in that report to address "the applicability of this analysis to cable operators providing Internet access service." *Id.* at 11,535 n.140. In *Gulf Power*, this Court stated that the FCC had "proceeded in a sensible fashion" in electing to avoid answering "hard questions [about how to classify cable modem service] when easier ones are dispositive." 534 U.S. at 337, 338.

> FN1. See *In re Implementation of Section 703(e) of the Telecommunications Act of 1996: Amendment of the Commission's Rules and Policies Governing Pole Attachments*, 13 F.C.C.R. 6777, 6794-6796 (1998), aff'd in part and rev'd in part *sub nom. Gulf Power Co. v. FCC*, 208 F.3d 1263 (11th Cir. 2000), rev'd *sub nom. National Cable & Telecomm. Ass'n v. Gulf Power Co.*, 534 U.S. 327 (2002).

Although the FCC thus refrained from making a determination on the classification of cable modem service, the Ninth Circuit addressed that issue in *AT&T Corp. v. City of Portland*, 216 F.3d 871 (2000). The issue in *Portland* was whether local governments could, as a condition of consenting to the merger-related*9 transfer of a cable franchise, require a cable operator to provide unaffiliated ISPs nondiscriminatory access to its cable broadband facilities. The FCC participated as amicus curiae and explained that, because the regulatory classification of cable modem service was an "unresolved

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1943678 (U.S.)
(Cite as: 2004 WL 1943678)

Page 7

controversy," the court of appeals should (and could) decide the case "in a narrow fashion" that did not turn on the proper classification of cable modem service under the Communications Act. Br. of the FCC as Amicus Curiae at 19, 31, *AT&T Corp. v. City of Portland*, 216 F.3d 871 (9th Cir. 2000) (No. 99-35609).[FN2]

> FN2. The Fourth Circuit adopted just such a narrow approach in *MediaOne Group, Inc. v. County of Henrico*, 257 F.3d 356 (2001). In that case, the court addressed a challenge to a local access requirement similar to the one at issue in *Portland*. The Fourth Circuit resolved the controversy by concluding that the local access requirement was unlawful because it required the cable operator to provide a "telecommunications facility" in violation of 47 U.S.C. 541(b)(3)(D). 257 F.3d at 363. The Fourth Circuit observed that the question of the proper classification of cable modem service "is complex and subject to considerable debate" and that the "outcome will have a marked effect on the provision of Internet services." *Id.* at 365. The Fourth Circuit accordingly concluded that resolution of the classification issue should be left "to the expertise of the FCC." *Ibid.*

Notwithstanding the FCC's request, the *Portland* court resolved the case on the basis of its own classification of cable modem service under the Communications Act. The Ninth Circuit concluded that cable modem service is an information service to the extent the provider acts as a "conventional ISP," but a telecommunications service to the extent the provider offers Internet transmission over the cable broadband facility. 216 F.3d at 878. Because the Communications Act prohibits localities from imposing conditions on the provision *10 of telecommunications services by cable operators, the court reasoned, the local governments' requirement of nondiscriminatory access was prohibited by the Communications Act. *Ibid.* (citing 47 U.S.C. 541(b)(3)). No other circuit has adopted the Ninth Circuit's classification of cable modem service, and the courts that have addressed the classification issue have failed to develop any consensus.[FN3]

> FN3. See, *e.g.*, *Gulf Power Co. v. FCC*, 208 F.3d 1263, 1276-1277 (11th Cir. 2000) (concluding, inter alia, that the FCC had classified "the Internet as an information service" and that "there is no statutory basis for the FCC to regulate the Internet as a telecommunications service"), rev'd on other ground *sub nom. National Cable & Telecomm. Ass'n*, 534 U.S. at 337-338; *MediaOne Group, Inc. v. County of Henrico*, 97 F. Supp. 2d 712, 715 (E.D. Va. 2000) (concluding that cable modem service fell within definition of "cable service" because it provided "news, commentary, games, and other proprietary content with which subscribers interact as well as Internet access"), aff'd on other grounds, 257 F.3d 356, 365 (4th Cir. 2001); see also *Parish of Jefferson v. Cox Comms. La., LLC*, No. Civ. A 02-3344, 2003 WL 21634440, at *6 (E.D. La. July 3, 2003) (adopting FCC's classification of cable modem service); *GTE.Net LLC v. Cox Comms., Inc.*, 185 F. Supp. 2d 1141, 1145-1148 (S.D. Cal. 2002) (adhering to *Portland*); *Bova v. Cox Comms., Inc.*, No. 7:01CV00090, 2001 WL 1654708, at *3 (W.D. Va. Dec. 12, 2001) (noting contradictory classification decisions in the courts of appeals).

4. In September 2000, the Commission initiated a comprehensive proceeding to "develop a national legal and policy framework in light of recent federal court opinions that have classified cable modem service in varying manners." *In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 15 F.C.C.R. 19,287, 19,288, para. 2 (2000). In the course of that proceeding, the Commission reviewed approximately 250 comments and engaged in *11 numerous discussions with "industry representatives, consumer advocates, and state and local government[s]." Pet. App. 9a.

On March 15, 2002 (after the Ninth Circuit's *Portland* decision), the Commission issued a declaratory ruling concluding that cable modem service "as it is currently offered" is neither a cable service nor a telecommunications service under the Communications Act, but solely an interstate information service. Pet. App. 48a; see *id.* at 88a. The Commission explained that its analysis was "guided by several overarching principles," *id.* at 46a, including the statutory goal of encouraging "the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans" and the related goal of fostering "investment and innovation" in broadband services by creating a "minimal regulatory environment" in which "regulatory uncertainty" and "unnecessary and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unduly burdensome regulatory costs" are minimized. *Id.* at 47a. The Commission sought to create "a rational framework for the regulation of competing services that are provided via different technologies and network architectures" and to develop "an analytical approach that is, to the extent possible, consistent across multiple platforms." *Id.* at 48a.

The Commission reaffirmed its conclusion that, as a general matter, "Internet access service is appropriately classified as an information service, because the provider offers a single, integrated service, Internet access, to the subscriber." Pet. App. 91a (citing *Universal Service Report*, 13 F.C.C.R. at 11,537, para. 73). Because cable modem service offers subscribers functions "commonly associated with Internet access," *id.* at 93a, the Commission concluded that it too is an information service under the Communications Act. *Id.* at 94a-95a. *12 Emphasizing that the classification inquiry under the Communications Act "turns on the nature of the functions that the end user is offered," *id.* at 94a; see 47 U.S.C. 153(20), and reaffirming its prior determination that "the Act's 'information service' and 'telecommunications service' definitions establish mutually exclusive categories of service," Pet. App. 97a, the Commission determined that this structural dichotomy dictated that its statutory "analysis, like the relevant statutory definitions, [must] focus[] *** on the single, integrated information service that the subscriber to cable modem service receives." *Id.* at 98a. Given this statutory backdrop, the Commission rejected arguments that cable modem service as currently provided also includes a discrete offering of telecommunications service to subscribers. *Id.* at 95a-96a. The Commission concluded that the telecommunications (*i.e.*, transmission) component of cable modem service is not "separable from the data processing capabilities of the service"; as provided to the end user, "the telecommunications is part and parcel of cable modem service and is integral to its other capabilities." *Id.* at 96a.

The Commission further determined that cable modem service is not a cable service. Such a service must involve "the one-way transmission to subscribers of (i) video programming, or (ii) other programming service," and "other programming service" is defined as "information that a cable operator makes available to all subscribers generally." 47 U.S.C. 522(6)(A) and (14). Those provisions "require[] that the cable operator be in control of selecting and distributing content to subscribers and that the content be available to all subscribers generally." Pet. App. 127a. The FCC concluded that cable modem service does not satisfy those *13 requirements, because "the majority of the information accessed over the Internet is chosen individually by the Internet user without the involvement of the cable operator." *Id.* at 129a.

The Commission acknowledged the *Portland* decision, Pet. App. 114a, but noted that the Ninth Circuit had based its decision "on a record that was less than comprehensive," and, in particular, that the parties in *Portland* had not addressed the possible classification of cable modem service as an information or telecommunications service. *Id.* at 115a. The Commission observed that, by contrast, the administrative record in its proceeding "fully addressed the classification issue and explored the characteristics of cable modem service as it is now provided." *Ibid.*

5. Various parties petitioned for review of the FCC's classification decision in the Third, Ninth, and D.C. Circuits. After a judicial lottery conducted under 28 U.S.C. 2112(a)(3), the Ninth Circuit was selected to review the agency's decision. Pet. App. 10a-11a.

In a per curiam opinion, the Ninth Circuit vacated the FCC's determination that cable modem service is solely an information service under the Communications Act. The court of appeals considered itself bound by stare decisis to enforce *Portland*'s bifurcated classification of cable modem service without regard to the Commission's contrary interpretation of the Act. Pet. App. 12a-22a. The court acknowledged that the "FCC is the agency Congress has charged with the administration of the Communications Act," and that, under *Chevron*, "[w]here the agency's interpretation of the statute [it administers] is reasonable, the court must defer." *Id.* at 11a. The court, however, read Ninth Circuit case law to preclude adherence to *Chevron* here, because *Portland* itself did not involve "deferential *14 review of [agency] decisionmaking" or expressly state that the Communications Act is ambiguous about the correct classification of cable modem service. *Id.* at 18a, 19a (citing *Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers*, 861 F.2d 1124, 1134-1135 (9th Cir. 1988) (en banc)). The court concluded that *Portland* foreclosed the FCC's determination that cable modem service is a unitary information service with no separate telecommunications service component. *Id.* at 21a-22a.

Judges O'Scannlain and Thomas filed concurring opinions. Judge O'Scannlain observed that the panel's adherence to stare decisis produced a "strange

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

result": "three judges telling an agency acting within the area of its expertise that its interpretation of the statute it is charged with administering cannot stand - and that [the *Portland* panel's] interpretation of how the Act should be applied to a quicksilver technological environment is the correct, indeed the only, interpretation." Pet. App. 24a-25a (citation and internal quotation marks omitted). Judge O'Scannlain noted that the panel's decision "effectively stops a vitally important policy debate in its tracks," *id.* at 23a, an outcome that he characterized as "strikingly inconsistent with *Chevron*'s underlying principles." *Id.* at 22a (citation omitted). Nonetheless, Judge O'Scannlain joined the panel's opinion because he concluded that the rule of stare decisis it applied was compelled by circuit precedent. *Id.* at 25a.

Judge Thomas, the author of the *Portland* opinion, stated in his separate concurrence that he would have reached the same conclusion "even if [the panel] were writing on a clean slate." Pet. App. 39a. In his view, the statute "compels the conclusion" that cable modem *15 service is in part a telecommunications service. *Id.* at 25a.

6. On March 31, 2004, the court of appeals denied petitions for rehearing en banc, with Judge O'Scannlain voting to grant rehearing en banc. Pet. App. 205a-207a.

REASONS FOR GRANTING THE PETITION

The Ninth Circuit has incorrectly overridden the expert agency responsible for administering and interpreting the Communications Act with respect to a communications policy issue of immediate and compelling national importance: the regulatory framework under the Act that will apply to, and thus either promote or retard, the timely and universal deployment of broadband Internet access services in the United States. If the court of appeals' decision stands, the FCC will be required to regulate cable modem service - and likely other forms of broadband Internet access service - as a telecommunications service under the Communications Act, even though the Commission has concluded that such regulation is inconsistent with, and would directly threaten, the important federal policy of promoting access to those services. The court of appeals' rejection of the FCC's expert conclusion is particularly unsettling because the court refused to analyze the merits of the FCC's statutory interpretation under the deferential *Chevron* standard even while conceding that the FCC is ordinarily entitled to *Chevron* deference in making the type of decision under review. Further review is warranted.

*16 I. THE FCC PERMISSIBLY CONCLUDED THAT CABLE MODEM SERVICE IS SOLELY AN INFORMATION SERVICE UNDER THE COMMUNICATIONS ACT

The classification of cable modem service under the Communications Act is a "hard question" that involves a subject matter that is "technical, complex, and dynamic." *Gulf Power*, 534 U.S. at 338-339; see also *id.* at 349-350 (Thomas, J., dissenting) (noting differences between the Fourth and Ninth Circuits' approaches to classifying cable modem service). Under a *Chevron* analysis, the Commission's classification should have been upheld.

The Communications Act does not address the precise question whether cable modem service is an information service, or a telecommunications service, or both. Although cable modem service includes a telecommunications component, in that the provider employs telecommunications to deliver Internet access to subscribers, that fact does not demonstrate that cable modem service is a "telecommunications service." To the contrary, information services are by definition offered "via *telecommunications.*" 47 U.S.C. 153(20). Under the Act, therefore, a service is not a "telecommunications service" merely because it *uses* telecommunications. Instead, an entity provides a "telecommunications service" only by "*offering* telecommunications *for a fee directly to the public.* " 47 U.S.C. 153(46) (emphasis added).[FN4]

> FN4. Indeed, even the *provision* of telecommunications does not render the provider a "telecommunications service" provider under the Communications Act, because the telecommunications may be provided on a private carrier basis rather than being "offer[ed] *** for a fee directly to the public" under 47 U.S.C. 153(46). See Pet. App. 112a-114a (noting that a firm that "chooses clients on an individual basis and determines in each particular case 'whether and on what terms to serve' " is a private carrier service and does not offer telecommunications services) (quoting *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 533 F.2d 601, 609 (D.C. Cir. 1976)).

*17 The statutory text leaves open the question addressed by the Commission in this case: whether a unitary service offering that combines both information and transmission constitutes the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"offering" of transmission "for a fee directly to the public" (and is therefore a telecommunications service) or whether it instead constitutes the *use* of telecommunications to provide an information service (and thus remains exclusively an information service). See Pet. App. 87a ("[T]he relevant statutory provisions do not yield easy or obvious answers to the questions at hand."). There is no doubt that cable modem service has the characteristics of an information service. The Commission had previously concluded that Internet access service "is appropriately classified as an information service" under the Communications Act, *id.* at 91a; cable modem service provides the same functions as other forms of Internet access service, such as e-mail, news groups, and web-page hosting, see *id.* at 93a-95a; and no party to the FCC's proceeding had suggested that cable modem service is solely a telecommunications service, see *id.* at 86a-87a n.135. Thus, the remaining question was whether cable modem service, in addition to being an information service under the Act, is in part a telecommunications service as well.

After analyzing an extensive record, the Commission concluded that cable modem service "as currently provisioned" is a "single, integrated service" that does not include a separate offering of telecommunications services*18 to subscribers. Pet. App. 95a. That conclusion reflects a reasonable interpretation of the Communications Act. As the Commission recognized, the question whether a particular service constitutes a "telecommunications service" under the Communications Act must be determined by reference to the character of the provider's "offering *** to the public," 47 U.S.C. 153(46), and thus "the classification of cable modem service turns on the nature of the functions that the end user is offered." Pet. App. 94a. In keeping with the legislative history of the Communications Act, moreover, the Commission has reasonably and consistently interpreted "the Act's 'information service' and 'telecommunications service' definitions [as] establish[ing] mutually exclusive categories of service." *Id.* at 97a; see, *e.g., Universal Service Report,* 13 F.C.C.R. at 11,520, 11,521, 11,533, paras. 39, 43; S. Rep. No. 23, 104th Cong., 1st Sess. 18 (1995); H.R. Rep. No. 204, 104th Cong., 1st Sess. Pt. 1, at 46-47 (1995). The court of appeals' characterization of cable modem service as "part 'telecommunications service' and part 'information service' " fails to account for that definitional dichotomy. Pet. App. 21a.

The Commission recognized that "[a]ll information services require the use of telecommunications" to enable customers to interact with information. Pet. App. 96a. In light of the statutory definition of "telecommunications service," however, the Commission reasonably concluded that the mere transmission of information does not constitute a "separate 'telecommunications service' " absent "a stand-alone offering of transmission for a fee directly to the public." *Id.* at 97a. The Commission found that cable modem service providers in fact do not offer such stand-alone transmission services to subscribers. Instead, as cable modem service is *19 provided to the end user, "the telecommunications is part and parcel of cable modem service and is integral to its other capabilities." *Id.* at 96a. Based on that finding, the Commission concluded that subscribers to cable modem service as currently provided obtain a single information service from the cable operator, rather than separate information and telecommunications services.

The Commission rejected the argument that the cable operator's ownership of the facilities used to connect end users to the Internet should affect its analysis. Pet. App. 97a-98a (citing *Universal Service Report,* 13 F.C.C.R. at 11,520, para. 39). Focusing on the "single, integrated information service that the subscriber to cable modem service receives," the Commission concluded that the cable operator "is not offering telecommunications services to the end user, but rather is merely using telecommunications to provide end users with cable modem service." *Id.* at 98a. See *ibid.* (cable modem operator can be viewed as "furnishing raw transmission capacity to itself," rather than offering such transmission capacity to the public).

II. THE COURT OF APPEALS MISCONSTRUED THIS COURT'S PRECEDENTS AND EXACERBATED A CIRCUIT CONFLICT BY DECLINING TO DEFER TO THE COMMISSION'S REASONABLE CONSTRUCTION OF THE ACT

The court of appeals did not hold or suggest that the Commission's classification of cable modem service as a unitary information service was unreasonable. Instead, the court rejected the agency's classification on the ground that, prior to the time the FCC reached its conclusion, the Ninth Circuit in *Portland* had already classified cable modem service as in part a telecommunications*20 service. In the court's view, unless the earlier panel had conducted "deferential review" or otherwise "said the relevant provisions of [the statute] were ambiguous," a subsequent panel was bound to reject any contrary agency position, even when reviewing agency action that would otherwise clearly be entitled to *Chevron* deference. Pet. App. 18a, 19a (citing *Mesa Verde Constr. Co. v.*

*Northern Cal. Dist. Council of Laborers*, 861 F.2d 1124, 1134-1135 (9th Cir. 1988) (en banc)).[FN5]

   FN5. The Federal and Fourth Circuits generally appear to agree with the Ninth Circuit's position. See *Bankers Trust N.Y. Corp. v. United States*, 225 F.3d 1368, 1376 (Fed. Cir. 2000) (holding that stare decisis "requires adherence to precedential decisions" that are based on "a direct judicial construction of the statute," and that any "harmonization of the circuits" should be left to "the Supreme Court and Congress"); *Industrial Turnaround Corp. v. NLRB*, 115 F.3d 248, 254 (4th Cir. 1997) (circuit precedent binds subsequent panels if the prior opinion does not "discuss [] the deference due to the [agency's] interpretation" or indicate that the prior interpretation is "merely a defensible interpretation of the Act subject to change").

As cases in other circuits have made clear, the Ninth Circuit's position is wrong. The Eleventh Circuit explained in *Satellite Broadcasting & Communications Association of America v. Oman*, 17 F.3d 344, 348, cert. denied, 513 U.S. 823 (1994), that a no-deference rule like that adopted by the Ninth Circuit "illogically would wed [the court of appeals] to [its precedent], while all other circuits and the Supreme Court would be bound under *Chevron* to defer" to the agency; it would also "create a rush to the courthouse among parties wishing to litigate a statute's meaning before an agency has exercised its broad knowledge respecting the matters subjected to agency regulations." *Ibid.* (internal *21 quotation marks omitted). Accordingly, the Eleventh Circuit concluded that when a statute is not "explicit" on a particular question, a circuit may "revisit[]" its "initial interpretation" of the statute in light of a subsequent agency decision. Accord *Heimmermann v. First Union Mortgage Corp.*, 305 F.3d 1257, 1262-1263 (11th Cir. 2002), cert. denied, 123 S. Ct. 2641 (2003) (invoking *Satellite Broadcasting* principle).[FN6]

   FN6. The Second Circuit and (in a pre-*Chevron* decision) the D.C. Circuit agree with the Eleventh Circuit's position. See *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) ("[n]ew regulations at variance with prior judicial precedents are upheld" unless the regulations are arbitrary or in excess of the agency's authority); *Grocery Mfrs. of Am., Inc. v. Gerace*, 755 F.2d 993, 1000-1001 (2d Cir.) (holding that an "earlier and undeniably reasonable judicial construction" did not prevent an agency from promulgating a rule based on a different interpretation), aff'd mem., 474 U.S. 801 (1985); *Federation of Homemakers v. Schmidt*, 539 F.2d 740, 743 (D.C. Cir. 1976).

The Ninth Circuit's rule has no foundation in *Chevron*'s framework. Federal courts "accord deference under *Chevron* *** because of a presumption that *** Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 740-741 (1996). As Judge O'Scannlain recognized in his concurrence below, the court of appeals' refusal to apply *Chevron* in the event of prior circuit precedent on the statutory question "appends a subversive codicil to *Chevron*'s rule," that is, that agency interpretations of ambiguous statutes are entitled to deference "unless the courts take it *22 first." Pet. App. 24a (citing Kenneth A. Bamberger, *Provisional Precedent: Protecting Flexibility in Administrative Policymaking*, 77 N.Y.U.L. Rev. 1272, 1273 (2002)) (internal punctuation and cross-reference omitted); see also *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001) ("Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law."). By invoking *Portland* to invalidate the FCC's classification of cable modem service, the court of appeals undermined Congress's intent to delegate to the Commission the power to interpret gaps and ambiguities in the Communications Act. Cf. *Stinson v. United States*, 508 U.S. 36, 46 (1993) (holding that agency interpretations of their own rules bind the courts even if they conflict with prior judicial constructions of the rules).

Although the court of appeals cited *Neal v. United States*, 516 U.S. 284 (1996), see Pet. App. 20a-21a, that decision does not support its conclusion. In *Neal*, this Court stated that no deference would be due to a rule adopted by the Sentencing Commission if that rule were understood to construe the mandatory minimum sentence provisions of 21 U.S.C. 841(b)(1), because the Court itself had previously addressed the meaning of that statute in *Chapman v. United States*, 500 U.S. 453 (1991), and had reached a contrary conclusion as to what the statute

"requires." *Neal*, 516 U.S. at 295; see *Chapman*, 500 U.S. at 459, 463-464 (finding proposed alternative interpretation "not plausible" and declining to apply rule of lenity because statute was not ambiguous). *Neal* is thus best viewed as addressing a statute with a clear and unambiguous meaning that had already been judicially pronounced (*i.e.*, a *Chevron* "step-one" case), thus precluding *Chevron* deference to *23 any alternative view; *Neal* did not involve a statute that contained ambiguity that could be subject to later agency interpretation (*i.e.*, a *Chevron* "step-two" case).[FN7]

> FN7. Indeed, both of the cases cited in *Neal*, see 516 U.S. at 295, in support of its conclusion were cases in which the Court had previously reached a holding as to the clear and unambiguous meaning of a statute and then invoked stare decisis to overturn a subsequent agency decision. See *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 537 (1992) ("[W]e are saying, in *Chevron* terms, that [the statute] speaks to the issue."); *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 130 (1990) ("[T]he ICC has permitted the very price discrimination that the Act *by its terms* seeks to prevent.") (emphasis added).

In any event, because of this Court's unique role as the final arbiter of the meaning of federal statutes on a nationwide basis, the effect of a decision of this Court on subsequent agency constructions of a statute may be somewhat different from that of a court of appeals. Nothing in *Neal* instructs courts of appeals to withhold *Chevron* deference to an agency's reasonable interpretation of an ambiguous statute. The court of appeals thus erred in striking down the FCC's construction of the Communications Act without regard to *Chevron*, and this Court's review also is warranted to resolve the circuit conflict exacerbated by the decision below.[FN8]

> FN8. The combination of the Ninth Circuit's mistaken view of *Chevron* and the lottery provisions of 28 U.S.C. 2112(a)(3) has produced particularly perverse results in this case. A prior decision of a single circuit that did not apply *Chevron* has effectively denied the FCC, on a nationwide basis, the deference to which it is entitled.

*24 III. THE CLASSIFICATION OF CABLE MODEM SERVICE UNDER THE COMMUNICATIONS ACT PRESENTS AN ISSUE OF EXCEPTIONAL NATIONAL IMPORTANCE

The court of appeals' decision, which has nationwide effect,[FN9] creates immediate and urgent difficulties in the communications industry that warrant intervention by this Court.

> FN9. See 28 U.S.C. 2349(a) ("The court of appeals in which the record on review is filed *** has *** exclusive jurisdiction to make and enter *** a judgment determining the validity of, and enjoining, setting aside, or suspending, in whole or in part, the order of the agency.").

1. Encouraging the deployment of broadband services throughout the Nation has been one of the central objectives of federal communications policy since 1996. See pp. 3-5, *supra*. In Section 706 of the Telecommunications Act, Congress gave the FCC responsibility for overseeing broadband deployment and taking "immediate action" if such deployment is not "reasonable and timely." § 706(a) and (b), 110 Stat. 153. In classifying cable modem service as an information service under the Communications Act, the FCC was guided by its determination that a "minimal regulatory environment" will most effectively achieve the federal policy of "encourag[ing] the ubiquitous availability of broadband to all Americans." Pet. App. 46a, 47a. The FCC's view comports with Congress's recognition that the Internet has "flourished" under "a minimum of government regulation" (47 U.S.C. 230(a)(4)), and that the Internet should, to the extent possible, remain "unfettered by Federal and State regulation," 47 U.S.C. 230(b)(2).

Unlike telecommunications and cable service providers, which are subject to extensive regulatory obligations *25 under the Communications Act, information service providers operate in a largely unregulated environment - the type of environment that the Commission has stated "promotes investment and innovation in a competitive market." Pet. App. 47a. Indeed, since the enactment of the Telecommunications Act in 1996, the Commission has taken a "hands off" policy toward cable modem service (*In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 15 F.C.C.R. 19,287, 19,288, para. 4 (2000)), and the service has thrived during that period. Cable modem service is today the most popular service by which consumers obtain high-speed access to the Internet. Industry Analysis & Technology Div., FCC, *High-Speed Services for Internet Access: Status as of*

*December 31, 2003*, at 2, Table 1 (June 2004). As of December 2003, there were 16.4 million cable modem lines in use. *Ibid.*

2. If allowed to stand, the Ninth Circuit's decision would fundamentally change the regulatory environment in which cable modem services are offered. It would require the Commission (and the courts, see 47 U.S.C. 206, 207, 401) to regulate cable modem providers for the first time as telecommunications common carriers under Title II of the Communications Act, 47 U.S.C. 201 *et seq.* Service providers would be under a new federal duty to furnish "communication service upon reasonable request therefor"; to charge "just and reasonable" rates; to refrain from engaging in "unjust or unreasonable discrimination"; to comply with FCC requirements for filing and abiding by written tariffs; and to interconnect with other carriers. See 47 U.S.C. 201(a) and (b), 202(a), 203, 251(a). They would be required to contribute to federal universal service support*26 mechanisms,[FN10] 47 U.S.C. 254(d), as well as to other funds that support telephone number portability and telephone relay services for the hearing impaired. See 47 C.F.R. 52.17, 64.604(c)(5)(iii). Cable modem service providers might become subject to higher pole attachment rates, 47 U.S.C. 224, and they would have to comply with statutory provisions addressing access for the disabled and the protection of customer information. See 47 U.S.C. 222, 255.[FN11] Some of those obligations could overlap and potentially conflict with cable operators' obligations under provisions of the Act specifically directed toward them. Compare, *e.g.*, 47 U.S.C. 222, with 47 U.S.C. 551 (both concerning privacy obligations). The effect of the increased regulatory burdens could lead cable operators to raise their prices and postpone or forego plans to deploy new broadband infrastructure, particularly in rural or other underserved areas.

>FN10. Telecommunications carriers are required to pay into the universal service program an amount equal to a percentage of their interstate telecommunications revenue. That percentage - known as the "contribution factor" is adjusted each quarter based on the projected demand for universal service support. For the third quarter of 2004, the Commission established a contribution factor of 8.9%. See FCC, *Proposed Third Quarter 2004 Universal Service Contribution Factor, Pub. Notice,* DA 04-1613 (rel. June 7, 2004).

>FN11. Owners of utility poles have a right to compensation for pole attachments. In the wake of the court of appeals' decision, they might seek to charge the generally higher "telecommunications rate" rather than the "cable rate" that applies for attachments carrying "mixed" cable/Internet traffic. See *Gulf Power*, 534 U.S. at 335-339.

3. Furthermore, even if the instant decision does not directly compel the FCC to regulate broadband Internet access technologies other than cable modem service as telecommunications services under the Communications*27 Act, the Ninth Circuit's classification of cable modem service puts the Commission on the horns of a dilemma. The Commission must choose between its interpretation of the statutory requirements and the public interest (reinforced by congressional instruction) in a uniform and coherent regulatory regime. If the Commission does not subject broadband technologies such as those provided by DSL over telephone lines and the newly emerging services provided by electric utilities and wireless to the same Title II requirements that apply to cable modem service under the Ninth Circuit's decision, then the Commission could be compromising the policy of developing a "rational framework for regulation of competing services" that is "consistent across multiple platforms." Pet. App. 48a. Congress has sought to promote the deployment of high-speed telecommunications capabilities "without regard to any transmission media or technology," § 706(c)(1), 110 Stat. 153; see also 47 U.S.C. 153(46) (defining telecommunications service without regard to the "facilities used"), yet the Ninth Circuit has essentially declared that the desired uniformity can be accomplished only within the common carrier framework of Title II.

4. Contrary to Judge Thomas's suggestion in his concurring opinion below, Pet. App. 34a-35a, the possibility that the Commission might forbear from applying certain telecommunications service requirements to cable modem services is not an adequate substitute for correctly classifying cable modem service in the first instance. The FCC's decision that cable modem service is an information service under the Act leaves the service free from common carrier regulation from the outset, absent an affirmative decision by the FCC to impose such regulation on cable operators. In contrast, the FCC's forbearance authority presumes that services*28 are subject to Title II regulation absent an FCC determination that forbearance from regulation is required under Section 10(a) of the Communications Act, 47 U.S.C. 160(a). Section 10(a) provides that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Commission "shall forbear" from applying "any provision" of the Communications Act to a telecommunications carrier or a telecommunications service in certain circumstances.[FN12] Section 10 does not speak to the threshold issue whether cable modem service should be subject to regulation as a telecommunications service in the first place.

> FN12. The statutory prerequisites for forbearance are: (1) the regulatory provision "is not necessary to ensure that the charges, practices, classifications, or regulations are *** just and reasonable and are not unjustly or unreasonably discriminatory"; (2) enforcement of the provision "is not necessary for the protection of consumers"; and (3) forbearance is "in the public interest." 47 U.S.C. 160(a)(1), (2) and (3).

Further, neither the FCC nor any court has ever applied the forbearance criteria of Section 10 to Title II regulation of cable modem service. Forbearance proceedings would be time-consuming and hotly contested and would assuredly lead to new rounds of litigation, and there is no way to predict in advance the ultimate outcome of such proceedings. Moreover, the speculative possibility of eventual freedom from regulation under Section 10 would not relieve the industry or regulators of the immediate burdens and uncertainties that would be created by imposing common carrier obligations on cable modem providers. In short, the FCC's forbearance authority is not in this context an effective means of "remov[ing] regulatory uncertainty that in itself may discourage investment and innovation." Pet. App. 47a.

29CONCLUSION

The petition for a writ of certiorari should be granted.

Federal Communications Com'n v. Brand X Internet Servi
2004 WL 1943678 (U.S.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 832342, 73 USLW 3592 (Oral Argument) Oral Argument (Mar. 29, 2005)
• 2005 WL 669730 (Appellate Brief) Reply Brief for Cable-Industry Petitioners (Mar. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 669729 (Appellate Brief) Reply Brief of Respondents the Verizon Telephone Companies, GTE.Net LLC d/b/a Verizon Internet Solutions, and Verizon Internet Services Inc. in Support of Reversal (Mar. 20, 2005) Original Image of this Document (PDF)
• 2005 WL 640965 (Appellate Brief) Reply Brief for the Federal Petitioners (Mar. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 430104 (Appellate Brief) Brief of Amicus Curiae by the State of New Jersey, Board of Public Utilities in Support of the Respondents (Feb. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 435885 (Appellate Brief) Brief for Respondent MCI, Inc. (Feb. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 435898 (Appellate Brief) Brief of the National Association Of Regulatory Utility Commissioners as Amicus Curiae Supporting Respondents and Affirmance of the Decision Below%tc (Feb. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 435899 (Appellate Brief) Brief for the Respondents States and Consumer Groups in Opposition to Petitioners (Feb. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 435900 (Appellate Brief) Brief for Respondents EarthLink, Inc., Brand X Internet Services, and Center for Digital Democracy (Feb. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 470933 (Appellate Brief) Brief Amicus Curiae of the American Civil Liberties Union and the Brennan Center for Justice at NYU School of Law in Support of Respondents (Feb. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 430105 (Appellate Brief) Brief Amici Curiae of AARP, Free Press and National Internet Alliance in Support of Affirmance (Feb. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 122088 (Appellate Brief) Brief for the Federal Petitioners (Jan. 19, 2005) Original Image of this Document (PDF)
• 2005 WL 122087 (Appellate Brief) Brief for Respondents BellSouth and SBC in Support of Petitioners (Jan. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 1248282 (Appellate Brief) Brief for Cable-Industry Petitioners (Jan. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 139836 (Appellate Brief) Brief of Amicus Curiae Telecommunications Industry Association in Support of Petitioners (Jan. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 139837 (Appellate Brief) Brief Amicus Curiae of Washington Legal Foundation in Support of Petitioners (Jan. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 152921 (Appellate Brief) Brief of Respondents the Verizon Telephone Companies, GTE.Net LLC d/b/a Verizon Internet Solutions, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1943678 (U.S.)  Page 15
(Cite as: 2004 WL 1943678)

Verizon Internet Services Inc. in Support of Reversal (Jan. 18, 2005) Original Image of this Document (PDF)
• 2004 WL 2606744 (Appellate Petition, Motion and Filing) Reply Brief (Nov. 16, 2004)
• 2004 WL 2246249 (Appellate Petition, Motion and Filing) Opposition Brief of Respondent Earthlink, Inc. (Sep. 30, 2004)
• 2004 WL 2246250 (Appellate Petition, Motion and Filing) Brief for the States and Consumer Groups in Opposition (Sep. 30, 2004)
• 2004 WL 2246251 (Appellate Petition, Motion and Filing) Brief for Respondents Brand X Internet Services and Center for Digital Democracy in Opposition to Petitions for Writs of Certiorari (Sep. 30, 2004)
• 2004 WL 2112784 (Appellate Petition, Motion and Filing) Brief of the Verizon Telephone Companies, GTE.Net LLC d/b/a Verizon Internet Solutions, and Verizon Internet Services Inc. in Support of Petitioners (Sep. 20, 2004)
• 04-277 (Docket) (Aug. 31, 2004)
• 04-281 (Docket) (Aug. 31, 2004)
• 2004 WL 1944011 (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Aug. 30, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.