# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

CHRISTOPHER J. NEWMAN                              *
3817 Salem Church Road
Baltimore, Maryland 21084                          *

and                                                *

MARY FRANCES NEWMAN                                *
3817 Salem Church Road
Baltimore, Maryland 21084                          *

　　　Plaintiffs                                     *

v.                                                 *      Case No.: CCB-00-2609

MOTOROLA, INC.                                     *
1303 E. Algonquin Road
Schaumburg, Illinois 60196                         *
　　　SERVE ON:  Resident Agent
　　　The Corporation Trust                          *
　　　300 E. Lombard Street
　　　Baltimore, Maryland 21202                      *

and                                                *

VERIZON MARYLAND INC.                              *
A/K/A VERIZON
Formerly Known As:                                 *
Bell Atlantic – Maryland, Inc.
One East Pratt Street                              *
Constellation Place
Baltimore, Maryland 21202                          *
　　　SERVE ON:  Resident Agent
　　　Robert D. Lynd                                 *
　　　1 East Pratt Street
　　　Constellation Place                            *
　　　Baltimore, Maryland 21202
                                                   *
and                                                *

VERIZON COMMUNICATIONS INC.                        *
A/K/A BELL ATLANTIC
A/K/A VERIZON

Exhibit A

Formerly Known As:                                           *
Bell Atlantic Corporation
1095 Avenue of the Americas                                  *
New York, New York 10036
        SERVE ON:                               *
        Resident Agent
        The Corporation Trust                   *
        300 E. Lombard Street
        Baltimore, Maryland 21202               *

                                        *

and                                                          *


**BELL ATLANTIC MOBILE, INC.**                               *
Formerly known as:
Bell Atlantic NYNEX Mobile, Inc.                             *
180 Washington Valley Road
Bedminster, New Jersey 07921                                 *
        SERVE ON:  Resident Agent
        The Corporation Trust                   *
        300 E. Lombard Street
        Baltimore, Maryland  21202              *

and                                                          *

                                        *

**CELLCO PARTNERSHIP**
**d/b/a VERIZON WIRELESS**                                   *
Formerly d/b/a Bell Atlantic Mobile
Formerly d/b/a Bell Atlantic NYNEX Mobile                    *
180 Washington Valley Road
Bedminster, New Jersey 07921                                 *
        SERVE ON:
        Dennis F. Strigl, President             *
        180 Washington Valley Road
        Bedminster, New Jersey 07921            *

and                                                          *

                                        *

**SOUTHWESTERN BELL MOBILE**
**SYSTEMS, INC.**                                            *

2

d/b/a Cellular One Washington/Baltimore      *
17330 Preston Road, Ste 100A
Dallas, Texas 75252      *
      SERVE ON:
      Resident Agent      *
      The Corporation Trust
      300 E. Lombard Street      *
      Baltimore, Maryland 21202
      *

and      *

      *

**WASHINGTON/BALTIMORE**
**CELLULAR LIMITED PARTNERSHIP**      *
d/b/a Cellular One Washington/Baltimore
d/b/a Cellular One      *
7855 Walker Drive, Suite 100
Greenbelt, Maryland 20770      *
      **SERVE ON:**
      The Corporation Trust      *
      300 E. Lombard Street
      Baltimore, Maryland 21202      *

      *

and      *

**SBC COMMUNICATIONS INC.**      *
175 East Houston
San Antonio, Texas  78205      *
      SERVE ON:
      Resident Agent      *
      C.T. Corporation Systems
      350 N. Saint Paul Street      *
      Dallas, Texas 75201
      *
and      *

      *

**CELLULAR ONE GROUP**      *
A/K/A Cellular One
5001 Lyndon B Johnson Freeway, Ste. 700      *

3

Dallas, Texas 75244                                      *
     **SERVE ON:**
     Richard J. Lyons, President              *
     5001 Lyndon B Johnson Freeway, Ste 700
     Dallas, Texas 75244                      *

                    *

and                                                      *

**NATIONWIDE MOTOR SALES CORP.**                         *
d/b/a Nationwide Mobile Communications
2085 York Road                                           *
Timonium, Maryland 21093
     **SERVE ON:** Resident Agent              *
     Howard I. Gatlan
     315 North Charles Street, Suite 200       *
     Baltimore, Maryland 21201
                    *

and                                                      *

**CELLULAR TELECOMMUNICATIONS**
**INDUSTRY ASSOCIATION**                                 *
A/K/A CTIA, Inc.
A/K/A CTIA                                               *
1250 Connecticut Avenue, N.W., Suite 200
Washington, D.C. 20036                                   *

     SERVE ON:                                 *
     Resident Agent
     John M. Townsend                          *
     1775  I  Street  N.W. , Suite 600
     Washington, D.C. 20006                    *

and                                                      *

**TELECOMMUNICATIONS**                                   *
**INDUSTRY ASSOCIATION**
A/K/A TIA                                                *
Washington, D.C
     SERVE ON:                                 *
     Resident Agent
     Mathew T. Kranz                           *

4

1201 Pennsylvania Avenue, NW          *
Suite 315
Washington, D.C. 20044                *

                                      *

and                                   *

                                      *

ABC CORPORATION                       *
a presently unidentified entity or entities

                                      *

and                                   *

JOHN DOE                              *
a presently unidentified individual or individuals    *

Defendants                            *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### THIRD AMENDED COMPLAINT AND PRAYER FOR JURY TRIAL

Plaintiff, Christopher J. Newman and Plaintiff, Mary Frances Newman, by and through

their attorneys, The Law Offices of Peter G. Angelos, P.C. and Gary J. Ignatowski and John A.

Pica, Jr., sue the above-captioned Defendants, MOTOROLA, INC., VERIZON MARYLAND

INC., A/K/A VERIZON, f/k/a BELL ATLANTIC - MARYLAND, INC., VERIZON

COMMUNICATIONS INC., A/K/A BELL ATLANTIC, A/K/A VERIZON, f/k/a BELL

ATLANTIC CORPORATION, BELL ATLANTIC MOBILE, INC., f/k/a BELL ATLANTIC

NYNEX MOBILE, INC., CELLCO PARTNERSHIP, d/b/a VERIZON WIRELESS, formerly

d/b/a BELL ATLANTIC MOBILE, formerly d/b/a BELL ATLANTIC NYNEX MOBILE,

SOUTHWESTERN BELL MOBILE SYSTEMS, INC., d/b/a CELLULAR ONE

WASHINGTON/BALTIMORE, WASHINGTON/BALTIMORE CELLULAR LIMITED

PARTNERSHIP, d/b/a CELLULAR ONE WASHINGTON/BALTIMORE, d/b/a CELLULAR

5

ONE, SBC COMMUNICATIONS INC., CELLULAR ONE GROUP, A/K/A CELLULAR

ONE, NATIONWIDE MOTOR SALES CORP., d/b/a NATIONWIDE MOBILE

COMMUNICATIONS, CELLULAR TELECOMMUNICATIONS INDUSTRY ASSOCIATION,

A/K/A CTIA, INC., A/K/A CTIA, TELECOMMUNICATIONS INDUSTRY ASSOCIATION, A/K/A

TIA, ABC CORPORATION, and JOHN DOE, (hereinafter collectively referred to as

"Defendants"), and in support state as follows:

  1. This is a civil action arising out of the manufacture and sale of cellular wireless hand

held telephones (hereinafter referred to as "WHHPs"), the use of WHHPs, and injuries resulting

therefrom. The WHHPs are not to be confused with cellular telephones and or other

communication devices permanently mounted in automobiles, trucks, and other public and/or

private vehicles of all sorts and descriptions. These are wireless cellular phones currently in

widespread use throughout the United States and the world which are held up to the user's ear

and against the user's head, thereby causing serious debilitating catastrophic injuries by genetic,

cellular damage, cellular dysfunction and cancer to humans. The grounds for relief are: Strict

Product Liability - Failure to Warn, Strict Product Liability - Design or Manufacturing Defect,

Negligence, Negligence (Trade Associations), Supplier Negligence, Breach of Express Warranty,

Breach of Implied Warranty, Civil Tort Conspiracy, Concert of Action, Aiding and Abetting,

Civil Battery, Violation of Maryland Consumer Protection Act, Fraud, Punitive Damages, and

Claim for Damages and Loss of Consortium.

  2. The Venue is in Baltimore City, Maryland.

  3. As set forth within, the WHHP is not limited to the actual cellular wireless hand held

telephone itself, but, depending upon a particular allegation, may also consist of the entire

6

Telephone Switching Office (MTSO).

53. Defendant VERIZON controls the local telephone network lines, and these lines act as the "gateway" that all cellular and/ or wireless Defendants must use in order to operate their services.

54. Each of the base station towers are connected to the MTSO primarily through existing telephone land lines owned and operated by Defendant VERIZON. In essence, Defendant VERIZON provides the source of the cellular transmissions for all cellular and/ or wireless Defendants.

55. A phone call is transmitted to a WHHP through wireless and land based lines. Defendant VERIZON allowed the energy to pass through its lines and reach the WHHP causing radiation to be emitted from the WHHP, notwithstanding their knowledge of the harmful effects of RFR emissions from WHHPs.

56. At all relevant times, the Defendants were aware that the potential high level of radiation for WHHPs could cause cancer and other injuries. Defendants were aware of the clinical observations that many patients' brain tumors were located in an area where RFR from a WHHP's antenna would be deposited. Such observations were derived in part from studies available to the Defendants as well as studies performed by Defendants.

57. The Defendants, aware of these conclusions, along with a myriad of other scientific studies, clinical observations, and hypotheses by noted scientists and engineers, misled both public officials and the public into believing that WHHPs could in no way cause biological harm to the user, and further, that there should be no alarm.

58. Defendants, under public pressure, funded a twenty-seven million dollar surveillance

18

and research effort in hopes of proving that WHHPs were safe and not a health threat. This research project failed to prove the safety of the WHHPs.

59. In late 1994, researchers reported on their observation that rats exposed to microwaves similar in intensity to those radiating from a WHHP's antenna appeared to experience single strand DNA breakage as a result of the exposure. The following year reports were published suggesting double strand DNA breaks in the same exposure scenario. Researchers had adapted the traditionally *in vitro* single cell gel assay in an *in vivo* situation. From this, the Defendants knew or should have known that WHHPs had the capability to cause biological damage.

60. In 1997, researchers were reporting biological effects in rats exposed head first to WHHP mediated RFR. These studies, though inclusive, represented controlled studies showing biological effects from RFR exposure that were not heat induced.

61. The WTR wireless phone industry funded program funded by the Cellular Telecommunications Industry Association, which is supported by the companies that produce WHHPs and its communications infrastructure, began to disseminate its findings in 1998 and 1999. Immediately thereafter, the WHHP industry, including the Defendants, negligently and wrongfully discontinued future funding of the program, which provides a database on the adverse effects of RFR.

62. Defendants, who are members of the CTIA, have negligently and wrongfully continued to maintain that WHHPs are safe even though the studies proved otherwise.

63. The Plaintiffs allege that the Defendants intentionally, negligently and wrongfully reported that the WHHPs were safe and that there was no danger from high levels of RFR

19

emitted from WHHPs.

64. Even though the Defendants were aware of the increasing demand for WHHPs and wireless service, they failed to conduct adequate testing, manipulated the results of other testing, concealed evidence that WHHP radiation is harmful, and suppressed scientific and medical research.

65. The Defendants were aware of the results of numerous studies outlining the biological risks associated with WHHPs. Nevertheless, the Defendants failed to apprize NEWMAN, their other customers, and the public that WHHPs pose biological risks. Defendants have also failed to adequately warn the public of the biological risks associated with WHHP use.

66. Research conducted by the Defendants, and research paid for directly by the Defendants, has repeatedly shown that the Defendants have and continue to manipulate science to the detriment of consumers by failing to reveal all relevant findings and by selectively withholding important public health information from the public and NEWMAN. Such information would have caused NEWMAN and other prudent consumers to cease using their WHHPs.

67. The Defendants have actively encouraged the increased use of WHHPs, while knowing the potential biological risks associated with their use.

68. The product warnings in effect during the period relevant to this Complaint were both substantively and graphically wholly inadequate to alert NEWMAN and other consumers of the risks associated with WHHP use.

69. As a result, NEWMAN and the public have been grossly misled and misinformed regarding the biological risks associated with WHHP usage.

20

70. Defendants have never fully and adequately warned the public about the risk of biological damage, such as, but not limited to, brain tumors, cancer, or genetic damage in human blood, and/or that the risk of injury can differ with the amount of use and the sensitivity of the user.

71. Defendants have actively encouraged the use of WHHPs, thereby increasing their sales and profits.

72. At all times relevant, Defendants, themselves, or by use of others, did manufacture, create, design, test, label, package, distribute, supply, market, sell, advertise, and/or otherwise distribute products and services related to WHHPs in Baltimore City, the State of Maryland, and elsewhere in the United States, as well as to, WHHP owners and users throughout its service areas, and as to some Defendants, nationally, and internationally.

73. The Defendants did business in Baltimore City and the State of Maryland, performed services in Baltimore City and the State of Maryland, made contracts to be performed in whole or in part in Baltimore City and the State of Maryland, and/or manufactured, tested, sold, offered for sale, supplied or placed in the stream of commerce, or, in the course of business, materially participated with others in so doing, the sale of WHHPs and cellular service.

74. Defendants knew or should have known these WHHPs to be defective, unreasonably dangerous and hazardous, foreseeably causing injury to the Plaintiffs as described herein, and committed and continue to commit tortious and other unlawful acts in Baltimore City and the State of Maryland.

75. At all times relevant, the Defendants, themselves, or by use of others, did manufacture, create, design, test, label, package, distribute, supply, market, sell, promote,

21

advertise, conduct research and otherwise conducted business and distribution of WHHPs in Baltimore City and the State of Maryland.

76. Defendants' strategy has been to aggressively market and sell these products and its related service by misleading and misinforming potential users about the products and by failing to protect users from serious dangers, which Defendants knew or should have known to result from use of these products.

77. Defendants widely and successfully marketed WHHPs in Baltimore City, the State of Maryland, other states, and as to some Defendants, nationally and internationally. Defendants undertook an advertising blitz extolling the virtues of WHHPs in order to induce widespread use of the product. The Defendants' marketing campaign consisted of advertisements on television, radio, and the Internet, promotional literature to be placed in the printed media and in other advertising media, and other promotional materials to be provided to potential users of WHHPs.

78. The Defendants' advertising program, as a whole, by affirmative misrepresentations and omissions, falsely and fraudulently sought to create the image and impression that the use of WHHPs was safe with no potential for biological harm to the user.

79. Defendants purposefully downplayed, understated, and/or did not state the health hazards and risks associated with WHHPs. These Defendants, through promotional literature, deceived potential users of WHHPs by relaying positive information, including testimonials from satisfied users, and by manipulating statistics to suggest widespread acceptability, while downplaying, understating, and/or not stating the known adverse and serious health effects. Defendants falsely and fraudulently kept relevant information from potential and actual WHHP users and minimized user concern regarding the safety of these products and services.

80. In particular, in the materials produced by Defendants, they falsely and fraudulently misrepresented a number of facts regarding WHHPs, including the following:

    a.   The presence of adequate testing of RFR and potential biological effects on wireless phone users.

    b.   The adverse potential health effects that may be caused by their product.

81. Upon information and belief, there are over 90 million WHHP users in the United States, and over 400 million WHHP users worldwide.

82. Defendants failed to publish adequate precautionary statements warning consumers as more information about possible adverse effects became available.

### Defendants' Further Fraudulent and Conspiratorial Conduct

83. During World War II intensive research and engineering work led to the development of devices capable of producing electromagnetic energy at the radio frequency band.

84. Defendants were aware or should have been aware of numerous studies and experiments that demonstrated the health hazards of radiation from RFR dating back to the late 1940s.

85. The medical and scientific communities were well aware of the biological effects of RFR in the 1920's. In 1928, Helen Hosner, a researcher at the Albany Medical College, showed that radio waves were capable of heating body tissue in a study investigating the effects of experimental short wave radio transmitters on workers at a General Electric research facility. Her work was entitled "Heating Effects Observed in a High Frequency Static Field," published in Science.

86. In a 1948 article published in the archives of Physical Medicine, it was reported that

electromagnetic radiation at 2,450 MHz was "highly productive in producing lenticular opacities."

87.  In 1952, researchers noted that "experiments in which the head area alone was directly irradiated suggests that the fatal outcome was the result of an excessive rise in brain temperature.  The lethal effects of irradiation to a limited area of the body are different from those in which the entire animal is exposed."  That warning was published after researchers had exposed laboratory rats to a few seconds of intense exposure of radio frequency radiation.  The warning was published in Microwave Radiation: Biophysical Considerations and Standards Criteria, IEEE Transactions on Biomedical Engineering.

88.  In 1955, researchers Schwan and Piersol published their work that radio frequency energy, in a broad range from 500 MHz to 1000 MHz is preferentially deposited beyond the skull and absorbed into the brain.

89.  In its initial form, during the 1960's the IEEE/ANSI safety standard, known as ANSIC95.1, established a maximum safe exposure level for radio frequency radiation at 10.0mW/cm2.  The modified standard, ANSIC95.1-1982 set the maximum level for radio frequency exposure on a sliding scale by dividing the frequency by a multiple of three hundred. At 845 MHz, the safety standard would be 2.8 mW/cm2; at 1900 MHz, the safety standard would be 6.33 mW/cm2.

90.  In 1962, it was known in the scientific community that radio frequency energy is most efficiently absorbed into human tissue and is capable of producing undesirable effects.

91.  It was well known in the scientific and medical communities in the 1970s that an antenna is the most efficient means of depositing energy into the human body and penetrating

24

human tissue.

92. In 1971, A.W. Guy published in IEEE Transaction in Microwave Theory and Techniques that in order to obtain selective heating, "hot spot" heating, it is necessary to expose the tissue to the near zone fields of the energy source, namely the antenna. From this experimental data at 433 MHz, 750MHz, and 918 MHz the research confirmed that energy is readily absorbed from the induction fields in the near zone. The absorption within the brain was found to be about 20 times greater than that of the skull and subcutaneous fat.

93. In 1972, in a study by I. J. Bahl, it was demonstrated that frequencies between 700 megahertz and 1000 megahertz interact most efficiently with human tissue to yield the greatest energy absorption and that the temporal lobe of the brain is the most sensitive area of the body to this type of radiation. The work performed by Bahl was published in IEEE Transactions on Microwave Theory and Techniques, a publication accepted as authoritative in the medical and scientific communities.

94. In 1977, J.C. Lin published the results of his research in IEEE Transaction on Microwave Theory and Techniques. Results revealed that because microwave absorption occurs in a very short time there is little chance for heat conduction to take place; the conduction of heat takes much longer. At "hot spots" the inability of biological tissue to get rid of excess heat quickly and efficiently may be yet another mechanism leading to destructive exposure.

95. Research confirmed that "hot spot" absorption is dependent on the diameter of the head model which was used. As the diameter decreased the absorption effect became more pronounced. Most notably, the greatest absorption enhancement occurs at frequencies between 800 MHz to 1000 MHz, effectively covering the portable cellular telephone transmit band.

25

96. In 1977, O.P. Gandhi published a study in Radio Science which confirmed that radiation absorption enhancement occurs when subjects are close to reflecting surfaces. Gandhi reported a measured energy absorption enhancement factor of as much as 27 in close proximity to corner shaped reflectors and about 4.7 for flat reflectors.

97. In 1978, MOTOROLA studied the efficiency of the antenna and learned that the maximum Specific Absorption Rate exists at the antenna "feed point".

98. Long before the introduction of cellular telephones, researchers provided data indicating that children absorb approximately 50% more radiation within their heads than do adults. The research performed by C.H. Durney, reported in IEEE Transactions on Microwave Theory and Techniques in 1979, only took into consideration the plain wave, far field exposures and did not include any of the enhancement effects that are introduced by the near zone operation of cellular telephones.

99. In 1979, researchers Sheppard, Bawin and Adey confirmed in a published article that low intensity modulated (16 Hz) 450 MHZ fields produced modified calcium efflux through brain cell membranes. The researchers observed the effect for power density levels lower than 2.0 mW/cm2. The work was published in Radio Science in December 1979.

100. In 1979, in an experiment by J. L. Meyerhoff, laboratory rats were killed quickly to prevent unwanted changes in brain structure. It was reported that "it is preferable to focus the microwave energy into the head of the animal, thereby increasing the efficiency of the energy delivered to the brain." The experiment was published in IEEE Transactions on Microwave Theory and Techniques in January, 1980.

101. The cellular phone industry conducted extensive research in the early 1980s on the

26

effects of antennas and discovered that there is a large amount of stored energy that is disposed immediately around the antenna of a cell phone.

102. In follow up research, Adey published in 1980 research demonstrating modifications in brain cells at low level radiation exposure. Adey also reported that weak modulated frequency radiation results in major physiological changes. The work was published in Proceedings of the IEEE, January 1980.

103. In 1981, a MOTOROLA researcher was quoted in IEEE Transactions on Vehicular Technology (November) "the proposed standard recognizes the possibility of encountering fields higher than the maxima of the protection guides in the close vicinity of low power radiators, like portable communication equipment. For this reason, an exclusion clause for devices operating at 1 GHz or less end with less than 7 watts output power has been proposed."

104. At the same time, MOTOROLA researchers publically stated, "the Radio Frequency Protection Guides of the American National Standards Institute at 750 MHz would be violated at 0.3 centimeters distance by a resident dipole radiating about 1mW and at .5 centimeters distance by a radiated power of 4mW." "A resident dipole provides the most favorable condition of minimum stored energy around the antenna." The researchers conceded that, "a rigorous enforcement without exclusion of the radio frequency protection guides would render portable radios practically useless."

105. MOTOROLA researchers concealed from the public the enhancement effects of antennas and the efficiency that antennas deposit energy into brain tissue. In an article published in 1981 in IEEE Transactions on Vehicular Technology, a prominent MOTOROLA employee stated, "this paper addresses the question of how long the power radiated by a dipole

27

has to be so that the field near the antenna never exceeds the ANSI - Proposed Protection Guides for distances greater than .3 centimeters, which is the spacing which at times separates the antenna from the head of the portable radio user. Radiated power of a few milliwatts is enough to exceed the proposed radiation protection guides at 750 MHz. Such reticence in accepting the clause probably resides in the fact that the near field of antennas is largely un-investigated." At the same time, a prominent Motorola researcher stated, "the study of the near field has been substantially neglected." The same prominent MOTOROLA researcher stated, "dipole antennas, although extensively used in portable and mobile communications, have not been carefully investigated in the near field."

106. In 1981, during the time that the exclusion of portable cellular phones was debated within the ANSI Committee, a MOTOROLA researcher was quoted as stating, "strict enforcement ... technically forbids the exposure to a resident dipole about 19 centimeters long, radiating 1mW."

107. In 1982, MOTOROLA researchers found that as little as 250 microWatts radiated power would be enough to exceed the safety standards established by the American National Standards Institute when using the helix antenna as the radiator for near zone exposure. The study was published in IEEE Transactions on Vehicular Technology in November, 1982.

108. The MOTOROLA researchers found that the exposure to the helical antennas yields a power density of as much as 127 mW/cm2 when the antenna is placed about 1 centimeter distant. The radiated power was only .02 Watts, which is thirty times less than what is radiated from a portable cellular phone.

109. MOTOROLA'S fraudulent and deceptive misrepresentations led customers and the

28

public into believing that there were health care standards in place, when in fact MOTOROLA knew the following: (1) that human body absorbs non-ionizing electromagnetic energy; (2) that more radiation is absorbed by the users' hand and head than is transmitted into space; and (3) that the absorbed radiation by the users hand and head exceeded acceptable safe standards.

110. The Defendants knew since the 1970's that this type of radiation is absorbed by the human body and not reflected away. Overwhelming research by notable scientists has indicated that more than 50% of the radiated energy from cell phones is absorbed within the head and brain.

111. In 1984, in an article published by Microwave News, there was a report of a 1984 study by the United States Air Force in which it was found by Dr. Vernot of the University of California "findings of excess malignancies in the exposed animals is provocative" after being exposed to radio frequency radiation.

112. In 1986, the United States Air Force sponsored a study performed by A.W. Guy in which 100 rats were irradiated over a three year period and compared to 100 rats that were not exposed to radiation but were otherwise treated identically. After the experiments were completed the researchers reported that 18 malignant tumors developed in the exposed rats as compared to 5 in the control group rats. The researchers claimed that such a difference was "statistically highly significant." They also stated, "at face value this last finding suggests that low levels of microwave radiation can cause cancer in mice." Remarkably, the Environmental Protection Agency accepted a report by the same researchers who suddenly "corrected" their conclusions. The EPA in 1986 stated that evidence of carcinogenicity must be confirmed to a specific tumor type.

29

113. In 1989, Stephen Cleary presented a review of the state of research related to non-thermal interactions and effects of radio frequency radiation. He concluded, "cellular studies provide convincing evidence that RF radiation, and other types of electric or magnetic fields, can alter living systems via direct non-thermal mechanisms, as well as via heating."

114. During a 1989 meeting of the ANSI Committee, held in Tucson, Arizona, industry representatives dominated the membership of the standard setting committee. After a heated discussion and debate over the exclusion clause it was decided upon a vote by the committee that portable cellular telephones would not be excluded from regulation or compliance under the ANSI Safety Standard. A short time after the meeting, at another quietly held committee meeting attended by a select, smaller group of members, the exclusion clause passed, and as a result, cell phones would be excluded from any testing, compliance, or monitoring by any safety standard, government agency, or regulatory body.

115. The American National Standards Institute "ANSI" has adopted a set of electromagnetic energy exposure levels that the Institute of Electrical and Electronic Engineers (IEEE) has determined to be safe for humans. The ANSI safety standard was initially developed during the 1960's, modified during the early 1980's, and modified again, most recently, during the early 1990's.

116. The cellular phone industry manipulated the research and pressured members of the Safety Standard Committee to exempt portable cellular telephones from regulation and compliance under the ANSI standards. Cellular telephones, then and now, would not meet the standard established in 1982.

117. In 1992, a project performed by A. Maes confirmed a marked increase in the

30

frequency chromosomal aberrations and the presence of micro nuclei in peripheral blood after exposed to 2,450 MHz radiation.

118.  In 1992, F. Montecchia published an article in IEEE Transactions on Biomedical Engineering that some antennas are specifically designed to use the non radiating induction energy (around the antenna) for penetration into humans. One such antenna was specifically developed to provide an improved method for depositing energy into tissue for hyperthermia treatment.

119.  In 1992, it was reported in Microwave News, a news publication widely circulated and read by the scientific and medical community, that Keith Angstadt, an antenna technician, was treated at Johns Hopkins University for exposure to radio frequency radiation which led to his loss of night vision and color blindness.  The retinas of his eyes had sustained 5 mW/cm2 of continuous wave radiation.

120.  The medical and scientific communities were well aware of the extensive research published and reported throughout the 1950's and 1960's of the dangers of causing burns when RFR is applied over a bony prominence.  It was revealed that non-uniformities such as bone ridges and irregular fat layers caused the energy to be absorbed non-uniformly within the body or head.

121.  On January 26, 1993, MOTOROLA, through one of its senior executives announced to the news media, and subsequently reported by the news media to the public, that "thousands of studies" had already shown cellular phones were safe.  Such statement was fraudulent, deceitful, and misleading.

122.  On July 16, 1993, the CTIA, representing many of the named Defendants, issued a

31

report entitled "Safety Update-Fast Facts: Portable Cell Phone Safety,"in which it was fraudulently and deceptively stated, in bold print, the following: "Rest assured. Cellular telephones are safe!" The report further stated that cell phones fall within the safety standards of the Federal Communications Commission (FCC). However, the Defendants fraudulently and deceitfully omitted the fact that the FCC had also declared that it does not consider itself the "expert agency" for evaluating health effects.

123. On July 19, 1993, Elizabeth Jacobson, Deputy Director for Science at the Center for Devices and Radiological Health, Food and Drug Administration, sent a correspondence to CTIA president Thomas Wheeler, which clearly identified certain fraudulent and deceitful statements made by the Defendants to the public regarding the "safety" of WHHPs. In pertinent part, this letter states:

> I am writing to let you know that we were concerned about two important aspects of your press conference on July 16 concerning the safety of cellular phones, and to ask that you carefully consider the following comments when you make future statements to the press.
>
> First, both the written press statements and your verbal comments during the conference seemed to display an unwarranted confidence that these products will be found to be absolutely safe. In fact, the unremittingly upbeat tone of the press packet strongly implies that there can be no hazard, leading the reader to wonder why any further research would be needed at all. (Some readers might also wonder how impartial the research can be when its stated goal is "a determination to reassure consumers," and when the research sponsors predict in advance that "we expect the new research to reach the same conclusion, that the cellular phones are safe."). . . .
>
> We are even more concerned that your press statements did not accurately characterize the relationship between CTIA and the FDA. . . . [S]ince it is not yet clear whether we will help to direct

32

> the research program, it is premature to state that we will credential
> the research.
>
> To sum up, Mr. Wheeler, our role as a public health agency is to
> protect health and safety, not to "reassure consumers.". I think it is
> very important that the public understand where we stand in
> evaluating the possibility that cellular phones might pose a health
> risk. . . .

124. In 1993, N. Kuster published an article in IEEE Transactions on Biomedical

Engineering which demonstrated the very high level of energy absorbed into the head and

brain in the area close to the location of the antenna. Kuster reported that the maximum SAR

measured in models of human heads exposed to 1 Watt of energy was 5 mW/g. The antenna

employed was approximately one inch from the head of the model.

125. In December 1993, Chegrinets reported that pulsed 150 to 300 MHz at 5 mW/cm2

caused chromosomal changes in human peripheral lymphocytes and whole blood cells.

126. On or about late 1993/early 1994, the cell phone industry, including the named

Defendants, through CTIA, organized a committee which was to draft a manual to discuss

"responsible" WHHP use. After receiving a draft of the manual, Thomas Wheeler, president of

CTIA, sent out a memorandum expressing his concerns over certain language used in the manual

which acknowledged and/or implied that the use of WHHPs could pose health risks. An example

of such substantive changes follows, with the suggested deletions put forth in bold typeface:

> Do not operate your transportable cellular telephone when holding
> the antenna, or when any person is within 4 inches (10 centimeters)
> of the antenna. **Otherwise you may impair call quality, may
> cause your phone to operate at a higher power level than is
> necessary, and may expose that person to RF energy in excess
> of the levels established by the updated ANSI Standard.**
>
> **If you want to limit RF exposure even further, you may choose**

33

> **to control the duration of your calls or maintain a distances**
> **from the antenna of more than 4 inches (10 centimeters).**
>
> For best call quality, keep the antenna free from obstructions and
> point it straight up."

127.  Gandhi, a well known and respected researcher, published findings of his research that were contradictory to Kuster's. Gandhi reported that the maximum SARs within the human brain would be about 30 times lower than what Kuster had reported. But by March of 1994, the word in the research community had spread that the Gandhi team had, in fact, misstated SAR figures. During the 1994 Bioelectromagnetics Society 16th Annual Conference, Gandhi produced findings of still higher maximum SARs for the same research. During his presentation, SARs corresponded, at times, to levels as much as ten times higher than were previously reported. The conference results, presented in Copenhagen, Denmark, never reached the U.S. audience. In a letter to the Federal Communications Commission, August 1994, Gandhi explained the nature of the errors and revised his experimental results upward. That is, nearly a full year after the initial false claims of safety - and almost six months after his revisions first became known, the Gandhi team provided an official correction.

128.  The Defendants knew that early in 1994 research performed in India by Sarkar, et al. confirmed that DNA modifications result from low-level exposure to radio frequency radiation. Clearly, if radio frequency radiation can rearrange the DNA in tissue then it can initiate cancer.

129.  In 1994, Henry Kues, a Johns Hopkins researcher, reported cell destruction and cell death comparable to that which would be expected from ultraviolet radiation was reported from exposure of rhesus monkeys to 1,250, 2,450 and 2,850 MHz radio frequency radiation. In a

34

1980 addition of IEEE Proceedings, it was reported that radio frequency radiation may inactivate enzymes or proteins that are involved in the repair process to correct DNA breaks and may also be responsible for inhibiting inherent DNA repair processes. In 1984, two researchers, Dr. Chang and Dr. Milham, made a presentation to the Annual Bioelectromagnetic's Society Conference in which they revealed an increase in malignant tumors in rats after long term exposure to radio frequency radiation in experiments they conducted.

130.  In 1994, L. Verschaeve documented evidence that human and rat blood samples exposed to 450 and 954 MHz radiation provided induced DNA breaks. The cellular phone industry has insisted for fifteen years that no such effect could be obtained from radio frequency radiation. The research by Verschaeve is but one of many similar reports that became known during 1994 and which supports the earlier findings of Cleary.

131.  In an alarming report, C.D. Cain disclosed in 1994 that 837 MHz radiation at a power density exposure level of 3.7 mW/cm2 produced a 40% increase in what researchers refer to as "focus Formation". These researchers explained at the 16th annual Bioelectromagnetics Society that the radio frequency radiation was acting as a co promoter for cancer formation.

132.  The Defendants knew, on or about June 12,1994,that the notable researcher Henry Lai, (and others) presented a report that indicated low-level (0.6 mW/g SAR) radio frequency radiation exposure at 2450 MHz resulted in memory deficits for experiments conducted with rats. This was a follow-up presentation of an article by Lai, Horita & Guy published only a few months earlier that provided substantially the same information. The memory deficits were observed as an inability of the rats to perform in a maze experiment. In effect, the rats forgot their way around a familiar area. The researchers explain the effect as being caused by a decrease

35

in brain activity. The low-level radiation exposure is extremely significant. Virtually all operators of Cell phones subject themselves to such exposure and energy absorption while operating the phone. Further, the memory deficits do not stop when the exposure ends. Researchers have learned that the effect persists for five days or more.

133. Late in 1994 Lai and Singh made known the results of their research which should have been received as conclusive proof that cellular phone radiation is capable of causing harmful biological effects. The researchers reported in the International Journal of Radiation Biology that low level exposure to radio frequency radiation causes an increase in single and double strand breaks in DNA.

134. Lai and Singh repeated their earlier experiment with similar results in 1996. In 1997, Repacholi published the results of his work that demonstrated that mice exposed to low levels of 900 MHz radiation exhibited a higher incidence of cancers than did their non exposed laboratory counterparts.

135. The Defendants acted in a fraudulent, deceitful, intimidating, illegal, and harassing manner to a researcher by the name of Dr. Jerry L. Phillips, who essentially replicated the DNA damage studies of Lai and Singh and reached the same conclusions, i.e., exposure to low levels of radio frequency radiation causes DNA damage which can develop into cancer.

136. MOTOROLA willfully and wantonly attempted to suppress information from NEWMAN, its other customers, the public, and government regulatory agencies by making illegal threats and illegal acts of intimidation upon Dr. Phillips.

137. After completion of his research, Dr. Phillips expressed his desire to publish said research. Initially, MOTOROLA told Dr. Phillips that it was too early to publish his results and

36

that he needed to do more research. When Dr. Phillips refused to "spin" his research, as demanded by MOTOROLA, MOTOROLA cut off Dr. Phillips' funding. Additionally, MOTOROLA threatened to discredit Dr. Phillips in the scientific community, as well as to ruin his career.

138. MOTOROLA willfully and wantonly attempted to suppress information from NEWMAN, its other customers, the public, and government regulatory agencies, by illegal threats and illegal acts of intimation made upon Dr. George Carlo, a notable public health scientist, epidemiologist, lawyer, founder of Health Risk Management Group, and the individual appointed by the cell phone industry to study the health hazards associated with WHHP use.

139. After leading the research effort regarding the health hazards associated with WHHP use for a period of six years, Dr. Carlo indicated that WHHPs may very well pose health risks to its user. In a response similar to that received by Dr. Phillips, the cell phone industry cut off Dr. Carlo's funding, attempted to discredit him within the scientific community, and attempted to ruin his career.

## COUNT I
## STRICT PRODUCT LIABILITY - FAILURE TO WARN

The Plaintiffs hereby incorporate by reference as if fully set forth in the above paragraphs of the Complaint, and further allege as follows.

140. Defendants are manufacturers and/or suppliers of WHHPs and services and are engaged in the design, manufacture, and sale of WHHPs.

141. Plaintiff purchased WHHPs (the "Product") from Defendants beginning in 1992.

37

Defendants are sellers of a Product which includes the WHHP and the service.

142. NATIONWIDE sold the Product to Plaintiff. The sale included the WHHP and the connection to Defendant Cell Phone Carriers' service networks.

143. MOTOROLA manufactured the WHHP based on specifications provided by the Defendant Cell Phone Carriers.

144. Defendant Cell Phone Carriers obtained licenses from the FCC in order to carry on the business of providing a network for the transmission of cellular phone calls.

145. The FCC granted specific frequency to each Defendant Cell Phone Carrier. Each Defendant Cell Phone Carrier provides manufacturers/sellers of WHHP's its specification which allow the manufacturers/sellers to market the WHHPs and sell service network with the WHHP as a Product.

146. The WHHPs manufactured and/or supplied by Defendants were placed in the stream of commerce and sold by the Defendants in a defective and unreasonably dangerous condition, in that the design of the WHHPs was such that it failed to include a proper warning regarding all possible adverse health effects associated with the use of WHHPs, the harmful effects of the radiation emitted from WHHPs, the comparative severity of such adverse effects, the warnings given did not accurately reflect the scope or severity of the effects, and/or Defendants failed to include a warning necessary for the safe and proper use of WHHPs.

147. The WHHPs reached Plaintiff without any substantial change in their condition and were in that same condition at the time of the injuries alleged herein.

148. The WHHPs manufactured and/or supplied by Defendants were unaccompanied by proper warnings regarding all possible adverse health effects associated with the use of WHHPs,

the harmful effects of the radiation emitted from WHHPs, and the comparative severity of such adverse effects, and/or, the warnings given did not accurately reflect the scope or severity of the effects, and/or Defendants failed to include a warning necessary for the safe and proper use of WHHPs.

149. Defendants failed to perform adequate testing which would have shown that WHHPs posed serious potential harmful effects with respect to which full and proper warnings, accurately and fully reflecting systems, scope and severity should have been made, with respect to the use WHHPs.

150. Defendants also failed to effectively warn users that numerous other methods of WHHPs were available, such as but not limited to, a headset, or speaker phone adapter, and/or hands free equipment which would have limited or negated the adverse health effects associated with the use of WHHPs.

151. The WHHPs manufactured or supplied by Defendants were defective due to inadequate post-marketing warnings or instructions because, after the Defendants knew or should have known of the risk of injury from their use, Defendants failed to provide adequate warnings to users or consumers of the product and continued to aggressively promote the product.

152. As a direct and proximate result of the Defendants' failure to warn of the defective and unreasonably dangerous condition of the relevant products and service as manufactured and/or supplied by Defendants, NEWMAN has suffered permanent and total disability, has undergone multiple craniotomy surgeries, has developed complications related to wound healing, has undergone radiation and chemotherapy, and suffers from excessive fatigue, visual impairment, some memory problems, and psychological and emotional stress, all arising as

39

debilitating effects of brain cancer and trauma associated with the brain surgery and brain tumor. NEWMAN'S condition is terminal.

153. As a further direct and proximate result of the Defendants' failure to warn of the defective and unreasonably dangerous condition of the relevant products and services as manufactured and/or supplied by Defendants, NEWMAN has been injured in health, strength and activity and suffered injuries to body and mind, the exact nature and extent of which will be determined, has sustained economic loss, including loss of earnings and diminution or loss of earning capacity, in an amount to be determined, and has been otherwise injured. NEWMAN requires reasonable and necessary health care, attention, and services, and has incurred and will incur medical, health, incidental and related expenses.

154. At all times relevant hereto, the Defendants actually knew of the defective nature of their products as herein set forth and continued to design, manufacture, market and sell their products so as to maximize sales and profits at the expense of public health and safety. Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to NEWMAN. NEWMAN, therefore, is entitled to punitive damages.

WHEREFORE, Plaintiffs demand judgment as follows: compensatory damages in the amount of Twenty-Five Million Dollars ($25,000,000.00); punitive damages in the amount of Fifty Million Dollars ($50,000,000.00); and such other and further relief as the Court may deem necessary and proper.

## COUNT II
## STRICT PRODUCT LIABILITY
40

their products as herein set forth and continued to design, manufacture, market and sell their products so as to maximize sales and profits at the expense of public health and safety. Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to NEWMAN. NEWMAN, therefore, is entitled to punitive damages.

WHEREFORE, Plaintiffs demand judgment as follows: compensatory damages in the amount of Twenty-Five Million Dollars ($25,000,000.00); punitive damages in the amount of Fifty Million Dollars ($50,000,000.00); and such other and further relief as the Court may deem necessary and proper.

## COUNT IV
## NEGLIGENCE (TRADE ASSOCIATIONS)

Plaintiffs adopt and incorporate all the preceding paragraphs above of the Complaint and further allege as follows.

175. Defendants CTIA and TIA (hereinafter "Trade Association Defendants") are trade associations which represent manufacturers of cell phone products and providers of cellular phone service ("Trade Association Members").

176. Defendant MOTOROLA is a Trade Association Member and a member of CTIA or TIA.

177. Defendants are Trade Association Members and members of CTIA or TIA.

178. Beginning in 1992, at the time NEWMAN began using WHHPs, to the present, the Trade Association Defendants represented Trade Association Members.

179. In 1993, CTIA and TIA participated in a Surveillance Program to research, inquire into, and assure the public of the safety of WHHPs.

46

180. CTIA and TIA were integral participants in the formation of the Surveillance Program which was formed to study the safety of WHHPs and report its findings to the public and to governmental bodies.

181. CTIA, with input and assistance from TIA, hired George Carlo ("Carlo"), an epidemiologist, to chair the Surveillance Program.

182. Thomas Wheeler, president of CTIA, handpicked Carlo to lead the Surveillance Program, and on January 29, 1993 announced that "it is time for truth and good science to replace emotional videotape and unsupported allegations. Therefore, the cellular communications industry is today announcing that it will fund research to re-validate the findings of the existing studies, which have found that the radio waves from cellular phones are safe."

183. CTIA, who was informed of all developments of the Surveillance Program, approved of the structure of the Surveillance Program.

184. With the knowledge and approval of CTIA and TIA, Carlo formed Wireless Technology Research ("WTR"), the entity which was responsible for the Surveillance Program.

185. With the knowledge and approval of the CTIA and TIA, Carlo, through WTR, appointed two Committees to oversee research, the Scientific Advisory Group (SAG) and the Peer Review Board (PRB).

186. CTIA and TIA, intentionally and/or negligently, concealed evidence and research of the SAG and PRB which demonstrated that (1) WHHPs were hazardous to the health of consumers, and (2) that more research was necessary to assure the public that WHHPs were safe for use.

47

187. CTIA and TIA, intentionally and/or negligently intimidated Carlo and researchers and consultants hired by Carlo and WTR and the SAG.

188. CTIA and TIA, intentionally and/or negligently, threatened Carlo and researchers and consultants hired by Carlo and WTR and SAG.

189. CTIA and TIA, intentionally and/or negligently, cut and reduced funding of WTR to prevent the research necessary to assure the public that WHHPs were safe for use.

190. On June 26, 1993, a Motorola executive stated, with the acknowledgment and support of CTIA and TIA, that "thousands of studies" had already shown cellular phones were safe.

191. In the fall of 1993, the cell phone industry appointed a committee to write and develop a consumers manual. The draft manual included wording which indicated and warned consumers: (1) that radio frequency emissions may exceed ANSI safety standards; (2) to limit the duration of phone calls; and (3) to maintain a distance of four inches from the antenna. The CTIA and the TIA, intentionally and/or negligently, changed the wording of the warning/label to omit language that would have advised and warned the public of the hazards of RFR.

192. CTIA and TIA were aware in the fall of 1994 that Henry Lai and N.P. Singh, notable and respected scientists at the University of Washington in Seattle, had conducted research that demonstrated single and double strand DNA breaks from radio frequency exposure.

193. In a December, 1994 memorandum from Norm Sandler to Michael Kehs, and account executive of Burson-Marsteller, a public relations firm hired by MOTOROLA, Sandler attempted to discredit the work of Lai and Singh while acknowledging that the research "raises some interesting questions about possible biological effects." The memo also stated that,

48

"without additional work in this field, there is absolutely no basis to determine whether the researchers found what they report finding - or that the results have anything at all to do with DNA damage or health risks, especially at the frequencies and power levels of wireless communications devices." The memo further stated "I think we have sufficiently war-gamed the Lai-Singh issue, assuming SAG and CTIA have done their homework. We may want to run this by George Carlo and fill him in on the contacts we've made."

194. In March 1994, Dr. Leif Salford, a respected researcher and physician from Stockholm, Sweden, advised the CTIA of his research which found a significant leakage or breakdown in the blood brain barrier in rats exposed to radio frequency radiation at 915 megahertz at specific absorption rates within the range of cellular telephones.

195. CTIA and TIA, upon direct notification by Dr. Leif Salford of his findings (1) failed to warn the public of the findings; (2) failed to fund further research of blood brain barrier effects; and (3) failed to attempt to replicate such research.

196. CTIA and TIA were aware of research conducted by MOTOROLA at the Veterans Administration in Loma Linda, California by Dr. Ross Adey. The research showed that biological effects were being induced by exposing rats, headfirst, to radio waves generated by a digital cellular telephone. CTIA and TIA, intentionally and/or negligently, (1) failed to warn the public of the findings; (2) failed to fund further research at Loma Linda by Dr. Adey; and (3) failed to attempt to replicate such research.

197. In May 1997, Dr. Michael Repacholi from the Royal Adelaide Hospital in South Australia published the findings of his work in Radiation Research, an authoritative scientific journal, that showed a higher incidence of lymphoma in mice exposed to radiation than in mice

49

that were not exposed. CTIA and TIA, intentionally and/or negligently, (1) failed to warn the public of the findings; (2) failed to fund further research by Dr. Repacholi; and (3) failed to attempt to replicate such research.

198. CTIA and TIA were made aware of several significant epidemiological studies, namely: (1) 1994 Canadian study of electric utility workers who had a statistically significant increase in lung cancer who had jobs in close proximity to mobile communications equipment; (2) a 1996 Air Force personnel studies of more than 800,000 workers exposed to radio frequency radiation that showed a statistical significance in brain tumors; and (3) a Polish military study of workers exposed to radio waves that showed a statistically significant increase in brain and blood cancers.

199. In December, 1998, CTIA and TIA were aware of the research conducted by Doctors Ray Tice and Graham Hook of the Integrated Laboratory Systems in Research Triangle Park, North Carolina. The project was coordinated under a contract with WTR. The research exposed human blood cells to radio frequency radiation in the cellular frequency band and showed a 300 percent increase in the incidence of genetic damage through the formulation of micronuclei. CTIA and TIA, intentionally and negligently, (1) failed to warn the public of such findings; (2) failed to fund further research by Tice and Hook to validate their work; and (3) failed to replicate such research.

200. Defendants owed Plaintiffs a duty of care to research, inquire into and study the potential harmful effects of exposure to radio frequency radiation from WHHPs.

201. Defendants knew or should have known of the hazards associated with radio frequency radiation emissions from WHHPs.

50

202. At all times relevant, Trade Association Defendants knew or should have known that Plaintiff would suffer foreseeable injury as a result of Trade Association Defendant's failure to exercise reasonable care.

202. Trade Association Defendants breached their duties of care to Plaintiff.

204. At all times relevant, Plaintiffs acted with due care and without negligently contributing to any of Plaintiff's injuries.

205. As a direct and proximate result of Defendants' negligence, NEWMAN has suffered permanent and total disability, has a terminal illness, has undergone multiple surgeries, undergone radiation and chemotherapy, bacterial meningitis and other complications. Furthermore, NEWMAN sustained economic loss, emotional and psychological stress, including loss of earnings and diminution or loss of earning capacity, in an amount to be determined and requires reasonable and necessary health care, attention and services and has incurred and will incur medical, health, incidental and related expenses, and/or has been otherwise injured.

206. At all times relevant hereto, the Defendants actually knew of the defective nature of their product as herein set forth and continued to design, manufacture, market and sell their products so as to maximize sales and profits at the expense of public health and safety. Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to NEWMAN. NEWMAN, therefore, is entitled to punitive damages.

WHEREFORE, Plaintiffs demand judgment as follows: compensatory damages in the amount of Twenty-Five Million Dollars ($25,000,000.00); punitive damages in the amount of Fifty Million Dollars ($50,000,000.00); and such other and further relief as the Court may deem

51